1                 IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

UNITED STATES OF AMERICA,     )  Docket No. 20 CR 650-1
4                       )
             Government,   )
5                       )
      vs.              )
6                       )  Chicago, Illinois
   VINCENT STORME (1),      )  August 3, 2023
7                       )  1:00 o'clock p.m.
             Defendant.   )
8

9              TRANSCRIPT OF PROCEEDINGS - Motion
          BEFORE THE HONORABLE JOHN ROBERT BLAKEY
10

11   APPEARANCES:
     For the Government:      UNITED STATES ATTORNEY'S OFFICE
12                     BY:  MS. ASHLEY A. CHUNG
                         MR. BRIAN WILLIAMSON
13                  219 South Dearborn Street
                  Suite 500
14                  Chicago, Illinois  60604

15   For the Defendant:       BLAINE & VANZANT LLP
                     BY:  MR. ANDREW D. FINKE
16                  922 Davis Street
                  Evanston, Illinois  60201
17

18

19

20

21             Laura LaCien, CSR, RMR, CRR
               Official Court Reporter
22           219 South Dearborn Street
                   Room 1212
23             Chicago, Illinois  60604
                 (312) 408-5032
24

25

1    (The following proceedings were had in open court:)

2    COURTROOM DEPUTY:  20 CR 650-1, USA versus Vincent

3    Storme.

4    THE COURT:  Good afternoon.  Appearance on behalf

5    of the government?

6    MS. CHUNG:  Good afternoon, your Honor.  Ashley

7    Chung and Brian Williamson on behalf of the United States.

8    MR. FINKE:  Good afternoon --

9    THE COURT:  Defense counsel?

10   MR. FINKE:  Good afternoon, your Honor.  Andrew

11   Finke on behalf of defendant Vincent Storme who is present.

12   THE COURT:  Defendant is present on bond.  Sir, you

13   have to come up at the podium.  Okay?

14   Did you see the most recent filing?  There's --

15   obviously, it was pretty long.

16   MS. CHUNG:  We did, your Honor.  On a quick review,

17   we believe that those were the same motions that defense

18   counsel had previously filed that were just being refiled as

19   separate entries on the docket --

20   THE COURT:  Okay.

21   MS. CHUNG:  -- but we presumed that that because

22   your Honor's minute entries granting the various instanter

23   motions for leave to file an overlong brief, et cetera,

24   specified that they should be filed separately.

25   THE COURT:  Okay.  And the additional authority, is

1    there anything different in them?  I didn't do, you know, a

2    red line exchange side to side, do you know what I mean?

3              MR. FINKE:  I don't think I refiled the additional

4    authority.  I think --

5              THE COURT:  Well, there's -- the reply was long,

6    too.

7              MR. FINKE:  The reply, yeah.

8              THE COURT:  Okay.  Is anything new or different in

9    the reply?

10             MR. FINKE:  Not that I'm aware of.  I just printed

11   out the PDF and uploaded it again, so.

12             THE COURT:  Okay.  All right.  Okay.  Well, it's

13   your motion, counsel.  There's actually several parts to the

14   motion.  Feel free to argue.  Both sides ready to argue?

15             MS. CHUNG:  Yes, your Honor.

16             THE COURT:  Okay.  Go ahead, on behalf of defense.

17             MR. FINKE:  So we feel that our brief is fairly

18   extensive and covers most of the issues.  So unless there is

19   anything specific in the -- on at least the first counts --

20   or the first motion, the motion to dismiss on vagueness --

21   overbreadth, vagueness, and as-applied, we'd like to rest

22   primarily on the briefs unless there's anything the Court

23   specifically would like us to address at argument.

24             THE COURT:  All right.  It's your motion.  If you

25   want to argue it, you can.  If you want to rest on the

1   pleadings, you can do that as well.  It's up to you how you

2   want to handle your case.

3               MR. FINKE:  Thank you, your Honor.

4               Just regarding that, the as-applied aspect, there

5   are just some things we do want to point out because in our

6   reply, we did largely just rely on the issues as they were

7   presented in the original brief.

8               One of the things that we think that we feel is

9   really central to this argument is although, as the

10  government argues, it is pre -- they believe that it's

11  premature simply because there are certain, you know, issues

12  of fact that they believe should require this to go to trial,

13  we feel that to the extent that there are any of those issues

14  of facts, it requires or it highlights the need for a bill of

15  particulars here particularly with their theories of why the

16  communications or the conduct that the defendant is alleged

17  of, why those satisfy First Amendment scrutiny here.

18              Here they say that there is a number or that all of

19  defendant's conduct is -- falls into some well-established

20  category of unprotected conduct here.  But for each of those

21  counts, those are very, very different conduct.  For Counts

22  One, they say that it's primarily extortion or some kind of

23  false impersonation.  It's not clear whether the false

24  impersonation is this allegation that he logged on to her

25  Facebook account and essentially defaced the About Me section

1   or if it's that he doctored some kind of messages between

2   himself and Individual B, who is the subject of Count One,

3   and sent those to investigators.  Those are two very

4   different, you know, allegations and it's not even clear

5   whether they're sticking with either of them here.  They're

6   just kind of throwing out these potential examples of what

7   might be considered unprotected conduct.  Even -- even

8   though, you know, we would contest that, it's difficult for

9   us to do that here because we're essentially shadowboxing

10  with whatever facts the government claims it's going to try

11  to allege at trial.

12          The extortion, if true, that is a dispute of fact.

13  That would render that count likely premature as an

14  as-applied challenge at this point but there is no allegation

15  of extortion for Count Two unless it's an extortion to meet

16  with him for 30 minutes based on the facts that they've

17  alleged here and there's absolutely no allegation of

18  extortion for Counts Three and Four.

19          The allegations in Three and Four are that the

20  unprotected speech is something along the lines of either

21  obscenity or just defamation.  And in those cases -- and,

22  first of all, they don't apply the Miller test or any other

23  tests regarding obscenity here so we feel that the government

24  hasn't -- has failed to meet that burden on Counts Three and

25  Four.  And beyond that, the only other allegation that they

1    make are just a general claim that true threats are
2    unprotected speech.  But there's no allegation at least in
3    any of the facts that the government has alleged or in the
4    face of the indictment certainly of any kind of true threats
5    being made or any threats of physical violence and there's
6    none in the discovery either.  So there's -- as far as -- you
7    know, again, that gets into more of the bill of particulars
8    argument we just don't know what they're trying to say, the
9    speech that is pro -- that is unprotected here under the
10   First Amendment and it changes from each -- each of the
11   counts.

12           So we would say, you know, our argument there is
13   essentially that while there may -- the government is
14   creating or alleging that these disputes of fact defeat any
15   kind of as-applied challenge, it's only because the
16   government refuses to put any kind of specifics regarding
17   what facts it's actually alleging for each of these counts.

18           Regarding the overbreadth argument, honestly I
19   think the government's waived a lot of their argument in this
20   case.  Most of their overbreadth analysis is -- isn't an
21   overbreadth analysis.  They're saying that because the
22   statute can be read narrowly to only apply to unprotected
23   speech, there's no overbreadth problem but they refuse to do
24   that.  They say that there shouldn't be a limiting
25   instruction like in every one of the cases, like in *Ackell*,

1    *Petrovic, Gonzalez*, any of the cases that they cite in their

2    brief all -- in those circuits, the -- both the Third, the

3    Eighth, First have all limited the statute so that it can

4    pass -- pass an overbreadth challenge to true threats and

5    other prescribable conduct.

6            They say that the plain language of the statute

7    does that here but they're not willing to offer any kind of

8    narrow construction of the statute because if they did, there

9    aren't any true threats alleged and so the statute -- they

10   wouldn't be able to prove what they need to under the statute

11   in order to sustain a conviction here.

12           Their vagueness argument again relies on is -- is a

13   kind of retest of argument but it -- it kind of misses the

14   point that the argument isn't the same.  The harm there isn't

15   that there's -- it sweeps in all this under, you know,

16   unprohibited conduct into the ambit of the statute.  It's

17   that the average person may not understand whether or not

18   their conduct is actually illegal and our argument is

19   essentially that because it relies purely on the subjective

20   intent or the subjective experience of whoever is being

21   alleged to be harassed, it's difficult for anyone to really

22   know whether or not the statute actually covers the conduct

23   that they're alleging here.

24           So that's argument for -- broadly for the motion to

25   dismiss.  And unless the Court -- I mean, I think it probably

1    makes more sense to treat each of these separately.

2            THE COURT:  Yeah.  Let's hear from the government

3    on the motion to dismiss.

4            MR. WILLIAMSON:  Yes, your Honor.  Thank you.

5            I think defendant's argument is as to the

6    as-applied challenge so precisely why this is premature.

7    There's no need for a bill of particulars because the

8    government isn't obligated to telegraph its theory of the

9    case at this stage.  We are before the entry of facts before

10   your Honor.

11           THE COURT:  We're doing the -- we're doing the

12   motion to dismiss; not the bill of particulars right now.

13           MR. WILLIAMSON:  Oh, I know.  It's -- defendant's

14   argument kind of crossed the line between as-applied -- the

15   as-applied challenge and the bill of particulars so I'll jump

16   ahead.

17           Based on what we do know in addition to the

18   as-applied challenge being premature based on the record as

19   it stands now, the conduct that defendant is charged with was

20   mixed conduct.  It was speech.  It was nonspeech.  But again,

21   we don't have the benefit of all those facts at the moment

22   rendering an as-applied challenge premature but even if we

23   did --

24           THE COURT:  Well, don't you know what the facts are

25   because you're going to prove them beyond a reasonable doubt

1  according to you?

2         MR. WILLIAMSON:  Sure.  We do, your Honor, but --

3         THE COURT:  All right.  Let's start dealing with

4  the facts that you believe are going to happen and proffer --

5  explain to me why we don't have an as-applied challenge.

6         I mean, he's saying he doesn't even know what the

7  threats are so can you answer that?  Are there threats?

8         MR. WILLIAMSON:  Your Honor, there -- we do believe

9  there are threats at this time but we also believe that there

10  is conduct other than threats that --

11         THE COURT:  All right.  So it's not limited --

12  according to you, it's not limited to threats.  Where in the

13  discovery have you noticed up threats?

14         MS. CHUNG:  Your Honor, if I may, because I have

15  Exhibit A which was filed under seal readily available here,

16  as your Honor saw, the government provided indices specifying

17  all of the discovery that was provided with Bates and FBI

18  serial numbers for reference to the extent there were

19  follow-up questions.

20         Here, these included communications as well as

21  screenshots of the various accounts that defendant either

22  doctored or accessed and altered with respect to various

23  victims, screenshots of the websites, interview reports with

24  respect to friends and family of the victims and the victims

25  themselves who were contacted by defendant.

1    Throughout these -- I think in terms of, you know,

2   responding to the question about where are the true threats,

3   I think here the government's focus has been on the course of

4   conduct more broadly.  There is no requirement that there

5   necessarily be true threats in order for the -- for defendant

6   to violate the cyberstalking statute.

7    In here, I think the government's position is that

8   we have a course of conduct with respect to each of the

9   victims, Individuals A through C, that shows that defendant

10  was engaging in various online communications as well as

11  actions and conduct specifically intended to harass and

12  intimidate those victims and caused them or family members

13  emotional distress.

14    And so it's not a matter I think defendant -- it's

15  a bit of a red herring claiming, well, where are the true

16  threats, where are the specific communications.  Here, the

17  question is --

18    THE COURT:  Well, it's not a question of red

19  herring or not.  It's just a question of -- sometimes these

20  cases present as threat cases.  Sometimes they don't.  I want

21  to know what it is and you guys know what the evidence is.

22  You --

23    MS. CHUNG:  Yes.

24    THE COURT:  -- found enough to present to the grand

25  jury and you're going to try to prove whatever you can beyond

```
1   a reasonable doubt.  So are you saying this is a case that
2   does not involve threats?
3               MS. CHUNG:  That's correct, your Honor.
4               THE COURT:  Okay.
5               MS. CHUNG:  Not true threats in the sense of true
6   threats as defined --
7               THE COURT:  All right.
8               MS. CHUNG:  -- in the First Amendment --
9               THE COURT:  Okay.
10              MS. CHUNG:  -- rather, for example, threats to --
11              THE COURT:  Hang on a second.  Hang on a second.
12              MS. CHUNG:  My apologies.
13              THE COURT:  Hang on a second.  That's a direct
14  answer to my question which is what I was looking for because
15  it changes the analysis, right, because we're doing
16  as-applied challenge.  We need to know as-applied to what,
17  whatever this case is; and you guys know better than anyone
18  because you're the one who investigated it.
19              Okay.  Thank you for that answer.
20              All right.  I interrupted you.  So go ahead and
21  respond.
22              MR. WILLIAMSON:  Yes, your Honor.  So there are
23  other types of speech at large here and there are also other
24  types of conduct at large here.  I think you'll see from both
25  the complaint and our summary of the facts on hand now in the
```

1    primer to our response motion that there is physical stalking

2    involved here.  That's another form of conduct that would be

3    covered by the statute "in the course of conduct, more than

4    one act."

5            And as the Court has previously ruled on

6    defendant's motion to dismiss and motion to reconsideration,

7    there's also defamation potentially involved here.  It's not

8    just threats.

9            THE COURT:  Well, potentially or do you think based

10   on your knowledge of the evidence that that's going to be

11   proven at trial, defamation?

12           MS. CHUNG:  Yes, your Honor -- I -- yes, your

13   Honor.  And -- and I apologize that we're tag-teaming here.

14           THE COURT:  No.  You go ahead and do that.

15           MS. CHUNG:  We were doing this response together.

16           THE COURT:  That's fine, that's fine.

17           MS. CHUNG:  But yes, we think that here there is

18   specific conduct that defendant engaged in, for example,

19   filing the false report, accusing Individual B of

20   prostitution to her college, the various defamatory

21   statements that he made about the different victims on fake

22   social media accounts, on their own social media accounts

23   that he got access to, things like that, that were intended

24   essentially to say false things about them tarnished their

25   reputation at work, at school, and among friends and family.

1           THE COURT:  Okay.  All right.  Go ahead, counsel.

2    Go ahead.  I interrupted you again.

3           MR. WILLIAMSON:  No, no.  Thank you, your Honor.

4           And we would add to that list, you know, speech

5    integral to criminal conduct is another category of

6    traditionally unprotected speech.  Here, we have speech that

7    could potentially be used to perpetuate an extortion scheme

8    based on that *Petrovic* --

9           THE COURT:  All right.  Hang on a second.  I

10   don't -- you keep saying "potential," right, and this is an

11   as-applied challenge so I need to know what you think the

12   evidence is going to be.  So if -- if something is a

13   potential -- theoretical potential but it's not about this

14   case, then that's not helpful.  So when you say "potential

15   extortion scheme," do you in fact expect the evidence to show

16   an extortion scheme?  I mean, that's what I'm concerned about

17   because hypothetically it could be a lot of things and that's

18   not what -- that's not the analysis.

19          The analysis is an as-applied challenge what you

20   think the facts are going to be here and whether or not

21   that's something that needs to be addressed pretrial by

22   the -- a dismissal or we have to wait to see for the actual

23   proofs.  I mean, there's sometimes a -- there's a, you know,

24   Rule 29 motion.  But you know what the case is and you know

25   what the evidence is so let's deal with proffers rather than

1    potentialities of what you think the evidence actually is in
2    this case.  Go ahead.
3              The extortion, is there going to be extortion in
4    the case?
5              MR. WILLIAMSON:  Your Honor, so that was my
6    misstatement.  You know, we're going to focus back on the
7    statutory language and what the conduct falls under there.
8    We do think that there were attempts at harassment,
9    intimidation that may fall under these other classes of
10   speech but the proofs won't be for an extortion scheme.  The
11   proofs will be for intentional --
12             THE COURT:  Okay.
13             MR. WILLIAMSON:  -- conduct, that harassed or
14   intimidated, so I just wanted to clarify that.
15             THE COURT:  Okay.  Great.  Thank you.  Keep going.
16             Anything else in response on the First Amendment
17   stuff?
18             MR. WILLIAMSON:  Sure.  I'll move on to the
19   overbreadth and vagueness challenges.  So both on overbreadth
20   and vagueness -- and no Court of Appeals to have addressed
21   the issues here, challenges to 226(a)(1) (sic) -- or 226(a)
22   (sic) have held the statute unconstitutional on the First
23   Amendment grounds on either overbreadth or vagueness.  The
24   defendant misstates the standard that needs to be applied on
25   an overbreadth challenge.  And what the courts should be

1   looking at is not only whether the statute criminalizes a

2   substantial amount of protected expressive activity but

3   whether that is relative to the statute's plainly legitimate

4   sweep.  So, in other words, a balancing test needs to be

5   conducted between the statute's covered protected speech and

6   unprotected speech.

7           We would argue the defendant just has not shown

8   that the statute covers more protected speech than the wide

9   range of unprotected speech including conduct on the plain

10  face of the language of the statute and those traditional

11  categories of the unprotected speech in comparison to the

12  protected speech that it may touch.

13          I want to briefly talk on -- speak to the recent

14  Supreme Court holding in *Counterman versus Colorado* which

15  defendant briefed but we didn't have a chance to respond to.

16          THE COURT:  Yeah.  I mean, he did have a motion for

17  leave to cite additional authority.  If you believe you need

18  a written response to that, I'll give it to you or you can

19  argue it orally.  It's up to you.

20          MR. WILLIAMSON:  No.  Thank you, your Honor.  We

21  actually conferred on the path ahead and we were comfortable

22  answering it orally today rather than in a filing.

23          THE COURT:  Okay.

24          MR. WILLIAMSON:  So there -- you know, our argument

25  would be that it just -- it doesn't apply to this statute

1    because here specific intent is step one of the statute.

2    *Counterman* addressed, you know, the statute and -- the

3    Colorado statute involving *Counterman* was making it unlawful

4    to repeatedly make any form of communication with any other

5    person in a manner that would cause a reasonable person to

6    suffer serious emotional distress.  So there was no intent

7    element to the Colorado statute and that's what the Supreme

8    Court went out and looked for.  And the answer they found was

9    that there needs to be some sort of intent and that level of

10   intent should be recklessness.

11         Now when you compare that to what's happening in

12   2261(a), there's already a specific intent.  It is intent to

13   kill, injure, harass, intimidate, or place under

14   surveillance.  That subsumes recklessness in every instance

15   so there's not going to be an instance when recklessness is

16   not met, when specific intent is met for the purposes of this

17   statute so we just don't think *Counterman* moves the needle on

18   this analysis.

19         And then as to vagueness, your Honor, again no

20   Appellate Court to have ever addressed the issue, has

21   overruled the statute based on vagueness and that's again

22   because of this two-step nature of 2261(a).  You have the

23   intent element and then you also have the response element,

24   the effect on the listener element.  And that's what

25   defendant challenges here, that this language that --

1    anything that would be reasonably expected to cause

2    substantial emotional distress is just too vague and too

3    hypothetical to constitute a validly construed criminal

4    statute.  Again, no court has ever held that.  They -- the

5    circuit courts to have addressed the issue talk about how,

6    when you combine that with the specific intent requirement of

7    the statute, it leaves very little doubt as to what is

8    criminal conduct and what is not.

9           And I would just briefly like to hit on defendant's

10   hypotheticals that he puts in his motion.  For example, he

11   cites that "a dogged journalist seeking to comment by email

12   from a public official who is likely to be embarrassed and

13   distressed by a report on his sexual activities may

14   constitute a violation of this statute."  No one -- it's just

15   not -- this is a hypothetical that does not meet the

16   statutory requirements.  This would be a journalist doing his

17   job, there would be no intent to harass or intimidate, and

18   there would be no kind of corresponding effect on the

19   listener.

20          The other example that they gave were "a

21   politician's disaffected constituents who barrage their

22   representative's website with disapproving and insulting

23   comments."  But again here, that's not -- that wouldn't be

24   reasonably expected to cause substantial emotional distress

25   even if it did meet the intent element because a politician

1    is not reading their website.  No one would expect a

2    politician to be taking each of these comments personally and

3    having a substantial emotional distress on the back end of

4    it.

5         So even though some of this conduct involves what

6    was happening on the internet, this false premise that a few

7    Tweets sent in the wrong direction is going to be prosecuted

8    by the federal government just doesn't hold water.

9         THE COURT:  Anything else on the First Amendment?

10        MR. WILLIAMSON:  No, your Honor.

11        THE COURT:  Counsel, do you want to address

12   *Counterman versus Colorado* and the effect of Judge Lee's

13   rulings in the case?

14        MR. FINKE:  Yes, your Honor.  Starting with

15   *Counterman* --

16        THE COURT:  Yeah; it's you.

17        MR. FINKE:  Sorry, sorry.  Starting with

18   *Counterman*, I mean, I think it's completely on point.  I

19   think the fact -- the idea that -- I mean, even looking at

20   the last example that counsel was discussing whether or not

21   that it wouldn't be -- these comments wouldn't be -- fall

22   under the ambit of the statute because they were not

23   reasonable -- the average person would not find that they're

24   reasonably expected to cause emotional distress, the whole

25   point of *Counterman* is that isn't the standard.  There isn't

1    an objective standard to determine intent here.

2           The example the government just gave was that under

3    an objective standard, these comments would not be considered

4    reasonably calculated to cause that emotional distress.  The

5    whole point is there has to be some evidence that they

6    disregarded that standard.

7           Therefore, I -- our position is that under the

8    plain reading of the statute just without any narrow

9    construction, which the Seventh Circuit has not given, it's

10   not clear that the statute itself is constitutional anymore

11   under -- under *Counterman* simply because to the extent that

12   the actus reus of the statute regarding the effect of the

13   hearing on the listener, whether -- it doesn't require that

14   it actually caused the substantial emotional distress.  It

15   causes that it might be reasonably expected to cause it.

16          And *Yung* -- the *Yung* court talked about this

17   very -- in great depth that that language, you can't ignore

18   that that language is going to naturally be read by a jury

19   nor by anyone considering the statute in an overbreadth

20   context to modify and provide some kind of context for the

21   very broad and vague language for intent that is

22   intentionally for the purposes of -- well, in this case, it's

23   intimidating and harassing an individual.

24          They mention surveilling under the statute.  Just

25   going back to the as-applied challenge very quickly, they

1    mention physical stalking and -- because this also ties in

2    the overbreadth of the scope of the statute, this idea that

3    physical stalking is in some ways -- it's not clear whether

4    or not what they're talking about is surveilling, physical

5    stalking that is being around just to surveil someone which

6    would necessarily -- could fall under the ambit of the

7    statute or if it's with the intent to harass or criminally

8    harass or criminally intimidate another person.

9            The way -- going back to the as-applied challenge,

10   the superseding indictment doesn't charge him with the intent

11   to surveil anyone here, which is an option under the statute,

12   and so it's not clear where there -- this is again maybe -- I

13   don't want to get too much into the bill of particulars but

14   it's not clear whether or not this physical stalking is

15   general physical stalking which, as far as we understand, is

16   just alleging defendant's presence at some point in time in

17   the vicinity of several of these victims never mind that he

18   lived within several blocks of Victims A and Victims B, but

19   it's -- that might be surveillance.  That is not enough to

20   allege any kind of intent to harass or to intimidate anyone

21   without -- without more specifics, especially considering

22   that there's this entire other section of the statute that

23   involves transport across state lines to actually do that in

24   person.

25           And so I think that to say that the scope of the

1    statute includes all of these physical characteristics and

2    that's somehow, you know, by making the plainly legitimate

3    sweep so broad that it outweighs any potential concerns of

4    sweeping and protected activity under the First Amendment, it

5    doesn't even -- I haven't seen that in any of the case law

6    that argument holding water because necessarily, just

7    logically if you're thinking about the sweep of a statute, if

8    it is nearly infinite in its scope, it's going to carry a lot

9    of conduct -- speech conduct that is protected by the First

10   Amendment without narrowly construing it.  The government has

11   offered no narrow construction in this case.  They can't.

12   They say true threats because that's where a lot of these --

13   the case law comes from.  There's no evidence of that.

14           For the other examples, they don't apply to all

15   three counts and so each one of those counts is really going

16   to turn on those facts and they just haven't provided it in

17   any part of their argument here, especially in the

18   as-applied.  But also in describing why this narrow -- a

19   narrow construction of the overbreadth challenge could

20   possibly save the statute here because they just refuse to

21   address it.  They just simply say that because the statute is

22   so broad, it outweighs the value of protecting any of the

23   protected speech that might be swept into it.

24           THE COURT:  Do you want to address the effect of

25   Judge Lee's rulings?  How is that not law of the case?

1    MR. FINKE:  We believe that Judge Lee's ruling

2  simply didn't address this.  He construed it as an as-applied

3  challenge and -- but -- I'm sorry.  He construed it as a

4  facial challenge based on -- and where the issue was under

5  *Reed* where we're alleging that this statute itself

6  specifically targets speech and we're not making that

7  argument here.  That isn't the nature of an overbreadth

8  challenge.

9    THE COURT:  Well, my question is the effect of his

10  ruling.  You can obviously disagree with his ruling but why

11  is it not law of the case?  Why -- what's different or

12  changed that we would have to relitigate something that was

13  decided and is there something different?  Is it just the

14  effect of *Counterman* or is it -- which obviously post-dates

15  Judge Lee's rulings?  Do you understand the question?

16    MR. FINKE:  I think I understand the question in

17  the sense that --

18    THE COURT:  Is it just the second bite of that same

19  apple because you didn't like what Lee said?  I mean --

20    MR. FINKE:  No, no, not at all.  There's a separate

21  superseding indictment and so we're moving to dismiss --

22    THE COURT:  Yes, but -- hang on, hang on, hang on.

23  And this is applies to everybody.  I have to interrupt

24  sometimes --

25    MR. FINKE:  I'm sorry.

1           THE COURT:  You can't talk at the same time and it

2    applies to all the attorneys so I have to interrupt.  It's

3    part of my job -- it's not a pleasant part of my job -- but I

4    have to.  So if I start talking, please stop.  Otherwise, my

5    court reporter gets mad at me and I don't want to get in

6    trouble.

7           So even if the superseding indictment comes down,

8    that doesn't create a blank slate in terms of legal decisions

9    in the case.  If the indictment is -- if there's a

10   fundamental change and the legal landscape has changed, then

11   certainly you could present an argument that wasn't

12   previously made but is that what's happening here or is it

13   the -- or is the superseding indictment not fundamentally

14   different in the sense that the legal issues have changed?

15   What basis do have I to basically revisit Judge Lee's

16   rulings?  That's what I'm trying to get a -- drill down on.

17   Go ahead.

18           MR. FINKE:  I think the answer is two-fold.  For

19   one, yes, *Counterman* absolutely does change the legal

20   landscape.  More importantly, *Yung* does as well.  *Yung* is the

21   most on-point analysis of an overbreadth challenge in

22   this -- from any circuit and it's the first one that we're

23   aware of aside from *Ackell* which does it very briefly and

24   wasn't really raised properly and presented on appeal, that

25   issue of the overbreadth, the breadth of the statute under

1    the 2013 revisions.  So those two issues themselves I think

2    bear -- are developments in the law that bear review here and

3    the government has failed to address either of them, your

4    Honor.

5            THE COURT:  Okay.  Anything further from either

6    side on the First Amendment issues?

7            MR. WILLIAMSON:  Your Honor, I would -- just

8    briefly to your point about Judge Lee's ruling, I mean, we

9    would argue that, you know, defendant is now seeking a

10   veritable third bite at the apple because there was the --

11   Judge Lee's ruling on the motion to dismiss.  There was the

12   ruling on the motion to reconsider.

13           The ruling on the motion to reconsider actually

14   addressed both as-applied and facial challenges.  We would

15   say *Counterman* doesn't change any of that analysis.  That,

16   kind of, bridging logical function between as-applied and

17   facial, Judge Lee addresses that.  You know, the *Reed* case,

18   the step zero of *Reed* saying we're not even getting to that

19   point of a constitutional analysis because this is a statute

20   that doesn't address conduct -- or it doesn't address speech.

21   I think that's what Judge Lee was angling at at the -- his

22   denial of the motion to reconsider.

23           So we would say, you know, this was been addressed

24   not once but twice already on the exact same arguments and

25   that *Counterman* does not need -- require a rereview of that

1    for the reasons I stated prior.

2              THE COURT:  Okay.  Do you want to argue anything on

3    the severance issue or do you want to rest on the papers on

4    that?  What's your thought?

5              MR. FINKE:  The papers are, we think, very

6    adequate.  There are a number of minor points that -- there

7    was actually one minor point that wasn't raised in the

8    briefing but we think is really -- very important for

9    severance here.

10             Just -- so one thing that wasn't addressed

11   extensively in the brief is that another example of just how

12   disparate and different these -- sorry, that there just isn't

13   going to be any efficiency gained from a trial by -- of all

14   four of these counts because that -- it would invite further

15   questioning of each of these individual witnesses to the

16   extent that they've communicated with one another before this

17   trial.

18             There is evidence in the discovery of Individuals B

19   and C communicating extensively about, and we would argue in

20   line with their stories, in -- before their decision to bring

21   these allegations against defendant.  That doesn't have to

22   come into defendant's cross examination at all.  They're

23   tried separately because, I mean -- unless there is any

24   actual evidence of bias or anything like that.  But to the

25   extent that their stories are massaged to somehow kind of

1   create -- to paint a contiguous picture, that becomes an

2   issue at trial and that's something that we have to address

3   and it's just going to make it even more inefficient in the

4   case here.  Beyond that, we think that it's -- we made a very

5   thorough analysis.

6           Just to rehash, I think there's an important

7   distinction to be made here between not only just the

8   prejudicial nature of all of the information regarding each

9   of these individual relationships that might come in.  It's

10  not just going to be prejudicial to the extent that they're

11  not related to one another but they're also -- to the extent

12  that they're just simply cumulative.  And one of his -- the

13  defendant's chief defenses is going to be attacking the

14  credibility from some of these much older counts in Count One

15  and Count Two because there simply isn't a record or even a

16  thorough record of a lot of the communications between them

17  and defense is probably going to have to testify.  And the

18  credibility which in some cases of these witnesses is very

19  much open to attack to the extent that they lied to officials

20  regarding the core facts of this case, there's -- there is a

21  distinct possibility that the testimony of Individual A in --

22  for Counts Three and Four is going to -- you know, they might

23  disregard these credibility issues for other people simply

24  because they find that they hurt -- that Individual A's

25  testimony regarding substantial emotional distress was so

1    convincing.

2          The cumulative effect of all of these unrelated

3    incidents is -- has a real potential for, you know, prejudice

4    here.  The probative value given that, you know, every

5    unhappy relationship is unhappy in its own way, we feel that

6    the probative value here, there's very little to be gained

7    from considering all of these together.  These are all unique

8    situations only in the most broad sense which the government

9    offers is -- are they similar in that they all occurred in

10   the aftermath of a relationship breaking down.  That offer

11   from the government is exactly the problem here.  They're

12   offering it for the propensity that he has a tendency to take

13   illegal action in response to when he feels wronged by a

14   paramour.  That's the only similarity across these as far as

15   we can tell.  The specifics that they offer aren't specifics

16   at all; and on closer look as briefed in the briefs, they

17   fall apart.

18          THE COURT:  And your understanding is that it's

19   properly joined is the question of severance, not joinder,

20   correct?

21          MR. FINKE:  Properly joined under Rule 8(a).

22   Fortunately, yes, simply because the case law there is very

23   clear --

24          THE COURT:  Okay.

25          MR. FINKE:  -- but if there ever was a case simply

1    because -- I mean, this is one of those cases where because

2    the course of conduct can encompass so many different things

3    and can be so broad, you wonder whether you should give very

4    much weight to the fact that they're all charged in the same

5    statute.   And even because they are charged in the same

6    statute, that even -- that makes the likelihood of potential

7    prejudice even higher as, you know, *Archer* and those line of

8    cases best have acknowledged.

9              THE COURT:   Government want to respond on the

10   severance issue?

11             MS. CHUNG:   Yes, your Honor, briefly because we did

12   respond extensively in our response.   But I think here, you

13   know, it's plainly within the Court's discretion to decide

14   whether these counts should be severed or not.   In the

15   government's view applying the standards that have been set

16   out in the case law, namely that severance should only be

17   considered where there's a serious risk that a joint trial

18   would compromise a specific trial right or prevent the jury

19   from making a reliable judgment about guilt or innocence and

20   where it's clear that the tailoring of any relief is left to

21   the discretion of this Court and that oftentimes less drastic

22   measures such as limiting instructions will suffice.   Here I

23   think, you know, the parade of horribles that defense counsel

24   has put forward about the cumulative impact of the evidence

25   with respect to each victim and how it could potentially lead

1    a jury astray, all of that could be addressed and cured with

2    the standard limiting instructions that are provided by these

3    courts about the defendant being presumed innocent until

4    proven guilty, about the testimony of each witness being

5    considered on its own and each witness's credibility being

6    assessed one by one, about only considering the evidence as

7    to each count for specific purposes, and also about

8    considering each count separately and not allowing the jury's

9    determination on one count to unduly influence its decision

10   as to other counts.

11           Here, those limiting instructions would cure any

12   risk of prejudice that would arise.  And in terms of the

13   defendant's need to testify or not, although his reply

14   provides some additional color about what that potential

15   testimony could entail, I think what it actually highlights

16   is that this is plainly distinct from the cases that

17   defendant relied on in pushing for the severance of counts

18   where he may testify and counts where he may not testify.

19   And that's the *United States versus Best* decision from the

20   Northern District of Indiana that defense counsel referenced

21   where there, part of the analysis that factored into the

22   decision to sever, had to do with, one, that the account that

23   was being severed was a capital offense, two, that an

24   acquittal on that count would necessarily moot the need for a

25   trial as to the other count since it was a -- that offense

1   was included as part of the other count that was severed so

2   there was a potential for additional judicial economy and

3   efficiency there.  And also, it was one where there was the

4   nature of the testimony that he planned to give was

5   essentially an alibi defense.

6            In contrast here, defendant has proffered

7   essentially that he expects that he may need to testify in

8   order to clarify his intent surrounding his -- the various

9   course of conduct that he engaged in with respect to

10  Individual B and Individual C.  And here in the government's

11  view, that proffered testimony rises nowhere near the level

12  of importance nor risk of prejudice as the defendant in *Best*.

13           And this dovetails somewhat into the efficiency

14  argument.  As the Court knows, it's not just the evidence

15  that would be presented at trial but also more generally

16  judicial economy and the need to consider, you know, the

17  appearance of witnesses, et cetera, that places the needle

18  firmly in favor of keeping -- adjoining counts and limiting

19  instances of severance.

20           And here turning to the 404(b) analysis, contrary

21  to defendant's claim, here the government believes that on a

22  404(b) motion in the future that evidence relating to

23  defendant's conduct as to other victims may be -- very well

24  be admissible under 404(b) as it goes to his intent and his

25  identity, which defendant has proffered is specifically what

1    he intends to put at issue with respect to Individual B and

2    C, his intent, and with respect to Individual C, also his

3    identity as the person who sent certain of those threatening

4    messages.

5            So, for example, in defendant's reply he claims

6    that he may testify that he was genuinely reporting --

7    reporting Individual B for what he believed was acts of

8    prostitution to her college when, in fact, the timing of when

9    he made that report, the fact that he once again was

10   submitting doctored information to others within -- to others

11   known to Individual B in order to tarnish her reputation, all

12   of that is conduct that is similar to what he did with

13   respect to Individual -- Individual B and Individual --

14   pardon me, Individual A and Individual C shortly after their

15   breakups and shows both that, in fact, that was not his

16   intent in making that report.  And also shows with respect to

17   Individual C where he's disputing that he sent these text

18   messages that he was, in fact, the sender because he engaged

19   in similar conduct sending harassing messages from different

20   phone numbers and different accounts to other victims in the

21   same way.

22           And so for all of those reasons, your Honor, in the

23   government's view, this is not one of the cases where the

24   circumstances are such that this Court should choose to

25   exercise its discretion and unnecessarily sever counts that

1    can fairly be tried in one trial preserving efficiency,

2    preserving judicial economy and government resources and

3    still, with the use of limiting instructions, limit any risk

4    of prejudice to the defendant.

5                THE COURT:  Thank you, counsel.

6                Anything on the bill of particulars, counsel?

7                MR. FINKE:  I mean, if I might respond --

8                THE COURT:  You can respond.  Yeah, sure.

9                MR. FINKE:  Yep.  Just on the -- first of all, on

10   the -- this idea of the risk of prejudice, we're -- the

11   government still isn't pointing to any witnesses that would

12   overlap between any of the cases aside from maybe the case

13   agent who investigated this and even then the testimony is

14   not going to overlap --

15               THE COURT REPORTER:  I'm sorry.

16               THE COURT:  Slow down.

17               MR. FINKE:  The government hasn't pointed to any of

18   the witnesses whose testimony would overlap as to the counts

19   and even then, it's -- aside from the case agent, it's not

20   clear that their testimony would even overlap for any

21   necessary reason.  They -- the example that they give here

22   of -- for the 404(b), I mean, it kind of just highlights the

23   problem here.  If they -- they're saying they can believe

24   that they're going to succeed on a 404(b) motion in the

25   future which requires specific statements that they would

1    want to have admitted and specific testimony.  And the only

2    specifics that they can give here at least on intent are, you

3    know, this idea that he doctored -- he's accused of doctoring

4    messages in the first count.  That doesn't explain to us how

5    that -- that might be relevant to his intent or identity in

6    that case but it's not clear how that's relevant in Counts

7    Two or Three at all.  The doctoring that's -- the specific

8    doctoring that's alleged here at least in the discovery is

9    completely different to the extent there is any doctoring

10   happening there at all or that that doctoring is in any way

11   related to a course of conduct designed to intimidate or

12   harass.

13        Making throw-away accounts to posts, references to

14   the website, for example, in Count Three is not doctoring in

15   either the sense that is used in Counts One or in the case

16   they cite, *Sayer*, where the whole point of the scheme was

17   essentially like writing on, you know, for a good time call

18   so-and-so and sending a bunch of people looking for sexual

19   encounters to someone as a method of harassing them.  That's

20   just not the kind of doctoring that's going on here.

21        The other -- one really big problem is the

22   government claims that it's addressing arguments we raised in

23   the reply and say that this isn't a case where alibi is an

24   issue.  The government in its response argues that this is

25   news to us, that part of the course of conduct for Count One

1   is that he's alleged to have traveled to California to

2   somehow harass or intimidate persons, part of the physical

3   stalking, Individual A at some point -- at several points at

4   some point during this, I believe, this five- or six-month

5   span -- during a very large month, you know, period of time.

6           And in that case, this -- again, this bill of

7   particulars but it's also really important here.  In order to

8   present it, his alibi defense is going to be crucial to that.

9   Being able to account for his time then and for him to be

10  able to testify, you know, and prepare, you know, for -- I

11  mean, again, this is getting into the bill of particulars,

12  but that's going to be -- that testimony there is essential

13  to his case.  He's going to have to be able to explain what

14  he was doing there.  That's an alibi.  That's exactly the

15  kind of testimony they're saying would justify severance

16  here.  They just are appearing to ignore it, so.  I mean,

17  that is a crucial part.  And not only just for the

18  credibility of that witness who says that this happened but

19  also for their actual, you know -- for the acts that they're

20  accusing him of and the course of conduct.

21          Very briefly, that isn't an identity issue.

22  That's -- that's again an alibi.  That has nothing to do with

23  404(b).  There's nothing about, you know, whether or not he

24  was actually the person there that is relevant here.  So I'm

25  not exactly sure -- the 404(b) argument just doesn't hold

1    water, I think, and it's the only example of any kind of

2    efficiency that they're saying that will be gained aside

3    from, you know, someone testifying that this is how you post

4    on Facebook and everyone can see stuff on Facebook which

5    would all be -- you know, we'll stipulate to.

6              THE COURT:  Have you provided any notice of an

7    alibi defense consistent with the rules of procedure?

8              MR. FINKE:  We -- so that's a -- the tricky thing

9    is that in order to -- I think that's only triggered when the

10   government -- when we actually can specifically raise one.

11   When -- in this case, it's just this broad period of time and

12   there are no specifics.  That's part of the issue with the

13   bill of particulars is that we didn't know that this was part

14   of the course of conduct they're alleging in Count One until

15   their response.  And now in order to prepare for that, in

16   order to -- like he would just have to say his alibi is that

17   didn't happen but it's difficult for us to allege that with

18   particularity here because there isn't -- there aren't any

19   specifics regarding what date, what specific location he's

20   supposed to have visited and, you know, any kind of conduct

21   that would have occurred during that time.

22             THE COURT:  So the answer is no?

23             MR. FINKE:  Sorry, your Honor.  Yes.  The answer is

24   no.

25             THE COURT:  Okay.  Anything on the bill of

1    particulars, counsel?

2              MR. FINKE:  Aside from what's already been -- you
3    know, this is something that we've kind of been dancing
4    around from the beginning but I think the alibi is a very
5    good place to start on that.  It's -- he's -- we're going to
6    have to basically, both with the alibi and the government's
7    changing theories -- you know, extortion isn't something that
8    was originally argued at all in their -- in their argument in
9    front of Judge Lee as, you know, the unprotected conduct
10   here.

11             The -- in order to specifically address any of
12   these theories and specifically mount his First Amendment
13   defense and an alibi defense to the extent that one is
14   needed -- and again, alibi might also be something that comes
15   in for Individual B in Count Two because there is just a
16   general allegation that he -- she saw him outside her house
17   at one point or may have encountered him in public.  No
18   specifics on dates and times.  If that comes up at trial,
19   we're left scrambling trying to -- you know, the only way we
20   can prepare for that at trial is essentially by accounting
21   for every single day that he's -- that he might possibly be,
22   you know, his whereabouts for every single day and have that
23   ready to go so that if we get any specifics from that
24   witness, we can somehow impeach them and that's -- that's
25   essentially -- it's kind of like the reverse of a needle in

1    the haystack.  We'll have to account for all the individual

2    strands of hay in order to be able to attack the needle at

3    trial, which we don't even know, you know, if it's a needle

4    or if it's a thimble or if it's, you know, a marble.

5            THE COURT:  Is there a specific course of conduct

6    that you've identified in the discovery that you think is

7    missing something you need to present an alibi defense or is

8    it a general denial of allegations over an entire course of

9    conduct?

10           MR. FINKE:  It depends.  So for the travel part

11   with the -- you know, that there are these multiple trips,

12   that's an example.  We don't have any specifics regarding

13   when that is supposed to happen.  The witness just says he

14   showed up multiple times in San Francisco.  We don't know why

15   she believes that.  We have some theories as to why she might

16   believe that but she doesn't say.  They -- and the alibi

17   simply that it didn't happen or that, you know, if it did,

18   there is no evidence that he saw her at all or that they saw

19   each other at all.

20           For the courses of conduct for the -- are you

21   asking particularly for alibi or any other defenses?

22           THE COURT:  Well, the -- one of the -- part of the

23   analysis for a bill of particulars is whether or not you have

24   sufficient information not just in the charging instrument

25   but in the discovery to present an adequate defense; and I'm

1    paraphrasing it.  I'm not quoting the standard specifically.

2           So if there's -- you've raised the issue of alibi

3    at least with respect to certain allegations of travel so

4    that's a thing I can ask the government about.  If -- is

5    that -- has that been tendered in discovery?  How does that

6    affect your knowledge of how you believe the case is going to

7    be tried?  If there's some other defense other than alibi or

8    general denials, I mean, obviously a general denial or

9    government hasn't proven its case beyond a reasonable doubt,

10   that's going to have a different presentation than a specific

11   alibi defense not only in terms of preparation for trial but

12   in terms of you complying with the giving notice as required

13   under the rules of procedure.

14          So you tell me, is there something other than the

15   travel dates that need to be addressed today in argument?

16          MR. FINKE:  Yes.  We think that -- to the extent --

17   like the court in *Ackley* (sic) that granted -- in *Ackley*

18   (sic), they granted a motion for bill of particulars.

19   Whether or not the government actually had to specify which

20   communications they are relying on in that course of conduct

21   under their -- under their -- you know, that they believe

22   constitute a violation of the statute as alleged in each of

23   the counts and we think that's necessary for a variety of

24   reasons.  They describe a lot of physical stalking.  We don't

25   know, you know, A, whether that happened, B, whether or not

1   that -- you know, whether those specific instances actually

2   rise to the level of stalking.  We can't, you know, prepare a

3   defense when we don't even know what specific conduct they're

4   saying occurred.

5          In a lot of these cases, they're saying -- in a lot

6   of the instances we're not sure whether or not their theory

7   is, you know, that he made these threats or if it's just that

8   there's this other harassing conduct that is supposed to have

9   occurred like they -- they argue slashing the tires.  Again,

10  the discovery does not specify when that occurred, how it

11  occurred, what -- you know, there's no police reports or

12  anything like that.  The -- similarly for the painting that

13  they say for Count Three, the defendant took -- whether it

14  was, you know, inside her house, whether, you know, how that

15  is -- whether that is actually something as part of a course

16  of conduct or whether it's just some kind of contact that is

17  meant to have occurred between them that is, you know, bad in

18  some way.

19         The only other thing is for Count Four -- and this

20  is, I think, really important -- is we need to know what it

21  is specifically they're saying that he took from her phone.

22  As far as we can tell, it's just from what they're alleging

23  is an admission in the website that he submitted where he

24  lists all this information he learned from having looked on

25  her phone; and if that's the case, we can build a defense

1   based on that.  But the discovery also indicates there's --

2   she makes a vague allegation that he took photos off of her

3   phone.  But we're not sure whether or not they're saying that

4   he took photos off and put the -- and included those in some

5   way in this long website or if it's just the information on

6   that page.  The response makes it seem as though they're

7   saying it's the stuff on that page.  But there's stuff in the

8   discovery that we're not really sure if what they're saying

9   is that, you know, because they didn't follow up and actually

10  confirm that there were photos that were taken or she didn't

11  specify, you know, where that, you know, how that came to be

12  part of the -- you know, what part of the course of conduct

13  that they're alleging in Count Three includes that

14  information from the phone so those specifics for Count Four

15  would also be necessary.  You simply can't, you know, tell

16  from the discovery what they're -- what they're really

17  alleging there.

18          THE COURT:  Government want to address the bill of

19  particulars?

20          MS. CHUNG:  Briefly, your Honor.  I'll just note

21  that in *Ackell*, the District Court did exercise its

22  discretion to order that bill of particulars.  However, that

23  was a discretionary call and that was an out-of-district

24  case.  I think it was in Massachusetts, although perhaps

25  defense counsel could -- or I think it was New Hampshire,

1    your Honor, District of New Hampshire.

2           Here in the Seventh Circuit, the Seventh Circuit

3    has made very clear that an indictment is not required to

4    allege in detail the --

5           THE COURT:  Slow down.

6           MS. CHUNG:  I apologize.  I've done that before.

7    I'm sorry.

8           An indictment is not required to allege the factual

9    proof that will be relied on to support the charges.  That's

10   in *United States versus Smith*.  And in *Fassnacht*, the Seventh

11   Circuit also specified "the defendant's constitutional right

12   is to know the offense with which he is charged, not to know

13   the details of how it will be proved."

14          Here, defendant has complained about not knowing

15   each specific communication, each specific action that the

16   government will bring up at trial to try to prove that course

17   of conduct.  Respectfully, that's information that, A, he has

18   access to in the discovery and can, in fact, prepare a

19   defense on based on what's already been provided in the

20   extensive discovery.  And, B, with respect to what he claims

21   to not know specific dates, for example, of that travel to

22   California, defendant has all of the information that the

23   government has at this juncture.

24          What defendant is asking for now is for the

25   government to generate additional discovery, conduct

1    additional follow-up interviews in advance of trial, and then

2    produce early additional reports that already necessarily

3    will be produced down the line as part of the government

4    adhering to its discovery obligations while preparing for the

5    trial.

6              I'll also note briefly that even with respect to --

7              THE COURT:  Let me -- let me address that.

8              MS. CHUNG:  Yes.

9              THE COURT:  I mean, it's not requiring you to

10   produce additional information or conduct additional

11   investigation to identify the persons that he's alleged to

12   have harassed or intimidated, right?

13             MS. CHUNG:  Correct, your Honor, but also --

14             THE COURT:  Hang on.  Hang on.  So that's something

15   that you -- it's either provided in the discovery or you can

16   provide, correct?

17             MS. CHUNG:  That's correct.  It is provided in the

18   discovery, your Honor.  And if you take a look at Exhibit A,

19   there are specific lists -- there's listings in the indices

20   of all of the people that the government interviewed and the

21   content of those interview reports make clear who has said

22   what and who has claimed that they received communications

23   from the defendant or harassed by, et cetera, all of those

24   things.

25             THE COURT:  And the same analysis would apply to

1    the communications, that that's -- that the ones that are at

2    issue, that those can be found in the discovery as well?

3            MS. CHUNG:  That's correct, your Honor.  Copies of

4    communications were provided where they were available and

5    preserved and otherwise the interview reports of the people

6    who received those communications have been provided where

7    they summarize their recollection of what was not preserved.

8            THE COURT:  One of the things that defense is

9    asking for is the nature of the substantial emotional

10   distress.  Where is that in the discovery?

11           MS. CHUNG:  Your Honor, that's outlined in the

12   victims' interview reports, for example, as well as the

13   reports of interviews of the family members of victims that

14   defendant contacted.  If to the extent that defendant's

15   request is intended to ask for, for example, psychological

16   reports or more specificity about exactly how these various

17   victims were harmed, the defendant is not entitled to that

18   level of detail or specificity at that stage nor does the

19   government have such information.  Everything that we have

20   has been tendered in discovery.

21           THE COURT:  Do you intend to present any expert

22   testimony at trial?

23           MS. CHUNG:  Your Honor, there -- we have not made a

24   decision on that front yet.  We certainly at the very least

25   obviously intend to have each of the victims testify at trial

1  about the effect that defendant's course of conduct had on

2  them.  And also to the extent that family members were

3  contacted, those family members would also be testifying,

4  your Honor.

5            THE COURT:  Have you done a due diligence inquiry

6  to obtain records, medical records or otherwise, from the

7  victims that would constitute Brady or otherwise be

8  constitutionally or required to be disclosed or disclosed

9  under the rules?

10           MS. CHUNG:  Yes, your Honor.  That's part of what

11  the law enforcement agent did early on at this stage of this

12  investigation prior to charging.  And to the extent anything

13  else new was generated, we would of course disclose that.

14           THE COURT:  What about the arguments regarding

15  Count Four and the specific information the defendant is

16  alleged to have obtained, is that in the discovery?

17           MS. CHUNG:  That is also in the discovery, your

18  Honor.  That is in the website that defense counsel has

19  referenced and that website contains specific reference to

20  defendant himself admitting to having accessed the victim's

21  phone and having obtained different kinds of information from

22  her phone.

23           THE COURT:  All right.  Anything further on the

24  bill of particulars?

25           MS. CHUNG:  No, your Honor.

1          THE COURT:  Anything, counsel?

2          MR. FINKE:  Just really briefly.  The

3    communications that they're referencing especially with

4    respect to Count Two are voluminous.  Like -- actually trying

5    to point out -- they're alleging, and they say in the

6    response, that the defendant communicated this picture to a

7    bunch of Individual C's friends and family and we -- there

8    just isn't -- as far as we can tell, there isn't any evidence

9    of that aside from just her testimony that that happened.

10   There's evidence of her communicating it and that's going to

11   be a question at the trial but we're trying to identify

12   this -- these particular communications that are -- that are

13   supposed to be in the discovery or supposed to have happened

14   and we're not yet -- no clear idea from the discovery when

15   they happened, between which individuals they happened, how

16   that's supposed to happen, or how that occurred at all.

17          In *Fassnacht*, which the government is citing here,

18   it's easily distinguishable.  They're -- it's going on the

19   line of cases where the idea is that when the crime is like

20   fraud or false statements is so the specification -- this

21   line of cases from *Russell* saying that when this -- the

22   language of the statute is so vague in that regard, that

23   they -- the defendant actually needs a specification of what

24   statements are claimed to be false in order to protect -- in

25   order to properly defend against them.

1       The government is now saying that one of the main

2   theories that it's operating under isn't truth threats.  In

3   fact, there's no truth threat that they're operating under

4   now.  They're saying instead that it's -- that there's some

5   defamation going on and that there are these false statements

6   that have been made and the defendant needs to be held

7   accountable for them.  It is not clear from the discovery at

8   all what statements those are.

9       And to the extent that we're able to identify some

10  that might possibly be considered false, say, in the long

11  website page for count -- that's at the issue of Counts Three

12  and Four, it's not clear what the government is going to say

13  from the witness interviews, et cetera, from the discovery

14  what statements in that website are -- they're saying are

15  defamatory -- that is, are false and everything else that

16  goes with civil common law acceptance for defamation if

17  that's the theory that they're going under.

18      So even if we want to make this First Amendment

19  argument that, you know, defamation isn't -- in this context

20  false statements isn't a protected -- is unprotected speech

21  and shouldn't apply here, we don't even know what specific

22  statements they're saying are unprotected.  And we can't by

23  reference to the extremely voluminous discovery in the form

24  of Cellebright download their data from the phones and

25  messages for Count Two, we can't identify what statements

1  they're saying are, you know, part of the course of conduct

2  here.

3          THE COURT:  Okay.  Anything further from any side

4  regarding any of the pending motions?

5          MS. CHUNG:  Just a very brief response to that last

6  point, your Honor.  I just -- with respect to the bill of

7  particulars with respect to defendant trying to characterize

8  this in terms of a false statement case where defendant has a

9  right to know what false statement is at issue, here

10  defendant is not charged with making a false statement.  He's

11  not charged with making a true threat.  He's not charged with

12  defamation.  He's charged under the cyberstalking statute

13  that criminalizes a course of conduct intended to harass or

14  intimidate.  That is what he is entitled to have notice of.

15  That is what he has more than adequate notice of here based

16  on the discovery and the request to identify every single

17  communication, to identify specific dates, times, for every

18  piece of evidence that the government intends to bring in at

19  trial is premature and not warranted here under the law.

20          THE COURT:  When do you intend to figure out which

21  communications you're going to rely on?

22          MS. CHUNG:  Your Honor, I think we'd be specifying

23  all of that as we prepared exhibits and prepared a witness

24  list for trial.

25          THE COURT:  Okay.  And then -- so I will have set a

1    jury and then he'll get -- finally get his list of

2    communications and then he'll ask for a continuance, right?

3    How is that -- how is that premature?

4              MS. CHUNG:  Your Honor, I don't think -- I don't

5    think it's -- I don't think that would necessarily be what

6    happens here.  I would imagine that your Honor would set a

7    trial date far enough out for both sides to adequately

8    prepare, for both sides to make all disclosures well in

9    advance of trial and for the parties to stick --

10             THE COURT:  Okay.  Let me -- all right.  Let me

11   jump back to my question then.  How long will it take you to

12   identify the statements that you need to rely on?

13             MS. CHUNG:  Your Honor, as a practical matter, the

14   case agent is going on leave next week on parental leave for,

15   I believe, at least a number of weeks if not months.  And so

16   our -- to the extent your Honor were inclined to exercise

17   your discretion to grant a portion of the defendant's request

18   for a bill of particulars, we would -- I would like to check

19   with the case agent as to when he's returning.  I believe

20   sometime in the next few months would provide enough time for

21   him to return and for us to make such a detailed accounting

22   should the Court order it.

23             THE COURT:  Well, I wasn't asking for a bill

24   particulars.  I was asking when do you -- when are you going

25   to essentially fish or cut bait on which of the voluminous

1    communications and course of conduct you intend to rely on,

2    so when do you intend to do that?

3              MS. CHUNG:  Your Honor, we would be doing so in

4    connection with whenever your Honor set pretrial deadlines

5    for disclosure of -- essentially for motions *in limine*, for

6    us seeking to admit certain -- to admit various

7    communications, to turn over exhibits list -- exhibit lists,

8    et cetera.

9              THE COURT:  All right.  So obviously part of the

10   bill of particulars analysis is the discovery.  So you're

11   telling me that if the Court sets pretrial deadlines

12   sufficient that there would be additional discovery and at

13   least notice of specific exhibits that that would affect the

14   Court's analysis on a bill of particulars?

15             MS. CHUNG:  I think -- I believe so, your Honor.  I

16   think so here.  I think the point here of a bill of

17   particulars, the focus is always on whether the defendant can

18   adequately prepare his defense.  That would be a sequence by

19   which the defendant certainly could adequately prepare for

20   the trial down the line.

21             THE COURT:  Okay.  Anything further from any party

22   on any motion?

23             All right.  Thank you.  Gloria, I need a 90-day

24   status date so I can -- I'll take all the motions under

25   advisement.  I've got a lot of work to do on this.  So give

1    me a 90-day date, Gloria.

2            COURTROOM DEPUTY:   Thursday, November 9th at 1:00

3    p.m.

4            THE COURT:   Is that good for the government?

5            MS. CHUNG:   Yes, your Honor.

6            THE COURT:   Is that good for the defense?

7            MR. FINKE:   One moment.

8        (Brief pause.)

9            MR. FINKE:   Yes, your Honor.

10           THE COURT:   All right.   That's going to be in

11   person.   Is there a motion to exclude time?

12           MS. CHUNG:   Yes, your Honor.   Motion to exclude

13   time both in the interest of justice as well as in light of

14   defendant's pending pretrial motions to allow resolution of

15   these issues prior to us setting a trial date.

16           THE COURT:   Any objection?

17           MR. FINKE:   No objection, your Honor.

18           THE COURT:   Oral motion to exclude time is granted.

19   The Court finds the ends of justice are served by the

20   continuance and outweigh the interests of the public and the

21   defense in a speedy trial based upon a reasonable time

22   necessary for effective preparation by counsel taking into

23   account the exercise of due diligence.

24           In the interest of justice, time is excluded from

25   today's date through and including November 9th for the

1  completion of the pretrial litigation, trial preparation, or
2  other issue.
3          Anything else on behalf of the government?
4          MS. CHUNG:  No, your Honor.
5          MR. WILLIAMSON:  No, your Honor.
6          THE COURT:  All right.  The pretrial release
7  situation has altered.  The defendant is going to be remanded
8  pending further order of Court.  I will make appropriate
9  findings as needed by separate order.
10         On behalf of the defense, if you want to file a
11  motion for the reconsideration of the Court's pretrial
12  detention order, you could have an opportunity to do that.
13  You'll get additional information when the Court issues its
14  written order.
15         Anything else on behalf of the government?
16         MS. CHUNG:  No, your Honor.
17         THE COURT:  Okay.  Thank you, counsel.  Court's in
18  recess.
19      (Proceedings concluded at 2:10 o'clock p.m.)
20
21
22
23
24
25

1

2                          C E R T I F I C A T E

3          I hereby certify that the foregoing is a complete, true,

4    and accurate transcript of the proceedings had in the

5    above-entitled matter before the Honorable John Robert Blakey

6    at Chicago, Illinois, on August 3, 2023.

7

8    /s/*Laura LaCien*                     August 22, 2023
     Official Court Reporter                    DATE
9