1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3

     UNITED STATES OF AMERICA,        )   Docket No. 20 CR 650-1
4                                     )
                      Government,     )
5                                     )
          vs.                         )
6                                     )   Chicago, Illinois
     VINCENT STORME (1),              )   August 9, 2023
7                                     )   9:00 o'clock a.m.
                      Defendant.      )
8

9           TRANSCRIPT OF PROCEEDINGS - Detention Hearing
            BEFORE THE HONORABLE JOHN ROBERT BLAKEY
10

11   APPEARANCES:
     For the Government:       UNITED STATES ATTORNEY'S OFFICE
12                             BY:  MS. ASHLEY A. CHUNG
                                    MS. GEORGIA N. ALEXAKIS
13                             219 South Dearborn Street
                               Suite 500
14                             Chicago, Illinois  60604

15   For the Defendant:        BLAINE & VANZANT LLP
                               BY:  MR. JAMES G. VANZANT
16                                  MR. ANDREW D. FINKE
                                    MS. HOLLY N. BLAINE
17                             922 Davis Street
                               Evanston, Illinois  60201
18

19

20

21

22              Laura LaCien, CSR, RMR, CRR
                    Official Court Reporter
23                219 South Dearborn Street
                          Room 1212
24                Chicago, Illinois  60604
                       (312) 408-5032
25

1      (The following proceedings were had in open court:)

2           COURTROOM DEPUTY:  20 CR 650-1, USA versus Vincent

3    Storme.

4           MS. CHUNG:  Good morning, your Honor.  Ashley Chung

5    and Georgia Alexakis on behalf of the United States.

6           MR. VANZANT:  Good morning, your Honor.  James

7    Vanzant, Andrew Finke, and Holly Blaine for Mr. Storme who is

8    present in court in custody.

9           THE COURT:  Good morning, everybody.  A couple of

10   thoughts before we begin.  The Court -- assuming

11   jurisdiction, which is certainly present here, the Court has

12   the authority -- has the inherent authority as part of its

13   discretion to reconsider any non-final orders in the case.

14   It can do so upon motion of the -- any party or on its own

15   motion and it can do so at any time prior to final judgment.

16   Often when a new judge takes over a case from a colleague,

17   the Court takes the case as it finds it and treats prior

18   orders as law of the case and there are a lot of reasons for

19   this common approach, but that fact doesn't preclude a

20   presiding judge from a case from reconsideration of any of

21   its non-final orders.

22           If the -- if this case belongs to this Court, and

23   it does, then the power and duty to ensure correct rulings

24   rests with me regardless of what a magistrate judge or what

25   Judge Lee might have done based on a different record at a

1    different point in time in the case.

2            The Court also has an inherent authority to
3    effectuate and to enforce its lawful orders.  This includes,
4    but is not limited to, either civil or contempt formally but
5    also includes less formal orders including the power to
6    arrest upon a sufficient factual predicate and that power
7    comes from the common law or constitutional system.  It is
8    not contingent upon a statute or formal rule of procedure.
9    Nevertheless, both of those inherent powers -- the power to
10   reconsider and the power to effectuate orders -- remains
11   consistent with the constitutional directives and the
12   relevant statutes and the rules of procedure that are
13   relevant in this case.

14           For example, of course, 18 U.S.C. 3141 talks about
15   the court's authority generally and it states "a judicial
16   officer authorized to order the arrest of a person under
17   Section 3041 of this title before whom an arrested person is
18   brought shall order that such person be released or detained
19   pending judicial proceedings under the chapter."

20           Section 18 U.S.C. 3142(f)(2) states in relevant
21   part that, quote, upon the judicial officer's own motion,
22   quote, in a case that involves 18 U.S.C. 3142(f)(2)(A) or
23   (B) -- and this is just an example -- the court can hold a
24   hearing to determine the issue of bond or detention and,
25   quote, the person may be detained pending completion of the

1    hearing, end quote.  And, quote, the hearing may be reopened
2    before or after a determination by the judicial officer at
3    any time before trial if the judicial officer finds that
4    information exists that was not known to the movement --
5    movant at the time of the hearing, and that's a reference to
6    the original detention hearing, and that has a material
7    bearing on the case.  It's just a quote in part.

8             The inherent power to reconsider is also supported
9    by statute.  The inherent power to effectuate its orders,
10   including a remand to custody pending further order or
11   further hearing is likewise supported by the statute and the
12   rules of procedure.

13            The Seventh Circuit also recognizes this Court's
14   authority to reconsider bond and the authority to detain
15   pending further order -- and this is just an example.  In
16   this own case itself, for example, in its August 8th order,
17   the Seventh Circuit stayed release and authorized continued
18   detention pending a hearing and noted that this Court -- this
19   particular Court, not the Seventh Circuit -- can decide the
20   issue consistent with the statute including -- quote,
21   including those related to any further temporary detention
22   pending outcome of the motion, end quote.

23            Indeed, it is common for trial courts to issue no
24   bond warrants under seal under a sufficient factual predicate
25   and to order defendants detained pending further order and

1  proceedings.  Ordering a remand to custody in open court

2  pending further order, which is exactly what happened here,

3  is the functional equivalent of a no bond arrest warrant and,

4  indeed, it is the preferred method here in light of the

5  threat assessment and the complexities and dangers of

6  executing an arrest warrant off-site.

7       Indeed, the Marshals discussed the issue of an

8  arrest warrant and indicated that an arrest off-site would

9  increase the danger not only to the defendant but to the

10 Marshals themselves, including it could result in a barricade

11 situation or a variety of other horrific sets of

12 circumstances.

13      This Court did exactly what it's supposed to do and

14 is authorized to do based on the inherent powers it has and

15 the relevant statutes.  Upon a sufficient factual predicate,

16 which I can discuss in detail as we go forward, the Court

17 remanded the defendant pending further order and it was clear

18 in my order of August 3rd that that was not the final say and

19 that there would be a further order.  The Court then said by

20 agreement of the parties -- not on August 3rd, but shortly

21 thereafter and I will explain that in a moment -- a full

22 detention hearing with notice.

23      It is clear by the August 3rd order that it was not

24 a final determination.  Indeed, the Court said it would issue

25 a separate written order.  The Court did not set a detention

1    hearing on 8-3 and there's a lot of reasons for that.  It was

2    the end of the business day and neither party -- neither the

3    government nor the defense -- had a chance to review, much

4    less be aware of, the new information from Pretrial Services.

5         So both of those parties were in no position to

6    assess either the nature or the length of a detention hearing

7    or even how long they would need to prepare to proceed on a

8    detention hearing.

9         The Court did not set a detention hearing on 8-4.

10   The Court assumed that the parties would need time to assess

11   the information.  I didn't know whether or not you would have

12   to do follow up based on the Pretrial Services' information

13   and the Court was not in session on 8-4.  The Court was

14   getting a CT scan at a hospital; and that was me getting a CT

15   scan so I did not do an order on Friday.

16        The very next business day, however, and before any

17   order was received by the Seventh Circuit, this Court set a

18   full hearing with notice and did it by agreement of the

19   parties.  Obviously, the date of the hearing notes does not

20   have to occur within the time limits of the statutory

21   provisions if the parties agree; and that was and is this

22   Court's understanding, that the detention hearing was set by

23   agreement of the parties.

24        It is strange and absurd that the parties would

25   agree to a hearing with notice in this Court and at the same

1    time agree upstairs to some procedural error that there was

2    no hearing with notice.  Those positions are inconsistent

3    and, indeed, unfair, not only to this Court but to the

4    Seventh Circuit.  Nonetheless, here we are.

5              An issue that has been raised is -- which was

6    raised not only by the Seventh Circuit in its August 7th

7    order, it requires a few thoughts as well.  There's an issue

8    of whether or not the Court can either reconsider a prior

9    detention ruling or revoke bond based on new evidence with or

10   without a motion by the government.  A few thoughts on that.

11   First, it's irrelevant.  There was an original motion by the

12   government.  At the onset of this case, the government filed

13   a timely motion for detention and even though it was

14   unsuccessful, this Court, as I indicated, has the power to

15   reconsider it.  It is not a final order.  And, indeed, the

16   landscape has changed since the magistrate judge and Judge

17   Lee addressed and considered those questions.

18             There's also a new motion now certainly was filed

19   this morning.  So to the degree that the law -- someone would

20   adopt an absurd view of the law that the Court is unable to

21   enforce its own orders or reconsider its own orders absent a

22   government motion, the issue is mooted or irrelevant because

23   there is a motion now.

24             In any event, the minority constricted reading of

25   the statute that precludes a court from acting on its own

1    motion is wrongly decided.  It violates the plain reading of

2    the statute.  The mention in the statute that the government

3    may do something does not preclude what the court can or is

4    authorized to do.  It also -- that constricted reading also

5    violates basic principles of statutory construction,

6    including in pari materia.  It has to be read in conjunction

7    with the other sections, including ones I've quoted today and

8    others, and the Court's inherent authority to reconsider and

9    to effectuate its orders.

10           When Congress legislates, it's presumed to know the

11    law, and that includes the Court's inherent authority under

12    the common law.  And the courts, when construing

13    constitutional -- excuse me, congressional directives, has to

14    give effect to all the congressional language in it and do so

15    without inconsistencies or absurd results.  In short, the

16    constricted and minority view that says that the court can't

17    act on its own motion is wrongly decided.

18           I'm going to -- without -- in the interest of time,

19    I'm going to incorporate by reference the more lengthy

20    analysis in the cases the Court, the Seventh Circuit in it's

21    8-7 order mentions one of the cases that collects some of the

22    cases.  And I know -- and the Seventh Circuit is going to be

23    reading this transcript so I know they're also aware of those

24    other cases and the analysis in there so I'm just going to

25    incorporate that by reference that analysis.

1    As an officer of the Court and as just a human

2    being, what did these parties -- and I'm asking the defense

3    counsel and the government -- do you take the view that I had

4    to give the defendant a heads up before temporary remand and

5    risk him killing himself?  Is that what you think the law

6    required me to do?

7    MS. CHUNG:  Your Honor, no, not a notice that would

8    risk defendant killing himself.

9    THE COURT:  Do you think that was what the law

10   required me to do?

11   MR. VANZANT:  Under the circumstances, I think so,

12   your Honor.

13   THE COURT:  Do you think -- you take an absurd view

14   that the law requires me to put him in danger, that's what

15   you're telling me?

16   MR. VANZANT:  That's not what I'm saying, your

17   Honor.  What I'm saying is that the law does not authorize

18   revocation and premature detention without a hearing.  That's

19   the situation here.

20   THE COURT:  It allows temporary hearing pending

21   resolution.

22   MR. VANZANT:  Not under the circumstances here,

23   your Honor.

24   THE COURT:  That's --

25   MR. VANZANT:  I --

1    THE COURT:  Well, your position is incredible.

2    MR. VANZANT:  I can certainly support it, your

3  Honor.

4    THE COURT:  Well, it's not credible.

5    All right.  Are both sides ready for a detention

6  hearing today?

7    MS. CHUNG:  Yes, your Honor.

8    THE COURT:  All right.  You ready?

9    MR. VANZANT:  I don't believe the Court has the

10  authority to prepare for a revocation hearing today, your

11  Honor.

12    THE COURT:  The Court doesn't have the authority to

13  issue -- have a revocation hearing?  The Seventh Circuit just

14  told me to do it.

15    MR. VANZANT:  Well, so that's the question, your

16  Honor.  The problem is 3148 specifically requires that a

17  person who has been released pursuant to provisions of 3142

18  as Mr. Storme has -- this is 18 U.S.C. 3148(a) -- and who has

19  violated a condition of his release is subject to revocation.

20  I haven't --

21    THE COURT:  Well, hang on second.  Hang on a

22  second.  Government, it's your position that it's not just a

23  question of -- because obviously the issue of detention is

24  not insular, it's not -- you don't silo every factual issue.

25  You looked at the entire record to determine both risk of

1    nonappearance and danger to the community and that would

2    include not only dangers of self harm but also the record --

3    the full record in this case, including all the things that

4    the Court would have to look at, which would include

5    violations of the conditions of release, right?

6            MS. CHUNG:  That's correct, your Honor.  And the

7    government noted that in its written motion.

8            THE COURT:  All right.  So there's an allegation

9    that he's violated the conditions of release?

10           MR. VANZANT:  Which condition, your Honor?  That's

11   the problem.

12           THE COURT:  Well, how about -- I can take a whole

13   bunch of them.  How about curfew?

14           MR. VANZANT:  That was resolved two years ago, your

15   Honor.

16           THE COURT:  And I have the authority to reconsider

17   it.

18           MR. VANZANT:  On a stale violation that was

19   resolved by the Court already two years ago?

20           THE COURT:  I have the authority to review any

21   non-final order.  Do you have any case law to the contrary?

22           MR. VANZANT:  I don't have any case law on that

23   issue, your Honor, but that's not --

24           THE COURT:  All right.  Are you ready to go forward

25   or not?  Your motion to preclude a -- the very hearing that

1    you precipitated at the Seventh Circuit level is denied.  Are

2    you prepared factually to go forward with presenting evidence

3    and cross examining witnesses?

4            MR. VANZANT:  May I make a record on that point,

5    your Honor?

6            THE COURT:  First answer my question, then you can

7    go ahead and say whatever you need to.  Are you going to go

8    forward?

9            MR. VANZANT:  We are not asking for a continuance

10   of any hearing, your Honor.

11           THE COURT:  Okay.  Good.

12           All right.  Go ahead, make your record.

13           MR. VANZANT:  Your Honor, the problem here is that

14   3142 and 3148 intersect in a strange way here.  3142 is --

15           THE COURT REPORTER:  Slow down, please.

16           MR. VANZANT:  Sorry.

17           THE COURT:  There's always a temptation when you

18   read to go a little too fast for the court reporter so slow

19   down just a little bit.

20           MR. VANZANT:  Okay, your Honor.

21           So 3148 is the statute that's implicated here.

22   What the Court did last week was revoke Mr. Storme's bond

23   which had already been issued.  He was already on -- release

24   on conditions without a hearing.  The Court was quite clear

25   in the minute order that it was an actual revocation subject

13

1  to further order.  Now the problem with that is that there

2  was no allegation at the time that Mr. Storme --

3           THE COURT:  Yes, he was remanded pending further

4  order.  And then on Monday, we set it for a hearing.

5           MR. VANZANT:  And that's not authorized, your

6  Honor, under 3148.

7           THE COURT:  So you're saying that the Court -- for

8  example, let's say there's a violation of bond, you're saying

9  the Court doesn't have the ability to issue a no bond warrant

10  and then have the defendant detained pending hearing?

11           MR. VANZANT:  No.  That's not what I'm saying, your

12  Honor.  3148 --

13           THE COURT:  Are you saying there's a functional

14  equivalent between taking him into custody in court pending

15  further order as opposed to issuing an arrest warrant?

16           MR. VANZANT:  Only if it's subject to a -- the

17  predicate is a violation of a condition of release, your

18  Honor.

19           THE COURT:  Okay.  Well, there is an alleged one.

20  So I know you don't like it but there is an alleged one.

21           MR. VANZANT:  May I make a record, your Honor?

22           THE COURT:  Yeah.  Go ahead.

23           MR. VANZANT:  The problem here is that there was no

24  violation pending at the time.  I know the government's filed

25  a motion for revocation this morning at 8:00 o'clock but that

1      wasn't pending at the time.  What 3148 says --

2                  THE COURT:  Well, it's pending now, isn't it?

3                  MR. VANZANT:  I'm talking about what's happened all

4      the way up until this point, your Honor.

5                  THE COURT:  Okay, but we're not dealing in the

6      past.  We're dealing right now.  And certainly didn't the

7      Court's order of yesterday -- I'm talking about the Seventh

8      Circuit order -- didn't it authorize the Court to -- let

9      me -- let's go ahead and take -- let's all take a look at

10     that for a moment.

11                 And this is the August 8th order.  The Court may --

12     and this is what the Seventh Circuit told me yesterday.  "The

13     District Court may delay appellant's release for a period not

14     to exceed 24 hours from this order for the purpose of

15     permitting the government to submit a motion to revoke

16     appellant's pretrial release.  That the Court will hear and

17     decide as promptly as possible consistent with the provisions

18     of 3142(f) -- okay, 3142, not 48 -- 42(f) including those

19     relating to any further temporary detention pending outcome

20     of such a motion.

21                 And then obviously the Court -- the Seventh Circuit

22     took issue with the agreed date which the parties agreed to

23     on the -- which was on August 16th and obviously required me

24     to do it within 24 hours, which is why we're here.

25                 You're saying that -- how do you read that any

1    other way that I'm supposed to have a hearing under 3142

2    today?

3                MR. VANZANT:  Your Honor, the Seventh Circuit

4    specifically said a motion to revoke appellant's pretrial

5    release pursuant to 314 --

6                THE COURT REPORTER:  I'm sorry.

7                THE COURT:  All right.

8                MR. VANZANT:  3145 --

9                THE COURT:  It's the reading.  You pushed on the

10    gas so just, just slow down.  Go ahead.

11                MR. VANZANT:  The Seventh Circuit said:  Permitting

12    the government to submit a motion to revoke appellant's

13    pretrial release pursuant to 18 -- 18 U.S.C. Sections 3145(a)

14    and 3148(b).

15                Now the reason they cited 3142(f) later is because

16    3148 incorporates the standards in Rule 3142 but there is a

17    predicate requirement prior to beginning a revocation hearing

18    that there must be a motion to revoke on file and there has

19    to be an allegation --

20                THE COURT:  Well, there is a motion and it does

21    include, among other things, a violation of release.  Yes?

22                MR. VANZANT:  I disagree, your Honor, but the issue

23    here is --

24                THE COURT:  Wait a minute.  How do you disagree?

25    There -- is there a motion on file?

1          MR. VANZANT:  The government has filed one as of

2     8:00 o'clock this morning, your Honor.

3          THE COURT:  Okay.  And does the motion -- does the

4     motion include, among other things, a violation of release?

5          MR. VANZANT:  It does not include a violation of a

6     condition of release because all they've alleged is -- may I

7     explain, your Honor?

8          THE COURT:  Go ahead.

9          MR. VANZANT:  It does not include a violation of a

10     condition of pretrial release because the sole basis for

11     withdrawal -- for revocation is the allegation that defendant

12     may be a risk of suicide.

13          THE COURT:  That's not true.  The motion includes

14     other issues than that.

15          MR. VANZANT:  It does not, your Honor.  What we're

16     talking about --

17          THE COURT:  It does.  It does.  Look at the motion.

18     The motion includes not only his suicidal ideation and all of

19     the other things -- and we'll talk about the factual record

20     when the time comes -- but also the entire history of the

21     case which includes violations of bond.

22          MR. VANZANT:  And those violations were over two

23     years ago, your Honor.  We're not talking about any past

24     violations --

25          THE COURT:  Is there a -- is there a time limit on

1   the -- how long they can file the violation of bond?  Is

2   there some law that prevents me from reconsidering non-final

3   orders in my case?

4           MR. VANZANT:  3148(a), your Honor.  That's -- this

5   is what I'm trying to explain.  The problem in this case is

6   that the Court took Mr. Storme into custody last week without

7   anything.  The government hadn't filed a motion, the parties

8   didn't know what was going on, the Court didn't provide us

9   explanation, and that is not consistent with 3148.

10          THE COURT:  Well, you have that now.  You have the

11   hearing now and you have it with notice.  In fact, on Monday

12   everyone agreed to a hearing on the 16th and the fact that

13   you had an inconsistent position upstairs is irrelevant

14   because now we're all here with -- for a hearing and notice.

15          MR. VANZANT:  To make a record on that point, your

16   Honor -- I will submit the actual emails for the record.

17   What we said was we are available and we were only given one

18   date, which was August 16th.

19          THE COURT:  Did you make any request for an earlier

20   date?

21          MR. VANZANT:  No, your Honor.  We didn't.  And if

22   that was a requirement, then that's on me.  But what we're

23   saying --

24          THE COURT:  Well, we were setting it for a hearing

25   and it was clear from August 3rd that it wasn't a final

1    because there was --

2                MR. VANZANT:  Do you have the email?

3                THE COURT:  -- because it's not final and the -- if

4    there was a misunderstanding regarding the timing, why

5    wouldn't -- why wouldn't -- I mean, my understanding from my

6    staff was that the case was going to be set for a hearing --

7    and again, I'll note for the record that was prior to any

8    receipt of any order from the Seventh Circuit -- and that we

9    set it for a date that the parties agreed to.

10               Now if you're saying there's a misunderstanding and

11   you just said you were available but you wanted something

12   earlier and you never told my staff that, then maybe that's

13   the case but I don't know how my staff is supposed to read

14   your mind.

15               All right.  Go ahead, make your record.

16               MR. VANZANT:  Okay.  So leaving aside the issue of

17   when the detention hearing was going to happen, your Honor,

18   the problem we've had since the beginning is Mr. Storme is

19   currently sitting in custody in violation of Rule 3148

20   because there was no violation of his supervised release

21   alleged and the Court revoked it sua sponte.  The Court --

22               THE COURT:  Okay.  How is that -- how is that a

23   live issue now because he has a hearing and there's an

24   allegation of a violation of release?

25               MR. VANZANT:  Because he's been sitting in custody

1    since last week and --

2           THE COURT:  Okay.

3           MR. VANZANT:  -- the government's motion was filed

4    this morning.

5           THE COURT:  Well, let's fix that -- let's fix that

6    with a hearing with notice, which is what we're doing, and

7    there's -- despite everything I said at the beginning, which

8    I still believe is a correct statement of the law regarding

9    the Court's inherent powers and not -- that the requirement

10   for a government motion is not required, that's a moot issue

11   because the -- in fact, the entire appeal is moot because the

12   Court has a motion and the motion includes a violation of

13   release, so.

14          Go ahead and make whatever record.  And since

15   you're not seeking a continuance of the detention hearing, go

16   ahead and make your record and we'll go forward with the

17   hearing.

18          MR. VANZANT:  Your Honor, I'm not saying that the

19   Court doesn't have the ability to detain someone pursuant to

20   a warrant under 3148(b) prior to a revocation hearing but --

21          THE COURT:  Well, I can -- I can issue someone to

22   be taken into custody either by having a piece of paper

23   called a warrant or by making the order orally from Court,

24   right?

25          MR. VANZANT:  Because the warrant requirement

1    requires assuming probable cause.

2            THE COURT:  Yeah, there was probable cause.

3            MR. VANZANT:  We don't know that, your Honor.

4            THE COURT:  I do.

5            MR. VANZANT:  And that's -- that's --

6            THE COURT:  And guess what, the issues of -- the

7    issuance of warrants on probable cause on the Court's own

8    motion they happen *ex parte* under seal all the time.  And

9    then what happens?  Then you have a hearing -- you have

10   persons temporarily detained, which is what occurred, and

11   then you have a hearing, which is what we set; and now we are

12   here having that hearing.

13           MR. VANZANT:  And that's the problem, your Honor.

14   The Court did not issue a warrant in this case.  The Court --

15           THE COURT:  There's no functional difference

16   between ordering a remand and ordering a no bond warrant,

17   which I can issue that and say -- in fact, the only

18   difference is, is that that would require the Marshals to

19   take him into custody under complicated and more dangerous

20   circumstances on the street or in his house rather than the

21   controlled environment of the court so that -- that's also an

22   absurd reading of the law.

23           All right.  Go ahead, make whatever record and then

24   we're going to go forward with the hearing.

25           MR. VANZANT:  Pointing to 3148, your Honor, (b), "a

1      judicial officer may issue a warrant for the arrest of a

2      person charged with violating a condition of release."

3              When Mr. Storme was taken into custody last week,

4      he wasn't charged with anything.  This whole idea of a

5      violation of condition of release didn't happen until 8:00

6      o'clock this morning when the government filed the motion at

7      the Court's request and in that motion they still don't

8      allege a new violation of supervised release.  They're

9      talking about things that happened two years ago that the

10     Court already dealt with.

11             So while the Court does have the ability to issue

12     an arrest warrant and tentatively detain someone under

13     3148(b), that has to be pursuant to a charge.  There is no

14     charge here.  Not only is there no charge but the Court

15     didn't issue a warrant.  The entire purpose of the warrant

16     requirement is to make sure that there is probable cause for

17     issuance of a warrant nor did the Court make any of the

18     required findings under 3148(b)(1) and (2) when the Court

19     took Mr. Storme into custody so he has been sitting there

20     until today on no basis, no legal basis to detain him.

21             THE COURT:  All right.  Anything else?

22             MR. VANZANT:  I realize that the Court disagrees

23     and I understand that the Court was concerned about his

24     health and safety.  The reason --

25             THE COURT:  Yeah, and you wanted me to give him

1    notice and have him kill himself, so.

2            All right.  Let's move on with the hearing now.

3            MR. VANZANT:  I disagree, your Honor.  May I make a

4    record on that point?

5            THE COURT:  Yeah, go ahead.

6            MR. VANZANT:  What the Court could have done is the

7    Court could have held a hearing right then and there in the

8    courtroom after the motion hearing last week.

9            THE COURT:  Of course the parties didn't have any

10   notice of what the information was and it was the end of the

11   business day.  How were you going to prepare for a hearing?

12   How would that have been meaningful?

13           MR. VANZANT:  It would have certainly changed the

14   entire tenor of this, your Honor.

15           THE COURT:  Well, I said it within a business day

16   that we would have the hearing and I said it according --

17   maybe there was a miscommunication between my staff and you.

18   I set it by agreement on the following Monday, so.  All

19   right.

20           MR. VANZANT:  To that point, your Honor, this is

21   the email so it's in the record and I'll file this too.  This

22   was sent on August 7th at 11:22 a.m.  So this was Monday,

23   August 7th, 11:22 a.m. --

24           THE COURT:  Yes.  The Court was not in session on

25   Friday for the reasons I already stated.

1    MR. VANZANT:  The Courtroom Deputy emailed myself,

2    Mr. Finke, the government, and another individual.

3         "Good morning.  Please confer regarding a detention

4    hearing.  We can hold one on 8-16 at 1:00 p.m. if everyone is

5    available."

6         THE COURT:  Did you say I wanted one tomorrow?

7         MR. VANZANT:  I did not, your Honor.  What I

8    responded --

9         THE COURT:  Okay.  Well, you had the ability to do

10   that.  That's normally what happens, counsel, when a

11   Courtroom Deputy tries to set something.  People say what

12   they want and then she finds a time in the calendar.  And if

13   we -- and even though we're on trial, I'm happy to move

14   things if that's necessary.  In fact, that's what I did

15   today.  I'm currently doing a jury trial and I pushed it back

16   until 10:00 o'clock today and I'm -- it looks like I'm

17   probably going to push it back farther.

18        So I don't know how -- I guess my staff is supposed

19   to read your mind about the fact that you didn't like the

20   date that the Court offered?

21        MR. VANZANT:  My response to the Court -- to the

22   Courtroom Deputy was at 11:25 a.m. on Monday, August 7th.

23   "Defense is available."  That was the question the Courtroom

24   Deputy asked and offered a date.

25        THE COURT:  Okay.

24

```
 1              MR. VANZANT:  That's what we said.  There's --
 2              THE COURT:  All right.  Anything -- go ahead.
 3              Mr. VANZANT:  To the extent that that caught the
 4    Court off guard, I apologize for that.  Could I have said
 5    something in addition to that?  Probably.
 6              THE COURT:  Okay.  Well, let's fix it now because
 7    we have a hearing now and that's -- that's within -- I mean,
 8    we have a hearing now so let's go forward.
 9              MR. VANZANT:  It still doesn't resolve the fact
10    that Mr. Storme was taken into custody.  He's sitting here in
11    custody right now and we haven't had a hearing.
12              THE COURT:  I know; and I have the authority to
13    have someone detained pending a hearing.
14              MR. VANZANT:  Pursuant to a warrant if a violation
15    is alleged.
16              THE COURT:  All right.  Well, now we're going in
17    circles.  I don't think you need to make any other record.  I
18    think you already did, right?
19              MR. VANZANT:  At the moment, no.
20              THE COURT:  Okay.  All right.  Counsel, are you
21    ready to go?
22              MS. CHUNG:  Yes, your Honor.
23              THE COURT:  Call your first witness.
24              MS. CHUNG:  Your Honor, we call Pretrial Services'
25    Officer Justin Wiersema to the stand.
```

1    (Brief pause.)

2    MS. CHUNG:  Your Honor, I'd just like to note for

3    the record Mr. Wiersema was present as the Pretrial Services'

4    officer in this case.  I did not provide prior notice to him

5    that we might call him as a witness.  We had intended to

6    proceed simply by a proffer if defense counsel would agree;

7    but if the Court would like to hear live witness testimony or

8    if defense counsel would not agree, then I would hope that

9    Mr. Wiersema would be willing to testify with respect to the

10   contents of his various reports filed in this case.

11   THE COURT:  Have you had an opportunity to see the

12   government's motion?

13   MR. VANZANT:  This one --

14   THE COURT:  The one filed this morning, yeah.

15   MR. VANZANT:  While I was driving down, your Honor.

16   THE COURT:  Okay.  Well, do you need more time to

17   review it?

18   MR. VANZANT:  No, your Honor.

19   THE COURT:  Okay.  Do you dispute any of the

20   factual assertions in there?

21   MR. VANZANT:  Actually, yes.

22   THE COURT:  Okay.  Can you take a moment; and if

23   you need a short recess, I'll give you time to sort through

24   it.  Let's try to figure out what issues are in dispute and

25   then the government is going to have to be ready to go

1    forward, not by proffer if it's disputed, but by evidence,

2    so.

3          MS. CHUNG:  Yes, your Honor.

4          THE COURT:  Let's take a short recess.  You can

5    take a look there and if the -- and I don't know if the

6    parties want to confer, you can do that as well.  Let me know

7    if there are areas of agreement.  Obviously, the rules of

8    evidence still apply in the same way as a trial so if the

9    parties want to have a combination of incorporating docket

10    entries by reference, talking about proffers, and that

11    goes -- that's a door that swings both ways so you have

12    evidence you want to present by way of proffer.  And then the

13    parties can at least identify for the Court any areas,

14    factual areas of dispute and then we can have evidence and

15    the Court could issue whatever factual findings are necessary

16    so we'll take a short recess.

17          (Recess taken.)

18          THE COURT:  All right.  Let's go back on the

19    record.  Okay.

20          Parties had an opportunity to confer.  Government

21    want to -- I'll hear from both sides but let me hear first

22    from the government.

23          MS. CHUNG:  Yes, your Honor.

24          THE COURT:  What -- are there any agreements

25    regarding a factual record, anything you want to incorporate

1    by reference for the Court's consideration for the factual

2    portion of the hearing?

3             MS. CHUNG:  Yes, your Honor.  The government

4    understands that the factual issues for today's hearing

5    relate primarily to the three reports that were most recently

6    disclosed to the parties, so the reports that are now filed

7    on the docket at Docket Entries 140, 141, and 142.

8             At this time the parties have discussed the

9    government putting on Pretrial Services' Officer Justin

10   Wiersema to testify about the facts underlying that report

11   and the government understands that defense counsel then

12   intends to put on Mr. Storme to testify about his

13   recollection of those facts.

14            THE COURT:  All right.  What about the issues

15   beyond the most recent suicidal ideation and all of those

16   things?

17            MS. CHUNG:  Your Honor, my understanding from

18   defense counsel is that those facts are not in dispute.

19            THE COURT:  Is that your understanding?

20            MR. VANZANT:  The historical items regarding the

21   curfew and the no contact order and things like that, your

22   Honor, they are not in serious dispute.  So the real issue

23   here --

24            THE COURT:  Well, hang on a second.  You're

25   equivocating so let's be clear.  The government filed a

1    response on appeal -- which was government's response to

2    defendant's emergency motion for release of custody -- and

3    filed the government's motion to revoke bond. The first one

4    is Docket Entry 7 in the Appellate Court and the second one

5    is Docket Entry 154. There's a bunch of facts in there.

6           Can I consider those facts -- I mean, apart from

7    the portion that we're going to have an evidentiary hearing

8    on, which is the most recent reports -- let me sort of create

9    two baskets or categories. The recent issues, suicidal

10   ideation and the -- that are contained in the -- is it three

11   reports from Pretrial? You're not agreeing to the three

12   reports but everything else that the government is alleging

13   in those two documents I referenced other than the issues in

14   the three reports, you're conceding that there are no factual

15   disputes as to that record; is that fair to say?

16          MR. VANZANT: Without talking about specific items,

17   your Honor, I would say that's roughly fair to say. I'm

18   hesitant to commit because I don't --

19          THE COURT: Okay. Well, then let's take a short

20   recess and go through it and -- because I need to be able to

21   make factual findings. So if there's a dispute, now is the

22   time to raise it and I can give you an opportunity to be

23   heard and I can make factual findings. If there's not a

24   dispute, that's okay, but I need to know whether or not you

25   dispute something.

1    So again, let's take a short recess.  My
2    understanding is there's a dispute as to the three Pretrial
3    Services' reports, we're going to have a hearing on that, but
4    I need to know whether or not I can accept as agreed facts
5    everything that predates those three reports.

6    MR. VANZANT:  Perhaps it would be helpful, your
7    Honor, if the government identified what specifically they
8    are basing the revocation motion on, what is the violation
9    of super -- of pretrial release.

10    THE COURT:  Well, the Court is going to look at the
11    entire record because that's what the Court needs to do so
12    I'm asking you whether or not you have any factual disputes
13    because I'm not limited by what the government decides they
14    think is important.  I have to make a bond determination.  I
15    have to make a detention determination.  And obviously, even
16    in a case where the government and the defense agrees that a
17    person might be committed to bond, the Court has the
18    authority to say no, I look at the record differently and
19    that's why we have Pretrial Services independent of the U.S.
20    Attorney's Office because the Court has an independent
21    obligation to get it right.

22    So I'm asking you, and I need to know, whether or
23    not you have any factual disputes as to -- and where they
24    are.  So let's take a short recess and I want you to look
25    through the two documents that I've identified -- and they're

1    not long documents and I know you've read them before.  You

2    go through and look at those facts.  And if there's -- any of

3    those facts are in dispute, I need to know that because if

4    there isn't, then I'll just incorporate them as an agreed set

5    of facts as part of the Court's ruling.

6           Okay.  Take a short recess.  Let me know when

7    you're ready.

8           (Recess taken.)

9           THE COURT:  All right.  Back on the record.  The

10   parties have conferred again.

11          Is there agreement regarding the facts beyond the

12   recent Pretrial Services' reports, which is Docket Entry 140,

13   141, and 144?

14          MR. VANZANT:  Your Honor, I've gone through the

15   government's motion to revoke bond so I'll be referring to

16   that in this --

17          THE COURT:  Okay.  My reference was both to Docket

18   Entry 154 in this case, which is the motion to revoke bond,

19   and their response in the Appellate Court 22-2522, Docket

20   Entry 7.  A lot of those facts are the same but I'm asking

21   the parties to review both of those.  So if you need more

22   time, let me know.  I'll give you all the time you need.

23          (Brief pause.)

24          THE COURT:  We're off the record again.

25          (Recess taken.)

1          THE COURT:  Okay.  Back on the record.

2          Okay.  Counsel, parties in agreement regarding the

3    facts set forth in Docket Entry 154 in my case and 7 --

4    Docket Entry 7 in the appellate case, other than the facts

5    set forth in Docket Entries 140, 141, and 142 that are going

6    to be subject to live testimony, is there an agreement that

7    those are part of the agreed facts for the purposes of

8    today's hearing?

9          MR. VANZANT:  Your Honor, I think the -- since the

10   government -- strike that.

11         Since the Court directed me specifically to the

12   government's response on appeal and the government's motion

13   to revoke bond, I'd like to go through those paragraph by

14   paragraph to identify the factual disputes for the record.

15         THE COURT:  Okay.

16         MR. VANZANT:  I'll start with --

17         THE COURT:  Which one do you want to do first?

18         MR. VANZANT:  I'll start with the response on

19   appeal, your Honor.

20         THE COURT:  The response on appeal, okay.  That's

21   Docket Entry 7 in that case.  Go ahead, counsel.

22         MR. VANZANT:  All right.  Starting --

23         THE COURT:  Counsel for the government, go ahead

24   and make notes because you're going to have to address these.

25         MS. CHUNG:  Yes, your Honor.

1    MR. VANZANT:  Starting on Page 3 with heading B,

2    first paragraph -- the first paragraph running onto Page 4 is

3    not disputed.  Second paragraph on Page 4 is not disputed --

4    THE COURT:  Hang on a second.  Why don't you do --

5    do you -- I don't know if this helps; and if it doesn't, let

6    me know.  Are there more disputes or more agreements?  Which

7    one is the bigger category?

8    MR. VANZANT:  It's more agreements, your Honor.

9    THE COURT:  Okay.  Why don't you go through the

10   ones you dispute and then the ones you don't mention are

11   agreed?  That might be quicker.

12   MR. VANZANT:  Okay.  Page 4, paragraph starting

13   "two days later."

14   THE COURT:  Okay.

15   MR. VANZANT:  That is in dispute until the next

16   page, the sentence beginning "without objection."

17   THE COURT:  Okay.  Gotcha.

18   MR. VANZANT:  Page 6, the carryover paragraph is

19   undisputed until the sentence beginning "Pretrial Services

20   reported that."

21   THE COURT:  So the rest of that paragraph on top of

22   Page 6?

23   MR. VANZANT:  Correct, your Honor.

24   THE COURT:  Okay.  That's in dispute.

25   MR. VANZANT:  Page 7, first paragraph is in

1    dispute.

2              THE COURT:  The entire first paragraph?

3              MR. VANZANT:  Yes, your Honor.

4              THE COURT:  Gotcha.

5              MR. VANZANT:  Page 8, first paragraph, which is the

6    one ending "contents until on or about August 3, 2023," just

7    above Subheading C.

8              THE COURT:  All right.  So beginning with "also in

9    November 22" continuing all the way "until on or about August

10   3rd"?

11             MR. VANZANT:  Correct, your Honor.

12             THE COURT:  Okay.

13             MR. VANZANT:  Moving further down the page in

14   Subheading C, the second paragraph starting "ahead of the

15   hearing."

16             THE COURT:  That entire paragraph?

17             MR. VANZANT:  Correct, through the next paragraph.

18             THE COURT:  Okay.

19             MR. VANZANT:  Page 10, carryover paragraph starting

20   "Pretrial Services."

21             THE COURT:  I'm sorry.  I lost you.  Page 10,

22   where?

23             MR. VANZANT:  Page 10 on the carryover paragraph,

24   your Honor.

25             THE COURT:  Okay.

1          MR. VANZANT:  The sentence beginning "Pretrial
2     Services subsequent."
3          THE COURT:  Oh, gotcha.  So it's the last sentence
4     of the paragraph on the top of Page 10.  Got it.
5          MR. VANZANT:  Correct, your Honor.
6          And that continues until the following page, Page
7     11, with the sentence beginning "based on information
8     provided."
9          THE COURT:  All right.  So the rest of Page 10 is
10    also in dispute?
11         MR. VANZANT:  Yes, your Honor.
12         THE COURT:  And then the top of Page 11 ending with
13    "Storme yesterday, August 7?
14         MR. VANZANT:  Correct, your Honor.
15         THE COURT:  Got it.
16         MR. VANZANT:  Moving on to the government's motion
17    to revoke bond, Page 2, second paragraph -- this is about
18    four lines from the bottom -- the sentence beginning "the
19    next day" through the end of the paragraph.
20         THE COURT:  Got it.
21         MR. VANZANT:  Or, excuse me.  Through that
22    sentence.
23         THE COURT:  Okay.  So just that sentence?
24         MR. VANZANT:  Correct, your Honor.
25         THE COURT:  Gotcha.

35

1          MR. VANZANT:  Page 3, the paragraph beginning "in

2    August 2021" through the end of the paragraph.

3          And to be clear, your Honor, I'm not -- we're not

4    objecting to anything procedurally that happened in the

5    court.  It's these underlying facts.  So any of these

6    sentences that say "Pretrial Services thus recommended,"

7    that's not seriously in dispute.

8          THE COURT:  The fact that they recommended

9    something is not in dispute?

10          MR. VANZANT:  Correct, your Honor.

11          THE COURT:  It's the fact that the stay occurred

12    and that -- are true facts, right?

13          MR. VANZANT:  To be --

14          THE COURT:  So you're saying that Pretrial Services

15    misrepresented things that the defendant said or did or

16    misunderstood it?

17          MR. VANZANT:  I would say misunderstood, your

18    Honor, and that's kind of my point here.  It's -- it's not

19    that we are necessarily saying Pretrial Services is one

20    hundred percent wrong.  We're saying that there are

21    additional facts that need to be brought out for the record.

22          THE COURT:  Well, that's not a dispute.  That's

23    just putting it in context with additional facts.  I'm

24    assuming when you say -- for example, on Page 2, you disputed

25    that sentence.  You disputed the sentence -- and I'll quote

1    it as an example -- the next day defendant called Pretrial

2    Services from the shores of Lake Michigan and said he was

3    having suicidal thoughts and was, quote, two steps away from

4    jumping in the lake, end quote.

5         You're disputing that when Pretrial says that's

6    what the defendant said that you're saying Pretrial Services

7    was incorrect, he did not say that?  If you want to add facts

8    that he said it but he didn't mean it, that would not be a

9    dispute of the fact set forth on Page 2 of Docket Entry 154.

10   That would simply be a requirement that you have additional

11   facts that you want to put in the record to put it in context

12   and then argue the inferences that should be drawn from it.

13        So maybe we're not understanding what we're -- the

14   process we're going through right now.  Are you disputing

15   that if the Pretrial Services says X happened or that

16   defendant said Y, that those things are true facts in the

17   world?

18        MR. VANZANT:  I think the better answer, your

19   Honor, is I'm not stipulating to it.  What -- the whole

20   concern I have on these paragraphs that I'm identifying is

21   all we've got here is a partial quote from a longer

22   conversation and if we're going to be doing this hearing now,

23   we need to have these facts on the record.

24        So I don't dispute that Pretrial Services made this

25   report with that in there.  What I want to know is what was

1    the conversation.

2            THE COURT:  Well, it doesn't matter whether or not

3    if they -- they made an allegation in the report.  What

4    matters is what the facts are.  If you dispute their facts,

5    then -- I mean, certainly you don't have to stipulate to

6    things.  But if you have a factual dispute, you have to have

7    a good faith basis for it.

8            I mean, are you going to simply not dispute facts

9    that you actually think happened for the purposes of

10   extending the hearing?  That wouldn't be consistent with your

11   ethical obligations.  But if you want to add facts to put it

12   in context, that's a totally different matter.  I mean, I

13   don't know why you wouldn't stipulate to facts if you lacked

14   a good faith basis to dispute them or if you thought they

15   were true.  And if you didn't know and you wanted the

16   government to prove it, that would be okay but I need to know

17   what your -- what your lines of dispute are.

18           If you simply want to add facts for context, then

19   I -- then -- then you need to explain to me why we're going

20   to have a hearing on facts that you don't contest.

21           MR. VANZANT:  My understanding what the Court said

22   earlier is we're trying to figure out what facts would need

23   to be considered and talked about right now.

24           THE COURT:  Well, it's -- it's an iterative

25   process.  I need to know the facts that everyone agrees to

1   and then we're going to have a hearing with additional facts.

2   So if you agree to all the facts as I stated before in 154

3   and 7 but you want to add facts and then argue the inferences

4   to be drawn from it, then we're going to have a hearing.  And

5   we can have it not just on the Docket Entry 141 and 142, but

6   if you want to add facts to the historical record, you can do

7   that too.

8           But I need to know -- and this is a legitimate,

9   request by the Court, I need to know what's in dispute and

10  what isn't because if there are agreed facts, then let's

11  figure out what those are and then get to the ones that are

12  not agreed because that's -- that's a fair thing to do on

13  both sides, so.

14          Do you want to agree to the facts and then add

15  facts both historically and to the recent three Pretrial

16  Services' reports?  I mean, you're going to call your client

17  anyway and he's going to testify to -- not just the recent

18  stuff but he can address the historical stuff too if you

19  want.

20          MR. VANZANT:  Your Honor, the reason I'm hesitating

21  is I'm weary of stipulating to anything right now without

22  having the actual evidence in the record and --

23          THE COURT:  Which is why I set the hearing out and

24  I wanted the parties to have an -- not only an opportunity to

25  consult with Pretrial Services but the opportunity to

1    investigate it and consider it, which is why the Court took

2    the procedure it did.

3         But we're here now because the parties agreed

4    upstairs that I needed to have a hearing and because of that

5    we got to do a hearing within 24 hours so that's why we're

6    here.  So if you want to begin the hearing and then you want

7    to continue it to finish it, I would consider that, which is

8    sort of the Court's initial approach before things got

9    preemptive.

10        Do you want to do the hearing and then leave the

11   evidentiary portion open so you can call additional witnesses

12   or evidence?

13        MR. VANZANT:  No.  We'll be calling Mr. Storme.

14   That's it, your Honor.

15        THE COURT:  Okay.  Well, are you prepared to --

16   well, go ahead look and through it.  If things are not in

17   dispute, let me know.  If they are, let me know.

18        MR. VANZANT:  Your Honor, it's not in dispute that

19   Pretrial Services said what it said in the Pretrial reports.

20   What I am attempting --

21        THE COURT:  Is it in dispute that it's true?  Not

22   just that it was said but that it was true?  Because I have

23   to find facts that are true.  It's not just the allegations.

24        MR. VANZANT:  No.  I understand that, your Honor,

25   and --

1          THE COURT:  And it's not a pop quiz.  If you want a

2    moment to talk about it with co-counsel, he's looking like he

3    wants to talk to you anyways, so.

4          MR. VANZANT:  It's not that, your Honor.

5          THE COURT:  Okay.

6          MR. VANZANT:  So this is the issue:  I am concerned

7    that I am going to waive something here.  What I want is to

8    make sure that there's an adequate factual basis in the

9    record for us to understand what exactly happened.

10          So I'm not necessarily saying that Pretrial

11    Services is completely misrepresenting this so if that's what

12    the Court is asking, I think these are the areas we are --

13    want to delve into and that's what I've discussed with the

14    government.

15          THE COURT:  I understand the areas the parties want

16    to delve into but the Court has an independent obligation to

17    look at the entire record to make an appropriate

18    determination on bond; okay.  So I'm telling you that that

19    universe includes everything because old facts take on new

20    significance with new developments and there certainly were

21    new developments in this case and you don't look at those in

22    isolation and ignore the entire factual record; right.

23          If, for example, let's -- and let's take a

24    simplified example because this is very -- an unnecessarily

25    complex case here.  Let's say a person had some issues with

1   drug addiction, right, violated a bunch of -- you know, had

2   positive tests, et cetera, and then he started doing well

3   again, right, and then he got a relapse and then some new

4   event happened, right, let's say he had a particular issue in

5   his life, right, the Court would look at the entire record on

6   bond in addressing new issues.  It wouldn't ignore

7   everything; right.

8          And, for example, if the defendant here had some

9   adverse rulings, right, from Judge Lee -- I didn't issue any

10  rulings -- but the adverse rulings from Judge Lee, that

11  changes the calculus, right, because his prospects about what

12  he thinks is going to happen with the case -- and this is

13  based on what he said to Pretrial and I think some of this is

14  not going to be disputed -- is, you know, I'm not going to

15  jail; right.  And so if he gets adverse -- and the other

16  thing he said is if that hearing -- I'll know of how Judge

17  Blakey is going to go based on his questions.

18         In fact, your client audited my courtroom for a

19  period of weeks.  We'd come in every day -- and it's totally

20  his right to do so because it's a public proceeding, but he

21  indicated to Pretrial that he had an idea of how I rule and

22  that by watching me in different cases, that he would be able

23  to figure out what I was going to do.  And then he also

24  took -- essentially escalated things by making final

25  arrangements.  It's not just that he made suicidal threats

1 and attempts -- in fact, he made an additional attempt on

2 August 3rd -- but he made final arrangements so that his

3 affairs were in order; right.

4 So the other factors, right, the underlying

5 cyberstalking, the international travel, the prior residency

6 abroad, the lacks of ties to the district, the loss of a

7 third-party custodian, right, which is also a changed

8 circumstance, I mean, those affect not just his -- the

9 Court's assessment of whether or not he's going to show up

10 for court. It also affects his risk of danger because

11 there's not a clean record on danger and the record on both

12 failure to appear and danger is the totality of the

13 circumstances. So if you have new information, it casts a

14 different light on the other ones and you can't just look at

15 what happened yesterday and ignore what happened over the

16 course of pretrial release.

17 There's no case that I'm aware of that says the

18 Court needs to be that myopic and that would be an absurd

19 view of things because the Court has to look at everything

20 because it's such a hard determination anyway, assessing a

21 person's -- what they're going to do in the future. We have

22 to look at a crystal ball, right, are they going to show, are

23 they going to be a danger to the community which technically,

24 I suppose, includes the defendant. The defendant is part of

25 the community. I'm not relying on that but it's true.

1          So I need to know -- regardless of what people want

2     to emphasize or what they think is important for today, I

3     need to know the entire record especially because I wasn't

4     the judge from the beginning of the case.  Okay.  Judge Lee

5     was, the Magistrate Judge was so I'm -- and I'm not going to

6     the view the same way those judges did.  No two judges in the

7     building are going to weigh factors the same way.

8          And whether it's the initial 3142 determination

9     being reconsidered or whether it's a revocation proceeding

10    under 3148, either way, I have to look at the entire record

11    so I need to know where the disputes are and where they're

12    not, so can you help me with that?

13          MR. VANZANT:  That's what I'm trying to articulate,

14    your Honor.  What I'm saying is -- I'm not saying the Court

15    can't look at the whole record.  What I'm saying is the

16    subject of testimony that we actually need to have is related

17    only to the paragraphs I identified.  I do not take issue

18    with the violation reports back in --

19          THE COURT:  Okay.  So how about a straight answer

20    to my question?  Other than the things that you want to add

21    with new testimony because you're -- I'm assuming your client

22    is going to testify and the testimony we're going to hear

23    from the Pretrial Services which would include your cross

24    examination, you're going add a bunch of facts to the

25    record -- apart from that, which will happen in a moment and

1  then I'll make whatever credibility determinations I need to,

2  there's no facts in the two documents that I've identified

3  that you say are untrue because if they are, the

4  government -- the government is entitled to a fair proceeding

5  as well.  If they're alleging something -- and they have in

6  two court filings that you've had an opportunity to review --

7  and you say -- you know, they say the sky is blue and you go

8  no, the sky is not blue, then they have -- need an

9  opportunity to prove whether the sky is blue and that's

10 legitimate.

11         So I need to -- I know you don't want to waive

12 anything but you also need to decide things.  So let me

13 know -- and I'll take another break -- whether or not there

14 are any facts in those two that you say are not true.  And

15 I'm not talking about what's alleged; I'm talking about what

16 the facts are in the true world.  And that doesn't prevent

17 you from adding additional facts or putting them in context

18 with new information; okay.  So let's take another break.

19 Let me know when you're ready.

20         (Recess taken.)

21         THE COURT:  Okay.  Back in session.  Where are we,

22 counsel?

23         MR. VANZANT:  All right.  This is -- this is my

24 thought process on this.  We need to hear factual evidence on

25 several of these points.  I intend to put Mr. Storme up and

1    we will ask him whether or not a particular fact is true or

2    not based on how Pretrial testifies.  What I can't do right

3    now is stipulate to things that I have not heard factually.

4    I know what Mr. Storme tells us.  I don't know if the

5    government is going to say something different because we

6    don't have the context.

7            So what I am saying is that there are -- the

8    paragraphs that I've identified are the ones that I think we

9    need to have -- hear evidence on.  So far as the prior stuff,

10   I don't think we need new evidence on the curfew violation

11   and the stalking thing.  None of that is seriously in dispute

12   but what I'm hesitant to do is I won't stipulate to something

13   that I don't know for sure.  And to the extent the Court --

14           THE COURT:  Well, that's legitimate so how about we

15   do this?  How about -- and I'm just throwing this out there.

16   You tell me if you -- this is not a good idea or it misstates

17   anything.

18           You've identified paragraphs -- at least in the --

19   you've done it as to both these two documents, right?  The

20   paragraphs you haven't identified, there's no dispute that

21   those are factually true, right?

22           MR. VANZANT:  Well, there might be a dispute about

23   what he said to the police specifically --

24           THE COURT:  Okay.

25           MR. VANZANT:  -- as the stalking thing.

1     THE COURT:  There's additional paragraphs that

2 might be in dispute in the two documents that you didn't

3 mention?

4     MR. VANZANT:  Well, and that's my problem, your

5 Honor.  I'm kind of shooting in the dark here because I don't

6 know what the government is going to argue.  I know what's in

7 their motion but so far as to what factually they're going to

8 point to I don't know that and I can't stipulate to

9 something.  What I'd like to do is just get Officer Wiersema

10 up on the stand, let's put Mr. Storme on the stand, and let's

11 get some answers rather than going back and forth.  And we

12 can certainly -- if the Court asks after that do we have a

13 dispute about X, Y, or Z, I'm more than to happy explain that

14 at that point.  I'm having a lot of trouble doing it

15 preemptively because I am very concerned about waiving

16 something that does not need to be waived.

17     THE COURT:  All right.  So how about we call the

18 Pretrial Services, we'll make that part of the -- officer,

19 that part of the factual record, direct subject to cross.

20     As part of that process, I'm assuming you're going

21 to ask for the effort in the -- effort to be efficient to

22 incorporate by reference "have you reviewed your reports 140,

23 141, 142, are they true and accurate," have you -- and give

24 him the opportunity.  Also, to review your characterization

25 of the facts and we do this before the testimony of Docket 7

1    and Docket Entry 154 -- and when I say "7," I mean the

2    Appellate Court -- so we can at least have some live

3    testimony about whether or not he thinks there's any

4    clarifications that need to be made to the government's

5    proffer in those two documents and then you go ahead and ask

6    additionally whatever else you think is important, then you

7    cross away.  Okay.  You cross away.  And I would not limit it

8    to the initial things because, as you agreed with me, that I

9    have to look at everything; right.  So go ahead and cross him

10   on everything, including historical.  Okay.

11              And then we can determine based on that factual

12   record, that live testimony, which would also include the

13   defendant testifying both as to recent events and historical

14   events and subject to cross -- and I'm including redirect in

15   all of this too -- and then the parties would have an

16   opportunity to meet and confer and see if any issues that

17   were not addressed in the live testimony can be at least

18   agreed to by reference to those two documents.

19              Also, I'm going to ask you about Docket Entry 1,

20   which is the criminal complaint.  Obviously as part of any

21   analysis, whether I'm doing a revocation of bond or

22   reconsidering the denial of a detention motion, the Court has

23   to look at the -- one of the factors has to do with the

24   underlying case and that's set forth in this Court's -- in

25   this case, my Docket 1, which has an affidavit signed under

1    oath by Michael Devine.

2              Is that person available to testify?

3              MS. CHUNG:  He is not, your Honor.  That's the case

4    agent in this case.  He's not present here today and I

5    believe he is on parental leave through some time in

6    November.

7              THE COURT:  Okay.  Is there anyone else involved in

8    the investigation of the underlying offense with knowledge of

9    the information set forth in Docket Entry 1, the complaint

10   affidavit that can be subject to cross?

11             MS. CHUNG:  Not to my knowledge at this time, your

12   Honor.  I can make inquiries.  I can try contacting Special

13   Agent Devine's colleagues at the FBI to see if someone else

14   would be prepared to testify.

15             THE COURT:  All right.  Well, I'm going to need --

16   I'm going to require you to do that because we have 24 hours

17   consistent with the Seventh Circuit's ruling so they would

18   have to come in today.  So at some point before we complete

19   the hearing, you're going to need to do that, so.

20             How does that sound?

21             MR. VANZANT:  I think that sounds like a good plan,

22   your Honor.

23             THE COURT:  All right.  Let's take a short recess.

24   I'm going to need to cancel my jury trial for today.  I'm

25   going to send all of my jury home and all the lawyers because

1    this sounds like it's going to take all day.  And while I'm

2    doing that, I would like the government to reach out to make

3    sure you can have people who are available to testify because

4    I'm assuming you're not going to stipulate to anything in

5    that criminal complaint but that's part of the facts the

6    Court needs to assess.

7                And obviously the defendant is presumed innocent

8    and allegations are not facts; but for the purposes of bond,

9    the Court needs to assess, among other things, the facts that

10   are in there because they relate to the factors both as to a

11   revocation or as to a reconsideration of a denial of

12   detention or a consideration of a revocation of bond, those

13   same facts, and also the strength of the case and what the

14   government believes its evidence would be beyond a reasonable

15   doubt.  Obviously, that's -- that's -- that doesn't bind what

16   some jury will do or what your defense may or may not be

17   and -- but the Court needs to look at the entire record and

18   that's part of it so you're going to have to have somebody

19   who can have knowledge of the facts in the affidavit.

20               Certainly I'm assuming the parties would testify,

21   if called to testify, Michael Devine would testify consistent

22   with his affidavit.  That's not saying those facts are true.

23   That's saying he would testify to that but counsel for

24   defense is entitled to test the underlying facts also, which

25   means a live witness subject to cross.

1    So why don't you get a witness available today to

2  prove up your case; and if you have any other witnesses you

3  need to -- other than your client, now would be the time

4  to -- or any other evidence at all, whether it's

5  psychological reports, a proffer of what relatives would say,

6  any of those things, the Court wants to look at a complete

7  record and I need to get it right.  And if I was wrong in

8  detaining him, then I need to know that, too, so -- detaining

9  him pending a full hearing, which is what we're doing today

10  instead of the agreed date, or at least I thought was an

11  agreed date.

12    All right.  I'm going to take a recess, you guys do

13  that; and then when you're ready to go, let me know and we'll

14  reconvene immediately.

15    All right.  Anything else before we take a break?

16    MS. CHUNG:  No, your Honor.

17    MR. VANZANT:  Just one point for the record before

18  I forget about it, your Honor, we just -- for the record, we

19  did receive the prior reports last night at I think 10:35.

20  Just for record, I wanted to make sure that that was clear.

21  We'll talk about it later but I don't want to forget.

22    THE COURT:  The 140, 142 and --

23    MR. VANZANT:  No, your Honor.  We got those right

24  before I filed the appeal so that's why I got the docket

25  numbers in there.  I'm talking about the remainder of the

1    reports.  We got those from Officer Wiersema last night

2    after --

3              THE COURT:  Which reports are you referring to

4    because I want to make sure we're talking about the same

5    thing.

6              MR. VANZANT:  I can put the actual email into the

7    record too, your Honor, so we've got it.

8              THE COURT:  Well, I just want to make sure I've got

9    it.  If there's some -- is the government aware of some

10   report the Court hasn't seen on the docket?

11             MS. CHUNG:  No.  Your Honor, I believe defense

12   counsel is referring to the prior Pretrial Services' report,

13   so, for example, the original bond report and addendum that

14   were -- are on the docket in this case.  I believe that --

15             THE COURT:  Oh, because you guys can't see those

16   without getting a copy?

17             MR. VANZANT:  They weren't filed, your Honor.

18             THE COURT:  Oh, okay.

19             MR. VANZANT:  They weren't filed on the docket.

20             MS. CHUNG:  Those were filed on the docket but they

21   may be sealed.  They're -- I believe it's Docket Entries 11

22   and 12.  And then there are a number of additional status and

23   violation reports that are referenced in the government's two

24   filings some of which were filed on the record and some of

25   which were not, your Honor.

 1            THE COURT:  Well, a lot of them are filed on the

 2    record but under seal.  In fact, the Pretrial Services'

 3    report I believe it's commonly sealed.  In fact, the parties

 4    get it for the detention hearing and then they have to give

 5    it back.  Is that still the rule?

 6            MS. CHUNG:  I don't know about giving it back, your

 7    Honor.  We receive it electronically --

 8            THE COURT:  Oh.

 9            MS. CHUNG:  -- so, for example, I had electronic

10    copies and the file of the AUSA I inherited this case

11    from but --

12            THE COURT:  Well, back when I'd do it, we didn't

13    have an electronic docket.  That's how old I am.

14            All right.  So -- well, can the parties meet and

15    confer on those because I need to know to make sure that

16    everyone has had an opportunity to review that because all

17    that is going to be part of the record for a detention

18    hearing and can -- can you print out a copy of the universe

19    so --

20            MS. CHUNG:  Yes, I can, your Honor.

21            THE COURT:  -- I'm physically looking at the same

22    thing?  I'll look through those; and if anyone thinks any of

23    that should be subject to live testimony, let me know.

24            MR. FINKE:  If we could also get --

25            THE COURT REPORTER:  I'm sorry?

1          THE COURT:  Can you find a microphone, please?

2          MR. FINKE:  If we could also get a paper copy for

3  the defendant so that he can review it with counsel so it

4  might expedite identifying which facts are in dispute.

5          THE COURT:  I appreciate that.  That's a great

6  idea.

7          All right.  So you're going to contact witnesses,

8  you're going to see if you need witnesses beyond your client,

9  you're also going to get the -- those documents to make sure

10  everybody is literally on the same pages and you're going to

11  give me a copy and you're going to give the defense a copy so

12  that his client has an opportunity to go through it.

13          I know the client has been on suicide watch which

14  makes it more difficult to meet and confer with him, which is

15  another reason why the Court set the detention hearing when

16  it did, but be that as it may, we're doing the detention

17  hearing now, so.

18          All right.  I'm going to rely on you guys to tell

19  me when to restart, okay, and I want to do it as soon as we

20  can -- as soon as practicable considering that we at least

21  have to do it fairly.  So -- quickly but fairly and then give

22  me reset.  While you guys are doing that, I'm going to -- I'm

23  going to call my jury and release them for the day.

24          All right.  Anything else before the break?

25          MS. CHUNG:  No, your Honor.

1     THE COURT:  Thank you, counsel.  Court's in recess

2    on this case.

3         (Recess taken.)

4         THE COURT:  Court's back in session.  All parties

5    are present.

6         Okay.  What's the current status, counsel?

7         MS. CHUNG:  Your Honor, first of all, I do have

8    copies of the Pretrial Services' reports from earlier that

9    were recently tendered to defense counsel last night so I can

10   pass that up.

11        THE COURT:  Did your client get copies as well?

12        MR. VANZANT:  Yes, your Honor.  We've got them.

13        THE COURT:  Excellent.  Thank you.

14        MS. CHUNG:  Secondly, I was able to contact Special

15   Agent Mike Devine, the case agent in this case.  He made

16   arrangements and is on his way to the courthouse now to

17   present live testimony with respect to the complaint.

18        THE COURT:  Okay.  Great.

19        MS. CHUNG:  So unless there's anything else from

20   the Court or from defense counsel, I think at this point we

21   may be ready to proceed starting with testimony from Pretrial

22   Services' Officer Wiersema.

23        THE COURT:  What are your thoughts?

24        MR. VANZANT:  I just have one question, your Honor,

25   a point of clarification.  Earlier in the hearing, the Court

1    referenced its inherent ability to reopen detention hearings

2    under 3142(f).  I wanted to clarify whether the Court

3    considers this a reopened detention hearing or a revocation

4    hearing under 3148.

5               THE COURT:  Both.  I'm ruling -- I'm going to

6    consider it and rule in the alternative.

7               MR. VANZANT:  Okay.  That was the reason I asked

8    your Honor because the standards are different so we'll -- I

9    guess we'll address that --

10              THE COURT:  How are the standards different?

11              MR. VANZANT:  Well, under 3148, there are very

12   specific requirements before the Court can revoke.  But if

13   the Court is considering this a reopened detention hearing of

14   which I guess we're considering whether he should be let out

15   de novo, then that's a different story.

16              THE COURT:  Well, it's a question of whether or not

17   the prior denial of the detention was rightly decided so be

18   prepared to elicit testimony and evidence and argument on

19   both issues and I'll rule alternatively on both --

20              MR. VANZANT:  Okay.

21              THE COURT:  -- as to both so there's a record clear

22   on both.  But just so you're not -- thank you for bringing it

23   up because I thought it was clear from what I said before but

24   I'm glad that you asked for a clarification because it's

25   important for the parties in framing questions and answers

1   and arguments, both factual and legal, that they address both

2   the reconsideration of the prior denial and I've cited the

3   statutes earlier.  One thing I didn't cite was a -- there's

4   another section that says the Court can amend the order at

5   any time, but anyway.  And also, the revocation section.

6          It's the Court's intention to do both.  The Seventh

7   Circuit referenced Section 3148 and obviously 3148 in turn

8   references the other one.  I'd be -- the Court, based on my

9   view of the law, I have to be able to assess the current

10  factual record and the developed factual record of the

11  parties under both things because the government is not just

12  seeking to revoke bond.  They had a prior motion to detain

13  the defendant that was denied and the Court has -- based on

14  the statute and including its inherent authority has the

15  ability to reconsider that so I'll make sure that everyone is

16  developing the facts and their arguments accordingly.

17         The only other thing I think I forgot to mention

18  before was -- and if I'm mischaracterizing your argument, let

19  me know.  One of the arguments the defense made was that the

20  government can't move for revocation of bond because the

21  revocation of bond conduct happened previously and they

22  didn't seek to revoke at that time.  They worked with the

23  parties either a wait-and-see or they agreed to modification.

24  Certainly, the Court did not revoke but there was a series of

25  modifications in bond.

1    I don't believe there's any authority for imposing

2    a time limit on the government's moving for revocation.  The

3    Court -- I mean, certainly the government, I think, has the

4    authority to exercise its prosecutorial discretion to

5    either -- to assess evidence of bond violations and not

6    immediately jump to a revocation.  They can wait and see,

7    they can agree to different things; and then as the factual

8    record develops, they could seek to revoke at a different

9    time based on not just the underlying violations of bond but

10   the other factual evidence that puts it into context over

11   time and any other reading of the statute, I think, is --

12   would lead to an absurd result.

13        You have to read the two sections together, 41 and

14   48, first of all.  And, second of all, it would create this

15   use-or-lose rule where if the government did not move

16   immediately or contemporaneously with a violation of bond,

17   that they would somehow be timed out or prevented from going

18   back and seeking a violation of bond based on new evidence.

19   And as I indicated earlier, very often when the Court looks

20   at a totality of circumstances in assessing either assurances

21   that they will appear or risk of danger, old facts take on

22   new significance and sort of new things.

23        So there's nothing wrong or improper about the

24   government not moving to revoke previously and there's

25   nothing wrong or unlawful about them doing so now.  In fact,

1    it would create a rule where the government would be seeking

2    to revoke when even they believe that there might be other

3    conditions or -- that we ought to try or that we ought to

4    wait and see with additional time about a person's conduct.

5           That's what they did here.  They had a basis to

6    revoke, they didn't, and they agreed -- kind of engaged in an

7    interactive collaborative process and then the landscape

8    changes over time, including a variety of things that we

9    talked about including the defendant experiencing adverse

10   rulings in the case and beginning to make final arrangements

11   financially and making statements that he wasn't going to

12   prison so obviously there's a lot involved in there.

13          Okay.  Anything else we need to address before we

14   call the witness?

15          MS. CHUNG:  Not to the government's -- not in the

16   government's view, your Honor.

17          THE COURT:  Ready, counsel?

18          MR. VANZANT:  Yes, your Honor.

19          THE COURT:  All right.  Call the witness.

20          MS. CHUNG:  Your Honor, the government calls

21   Pretrial Services' Officer Justin Wiersema to the stand.

22          THE COURT:  Raise your right hand.

23      (Witness sworn.)

24          THE COURT:  Okay.  Counsel, whenever you're ready.

25          MS. CHUNG:  Thank you, your Honor.

1    JUSTIN WIERSEMA, GOVERNMENT'S WITNESS, FIRST DULY SWORN

2                        DIRECT EXAMINATION

3    BY MS. CHUNG:

4    Q    Officer Wiersema, are you assigned to defendant Vincent

5    Storme?

6    A    Yes, I am.

7    Q    And can you -- and are you responsible for the

8    preparation of the various status and violation reports that

9    have been prepared in Mr. Storme's case?

10   A    Yes.

11   Q    Just to clarify, does that include violation and status

12   reports that -- some of which have been filed on the docket

13   and others of which have not?

14   A    All of them have been filed on the docket.

15   Q    Oh, okay.  To your knowledge, all of them have been

16   filed?

17   A    Correct, yes.

18   Q    Thank you; and my apologies for any confusion about

19   that.

20              More specifically, Officer Wiersema, were you

21   responsible for the preparation of a report on or about

22   October 13th, 2021, that was at least initially submitted

23   only to the Court and not initially publicly docketed?

24   A    Yes, I was.

25   Q    And at the time that you submitted that status report,

1    was the information in that report true and correct to the

2    best of your knowledge?

3    A    Yes, it was.

4    Q    Similarly, were you responsible for the preparation and

5    submission of a status report on or about November 9th, 2022,

6    that was initially only provided to the Court and later

7    docketed?

8    A    Yes, I was.

9    Q    And once again, was the information provided in that

10   report true and correct to the best of your knowledge at the

11   time?

12   A    Yes.

13   Q    Lastly, were you responsible for the preparation of

14   another report dated on or about August 4th, 2023?

15   A    Yes.

16   Q    And was the information in that report also true and

17   correct to the best of your knowledge at the time?

18   A    Yes, it was.

19   Q    Since the submission of these three reports, is there

20   any other -- actually, strike that.

21           Could you please describe what your process is when

22   preparing status -- we can start with violation reports and

23   then status reports.  So first, what is your typical process

24   when preparing violation reports?

25   A    When preparing a report, we gather the information

1    whether that's through a police source or whatever the

2    violation may be, we document that in our system, we generate

3    that report -- violation report, it's reviewed by my

4    supervisor or by a supervisor in our office and it's signed

5    off and at that point it is sent to the court and docketed

6    and then sent to all parties unless there's a reason it

7    doesn't need to go to all parties.

8    Q    And what's the typical time frame within which you first

9    learn of a potential violation and draft the report?

10   A    That varies based on the nature of the report.  Some

11   reports are kind of summary in nature that are maybe not as

12   serious, but serious reports are written sometimes within

13   minutes of that particular violation if that information

14   needs to get to the court immediately.

15   Q    And is it fair to say that your process is similar then

16   with respect to status reports as opposed to violation

17   reports?

18   A    Nearly exactly the same, yes.

19   Q    And with respect to -- in particular the August 4th,

20   2023, report that was prepared and submitted to the Court,

21   could you please describe what your -- what the process --

22   what the process was for preparing that -- that particular

23   report and the timing in relation to the events described

24   therein?

25   A    Of course.  That report contained information that was

1    provided to the Court previously in oral form in Judge's

2    chambers so that report was essentially a summary of what's

3    been provided to the Court prior to that.  The Court directed

4    us to write that report and then file it and submit it to all

5    parties after Mr. Storme was taken into custody.

6    Q    And can you -- can you describe the timing of when you

7    provided the oral reports to the Court prior to preparing the

8    written report?

9    A    Yes.  I believe I provided the oral report around July

10   25th and then the Court directed at that time, once

11   Mr. Storme was in custody, that report should be generated in

12   written form and submitted to all parties so it was to be

13   submitted after his -- he was taken into custody.

14   Q    Thank you.  Now I'd like to go back a bit and direct

15   your attention to around October of 2020.  Were you

16   responsible for preparing a status report sometime in early

17   October 2020?

18   A    Yes.

19   Q    And do you remember what the nature of the information

20   in that report entailed?

21   A    Is that dated October 2nd?

22   Q    It is.

23   A    Yes.  That -- in summary, that report outlined what we

24   believed to be a suicide attempt of Mr. Storme by Mr. Storme.

25   The report summarized kind of the events of that time frame

1    and what -- what had occurred and what we requested the Court

2    modify the bonds -- bond conditions to be.

3    Q    And since -- since writing and submitting that report,

4    have you learned any new information related to that specific

5    incident that is not included in that report?

6    A    Nothing.

7    Q    Next I'd like to direct your attention to early 2021 and

8    more specifically another report that you prepared on or

9    about February 2nd, 2021.  Do you recall what the

10   information -- what -- generally what the information was

11   provided in that February 2nd, 2021, report?

12   A    I don't recall exactly without looking at the report.

13   Was that a violation report?

14            THE COURT:  You can approach, counsel.

15            MS. CHUNG:  Yes.  It was a violation report and

16   I'll approach.

17            THE WITNESS:  Thank you.

18            MR. VANZANT:  Your Honor, I have no objection to

19   Officer Wiersema reviewing his reports as we're discussing

20   this for the sake of efficiency.

21            THE COURT:  Okay.  I appreciate that.  Noted.  He's

22   got a lot of reports so it's important that he knows which

23   one we're talking about.

24            THE WITNESS:  Yes.  This is -- this was authored by

25   me on February 2nd, 2021.

1  BY MS. CHUNG:

2  Q    And, Mr. Wiersema, could you please -- have you had a

3  chance now to review that report that's in front of you?

4  A    Yes, I have.

5  Q    And with respect to this report, was the information in

6  this report true and correct to the best of your knowledge at

7  the time that you wrote the report?

8  A    Yes, it was.

9  Q    And apologies, just to go back, the last report that we

10  talked about also from October of 2020, was the information

11  in that report also true and correct to the best of your

12  knowledge at the time that you wrote it?

13  A    Yes, it was.

14  Q    Now coming back to the February -- this February 2021

15  report, sitting here today, is there any other information or

16  update that you have since learned relating to the events

17  described in this report that is not captured within this

18  report?

19  A    No, there's not.

20  Q    Now I'd like to turn to the report that you submitted

21  that was filed at Docket 140; and I'll find the exact date in

22  just a moment.  So this is the report that was -- sorry.

23  This was the report that was dated October 13th, 2021.  Do

24  you recall that report?

25  A    I do, yes.

1    Q    And specifically in that report, do you recall

2    referencing statements that Mr. Storme made to his counselor

3    on or about August 31st, 2021?

4    A    I do, yes.

5    Q    Is there anything else that you recall with respect to

6    the statements that Mr. Storme made to his counselor on that

7    date that is not captured within this report?

8    A    Nothing.

9    Q    The report also references that defendant made contact

10    with you a few days after that August 31st therapy session.

11    Is there -- can you describe for the Court what, if anything,

12    else you recall about your contact with the defendant on that

13    occasion?

14    A    I don't recall anything further other than what's in the

15    report.

16    Q    And just -- just to make sure the record is clear, the

17    report references that when you made contact with the

18    defendant a few days following his August 31st, 2021, therapy

19    session, Mr. Storme again repeated the same statements and

20    expressed that he cannot be a convicted felon.  What does

21    "the same statements" refer to in that -- in your report?

22    A    Referring to -- "the same statements" refer to the

23    conversation he had with Ms. McKinley, his counselor, that

24    he -- he's not going to be a convicted felon, I'm not going

25    to -- this case is not going to -- I'm not going to be

1    convicted of this offense.  I have -- you know, I will

2    just -- statements to the effect of I will not continue with

3    this, I will not be living anymore.

4    Q    Thank you.

5         Now I'd now like to direct your attention to the

6    report dated November 9th, 2022, which for reference is filed

7    on the docket at Docket Number 141.  Are you familiar -- do

8    you recall the contents of this report?

9    A    Yes.

10   Q    And this report makes reference to statements that

11   Mr. Storme made at a November -- pardon me, at an October

12   27th, 2022, counseling session.  Is there anything else

13   relating to the -- the statements from that counseling

14   session that -- beyond what is described in the report that

15   you can testify to today?

16   A    He made similar statements to the ones he made in the

17   year prior, similar statements about that he will not be

18   convicted of this offense and he would end his life if he is

19   convicted.

20   Q    The report also references that on or about November

21   8th, 2022, you had contact with the defendant at which time

22   he repeated the same or similar statements.  It also

23   references that the defendant stated he has no plans to harm

24   himself at this time.  Is there anything else about your

25   contact with the defendant that you recall beyond what's

1     already captured in this report?

2     A    Yes.  Mr. Storme would say that -- I would ask him if

3     he -- is he okay, is he safe now, does he plan to harm

4     himself now and he would say no, not now but I will not be

5     convicted.  If I have -- if I'm convicted, I will kill

6     myself, I will harm myself, I will -- I will end it is a word

7     he used to use, he has used in the past.

8             So he expressed at that time that he had no

9     immediate plans but depending on how thing -- how this case

10    goes, it's likely to happen.

11    Q    And on the second page of that same report, there's also

12    reference to a February 3rd, 2021, phone call you received

13    from defendant when he was on the shores of Lake Michigan.

14    Beyond what's described in the report itself, is there

15    anything else you recall about that conversation that is not

16    captured in the report?

17    A    It was a lengthy conversation where we discussed many

18    things.  I was attempting to deescalate the situation by

19    telling him it's not -- it was very cold and he should not be

20    standing at a lake at this time, suicide is not the way to go

21    in this -- at all and I told him to call the crisis line.  He

22    had a -- he had a suicide hotline number which he had, was

23    provided from a counselor.  There was -- there was a lengthy

24    conversation about that.  And as we were speaking, I recall

25    him getting a call from another counselor so he disconnected

1    the call to take that call.

2          Being he was on GPS, I could see where he was so I

3    monitored that and noted that he had left the shores of Lake

4    Michigan and headed back to his house so I called him about

5    an hour later.  He was home.  He indicated he was safe and

6    that was a -- that was a lengthy process in which we talked

7    probably five times that day.  And that was a -- that was the

8    situation where, you know, he had expressed these feelings

9    and we feel he didn't make an attempt there but he went home.

10   Q    And finally with respect to the report dated August 4th,

11   2023, and this is the report that memorializes a prior

12   earlier -- oral reports that you made to the Court.  The

13   report first references a conversation with you in which

14   defendant expressed that he was very nervous about the motion

15   hearing that was being -- that was held last week.

16         Do you recall anything else about that contact and

17   conversation with the defendant that is not captured in this

18   report?

19   A    No.  I believe the report summarizes the entirety of the

20   conversation there.

21   Q    The report also references a prior counseling session on

22   or about July 20th, '23, in which defendant discussed

23   contacting an attorney and transferring his assets in advance

24   of the motion hearing.  Is there anything else with respect

25   to the information you received about that counseling session

1    that is not captured in this report?

2    A    There is not.

3    Q    Later on at the bottom of that -- the first page of the

4    report in the same paragraph, there's reference to another

5    counseling session on or about July 27th, 2023, in which the

6    defendant continued to discuss his thoughts and plans and

7    made further references to making payments to the attorney

8    handling his asset transfer.

9         Is there anything else relating to that counseling

10   session and the statements defendant made that is not

11   captured in this report?

12   A    The only thing is that Ms. McKinley stated that he

13   continued to make the similar statements about ending his

14   life depending on the motion status and ending his life

15   depending on how the ruling goes or how the hearing goes

16   that's -- that was approaching.

17   Q    And on the second page of the report, there's reference

18   to a July 24th, 2023, conversation that you had with the

19   defendant relating to the asset transfer.

20        Is there anything -- is there anything about that

21   conversation that you had with the defendant that you recall

22   that is not captured inside this report?

23   A    Nothing.

24        THE COURT:  Ladies and gentlemen, it's noon.  I

25   want to make sure the defendant doesn't miss lunch and so

1   we're going to adjourn for now and reconvene at 1:00 o'clock.

2   The attorneys are allowed to eat too so go ahead and have

3   something to eat and we'll reconvene at 1:00 o'clock.

4           MR. VANZANT:  Thank you, your Honor.

5           THE COURT:  All right.  Court's in recess.

6           MS. CHUNG:  Thank you.

7       (Lunch recess at 12:02 p.m. until 1:00 o'clock.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,      )   Docket No. 20 CR 650-1
 4                                   )
                      Government,    )
 5                                   )
               vs.                   )
 6                                   )   Chicago, Illinois
      VINCENT STORME (1),            )   August 9, 2023
 7                                   )   1:00 o'clock p.m.
                      Defendant.     )
 8

 9          TRANSCRIPT OF PROCEEDINGS - Detention Hearing
            BEFORE THE HONORABLE JOHN ROBERT BLAKEY
10

11    APPEARANCES:
      For the Government:       UNITED STATES ATTORNEY'S OFFICE
12                              BY:  MS. ASHLEY A. CHUNG
                                     MS. GEORGIA N. ALEXAKIS
13                              219 South Dearborn Street
                                Suite 500
14                              Chicago, Illinois  60604

15    For the Defendant:        BLAINE & VANZANT LLP
                                BY:  MR. JAMES G. VANZANT
16                                   MR. ANDREW D. FINKE
                                     MS. HOLLY N. BLAINE
17                              922 Davis Street
                                Evanston, Illinois  60201
18

19

20

21

22                    Laura LaCien, CSR, RMR, CRR
                         Official Court Reporter
23                      219 South Dearborn Street
                               Room 1212
24                      Chicago, Illinois  60604
                             (312) 408-5032
25
```

1          (The following proceedings were had in open court:)

2          THE COURT:  All right.  We're on the record.  We're

3     awaiting the defendant.

4          Do you mind if I address something preliminarily

5     while we wait for him and we go over it again?

6          MR. VANZANT:  Yes, your Honor.  Just for the

7     record, about -- I don't know -- five minutes ago when we

8     walked back in him, the government provided us with a

9     document dated I think as August 3rd --

10          THE COURT:  August 3rd.

11          MR. VANZANT:  -- which is a report from the Marshal

12     Service about Mr. Storme's attempted suicide at MCC so we are

13     just reviewing it now.  We haven't had a chance to talk with

14     him about it but we're on the way for that.

15          THE COURT:  Okay.  The Court is not going to do

16     anything substantive until he gets here.  Do you mind if we

17     talk about it at least preliminarily until he gets here?

18          MR. VANZANT:  Of course.

19          THE COURT:  He's here anyways, so.

20          (Brief pause.)

21          THE COURT:  For the record, the defendant is

22     present and in custody.

23          Mr. Storme, just so you know, the attorneys

24     received an additional memorandum from the MCC dated August

25     3rd, 2023.  The Court is just about to review it.  It is a

1  little over a page, maybe a page and a half.

2  Before we resume the evidence, I'm going to give

3  you and your attorney a chance to review it in its entirety

4  and discuss it privately.  The government is going to do the

5  same.

6  Before we do that, though, there was one last thing

7  on my To Do list that I did not address.  Excuse me.  On Page

8  5 of Docket Entry 154, which is the government's motion to

9  revoke, it states that on August 7 and 8, 2023, government

10 and defense counsel engaged in communications about what

11 plans were in place to assure defendant's safety and

12 appearance if he were to be released.

13 Defense counsel responded that following the August

14 9th detention hearing, he believed the U.S. Marshals or a

15 family member could transport defendant to a local emergency

16 room for evaluation where, if deemed to be a risk, medical

17 personnel could identify an inpatient facility with

18 availability or if deemed not to be a risk could be released

19 likely -- quote, likely to a family member, unquote.

20 Defense counsel acknowledged however that, quote,

21 precise details, unquote, were not yet solidified and that it

22 was, quote, uncertain, end quote, if a family member could be

23 present for the hearing and/or any post-hearing transport or

24 release.

25 The Seventh Circuit, among other things on our --

1    my shopping list, gave me or at least raised the issue of "or

2    permitting any appropriate person to seek involuntary

3    admission or civil commitment under 405 ICL -- ILCS 5/3-601

4    or other relevant similar statute relating to mental health

5    should such a person determine that this step is justified

6    under the circumstances."

7            Is there any update from either party regarding

8    those two related issues?  Is there a facility or evaluation

9    that needs to be part of the Court's analysis?  Do the

10   parties have information on that?  Is that a work in

11   progress?  Do they need additional time?  Because it's really

12   two parts.  There needs to be -- I know that currently in the

13   MCC, the defendant has -- the MCC does have psychological

14   services; and certainly as part of any suicide watch, there's

15   medical professionals involved.  But I'm sure defense counsel

16   and perhaps family members want to expand the -- that aspect

17   of the case.

18           I don't know if the government has reached out to

19   the U.S. Attorney's Office regarding civil commitment

20   procedures which could happen independent of family members.

21   I don't know -- I don't know where the -- it just looks like

22   both the Seventh Circuit has said that might be a thing

23   people need to talk about; and I agree with them.  First of

24   all, it doesn't matter if I agree with them.  I got to do

25   what they say; but apart from that, it was a great

1    suggestion.  And then it seems like the parties had begun a

2    conversation that I don't know if that conversation has run

3    its course.

4           So any thoughts on that, on behalf of the

5    government?

6           MS. CHUNG:  I think first off, your Honor, the

7    government did look into the civil commitment statute that

8    was cited on 405 ILCS 5/3-601.  In reviewing the statute, the

9    government noted that in Subsection (b)(3), it appears that

10   there's a provision that says -- asks about whether the

11   petitioner has a relationship to the respondent, including a

12   legal or financial interest in a matter -- in the matter or

13   if they're involved in litigation with the respondent.  And

14   if the petitioner has a legal or financial interest in the

15   matter or is involved in litigation with the respondent,

16   there needs to be a statement of why the petitioner believes

17   it would not be practicable or possible for someone else to

18   be the petitioner.

19          So in the government's view, because the government

20   is currently prosecuting Mr. Storme, neither myself nor any

21   other member of our office is -- we are all involved in

22   litigation with Mr. Storme and thus would not be

23   appropriately positioned to petition for his involuntary

24   admission so long as someone else could potentially do so.  I

25   don't know whether there have been inquiries made as to

1  whether there are family members or friends who are ready to

2  take that step.

3  THE COURT:  There's also a unit within the State's

4  Attorney's Office who is not involved in this litigation and

5  that's their job to do it when -- if someone poses a danger

6  to themselves or others and family members are not interested

7  in commitment.  So have you discussed that with the U.S. --

8  the State's Attorney's Office?

9  MS. CHUNG:  I have not, your Honor.

10  THE COURT:  All right.  Well, that's on your To Do

11  list.  Okay.

12  And what are your thoughts?

13  MR. VANZANT:  First, as to the involuntary

14  admission, your Honor, I am not aware of anyone who is

15  intending to seek that.

16  THE COURT:  Okay.

17  MR. VANZANT:  We have been in contact with his

18  family.  His mother came late last week to collect Biscuit,

19  the dog, took him back to Virginia.  Based on the hearing

20  today, she's not available to come back but his stepfather is

21  on the way back.  We're anticipating him flying in around

22  6:00 or something tonight --

23  THE COURT:  Okay.

24  MR. VANZANT:  -- so that's the family member aspect

25  of it.  As to the --

1    THE COURT:  Have you had any conversation with him

2    by phone about what his intentions are or what the -- how

3    long is he going to be in town, does he have any relevant

4    testimony?  Find a microphone.

5    MR. VANZANT:  Mr. Finke can address that, your

6    Honor.

7    MR. FINKE:  Yes, your Honor.  He's going to be --

8    he'll be arriving this evening.  I actually was incorrect

9    when I informed my colleague.  It's -- he's driving up here

10   and he will be here this afternoon.  He anticipates it will

11   be sometime around 9:00 or 10:00 in the evening so it's --

12   THE COURT:  Okay.  So after the court closes; yeah.

13   MR. FINKE:  He will be able to be here for several

14   weeks, if necessary.  He works as a medical physician

15   assistant in Virginia and most his work can be done remotely.

16   However, if something like one of the imaging tech -- or the,

17   you know, thing breaks, there might be an issue where he has

18   to drop -- he has to go back temporarily.  But in the

19   short-term, it is something -- you know, his family,

20   stepfather will be here and can make determinations like

21   involuntary commitments, if necessary.

22   THE COURT:  Okay.  But at this point, he has no

23   intention to do so but that that conversation hasn't run its

24   course or how would you characterize it?

25   MR. FINKE:  So I'd characterize it in two ways.

1  One, we've explored that, the possibility of that being a
2  necessity if Mr. Storme was not himself open to voluntarily
3  committing himself.  Because Mr. Storme is open to
4  voluntarily committing himself, it's not something that we
5  explored further.  However, he did express his intention that
6  he thought that Vincent should be committed and that it might
7  be useful under the circumstances.  So I can't say that we've
8  actually discussed with them and obtained -- I apologize.  I
9  thought you wanted to say something.

10         THE COURT:  No, go ahead.  Run your --

11         MR. FINKE:  I can't say that they've -- that we
12  have gotten -- we have received from the family notice of
13  their intent to do anything actually right now in terms of
14  involuntarily committing him but that is definitely something
15  that I think they'd be willing to if he were not open to
16  voluntarily committing himself.

17         THE COURT:  And I -- maybe I didn't hear you when
18  you spoke.  Did you say he is or is not amenable to voluntary
19  commitment?

20         MR. FINKE:  He is amenable to voluntarily
21  committing himself.

22         THE COURT:  Okay.  And that would be -- is there a
23  discussion about where that would be, how he would appear for
24  court, where would it be, how long would it be, would he be
25  able to change his mind afterwards?  Do you have answers to

1  any of those questions or is that something that needs

2  additional investigation?

3           MR. VANZANT:  That will need additional

4  investigation, your Honor, but I can give you a general

5  outline of what our immediate plan is.

6           After conferring with the social worker that we

7  work with and also our paralegal has some experience with

8  this, the fastest way to find out whether someone needs to be

9  committed is to take them to an emergency room.  We've

10  identified Thorek Memorial Hospital as the most likely

11  candidate.  My staff has been in contact with them throughout

12  the day today to make sure that they have open beds.  They

13  do.  So it would be our intent to -- assuming that Mr. Storme

14  is detained --

15           THE COURT:  Well, that would be open beds but not

16  in a custody situation.  So if he decides to leave, they

17  would have no way of stopping him, right?

18           MR. VANZANT:  That is probably true, your Honor,

19  but I don't know for sure.

20           THE COURT:  Okay.

21           MR. VANZANT:  That said, we have had this

22  conversation with Mr. Storme yesterday and today and he is

23  more than willing to be evaluated.  If they find that he is a

24  risk to himself and needs inpatient service, then we're --

25  he's more than happy to do that.  If they evaluate him and

1  determine he's not currently a risk, then that's a different

2  issue.

3  THE COURT:  Is there an agreement -- well,

4  evaluations happen in custody all the time.  Has there been

5  any discussion or agreement about having the defendant

6  evaluated while in custody and then both sides would have the

7  benefit of that report?  And let's say that report goes,

8  yeah, he talks a big talk but he's not going to hurt himself

9  or if he does hurt anyone, it's only himself.  Because

10  there's this notion that, you know, oh, if he's just going to

11  hurt himself, then that's not hurting anyone else.  Well, it

12  depends.

13  If you -- if your motive suicide is suicide by cop

14  or you jump in the lake and someone has to try to save you

15  and you put other people at risk or sometimes as things

16  escalate someone moves from not just suicide but

17  murder-suicide or something worse, right, and it would be

18  beneficial for professionals to at least weigh in.  And

19  obviously, what they determine is not a legal determination

20  but it's certainly expert testimony that I think would be

21  beneficial both from the government and the defense.  Has

22  there been any conversation about an in-custody evaluation?

23  MR. FINKE:  Just very briefly.  We have -- we

24  haven't arranged anything for that but we have already

25  reached out to MCC and they let us know that they would

1    facilitate any kind of evaluator that we wanted to bring in

2    admitting -- you know, admitting them so that they could

3    evaluate him.

4              THE COURT:  Okay.

5              MR. VANZANT:  Following up on that, there was an

6    initial evaluation based on the most recent report that we

7    got; the one that we just got.  I think that was a

8    psychiatrist.  There was some sort of evaluation that got him

9    placed on suicide watch and then he was removed, I believe,

10   on Saturday.

11             THE COURT:  Yeah.  That initial evaluation for a

12   suicide watch is not a full -- that not the bells and

13   whistles kind of thing that I'm envisioning the parties would

14   want.  I would think people would want a full evaluation with

15   the big old report that comes along with it.

16             MR. VANZANT:  Yes.

17             THE COURT:  Yeah.  Go ahead.  I interrupted you.

18             MR. VANZANT:  So far as that goes, your Honor,

19   that's the only evaluation that I'm aware of so if there are

20   additional ones, that's --

21             THE COURT:  That's an emergency stopgap measure to

22   see whether or not he should be on or not on suicide watch;

23   and based on the factual record, I'm sure that placing him on

24   there was factually predicated.  But the -- I mean, he

25   attempted on the 3rd.

1      What's the -- I didn't ask you anything.  What do
2  you think on the -- and this is -- this doesn't have to be
3  alternate tracks.  It could be tracks happening at the same
4  time.  The Court could proceed today.  Obviously, I think I
5  have to because the Seventh Circuit told me to.  I'm going to
6  proceed on today's hearing within the 24-hour window.  I'll
7  make a finding but, hey, you know what, like I said, my
8  findings are -- unless it's a final order, I can reconsider
9  it.

10      So I could issue a ruling today -- and I'm not
11  previewing what it is but if, for example, it was adverse to
12  the government and they wanted to either reconsider it based
13  on a medical report, I would reconsider it.  And if it was
14  adverse to the defense, we could have a follow-up hearing
15  maybe on August 16th, I don't know, maybe a date that
16  everyone is available.

17      So the -- even if -- even though I'm required to
18  issue based on my marching orders to have a hearing and issue
19  an order -- and it's my intention to do so both based on
20  inherent authority and statutory authority and both a
21  reconsideration of the prior denial of detention and a
22  revocation of bond both pursuant to motion by the government
23  and pursuant to the Court's power to do so on its own -- and
24  I'll do another factual record, make any factual findings I
25  need, and I'll make the findings both under 3148 and 3142, as

83

1    needed, that doesn't have to be the final say in any of this

2    because I think there's additional information.

3            And again, to beat a dead horse, which is why the

4    Court set it over -- at least I thought by agreement, maybe

5    it wasn't -- to the 16th because I thought there would be a

6    variety of things that we needed to do and defendant's

7    temporary remand in a safe manner, which is what I tried to

8    do, was not a final say but, rather, a way to maintain the

9    status quo and maintain safety until we could chase down

10   these other things, including an evaluation.

11           Is there -- does the government -- what are your

12   thoughts on an in-custody evaluation?

13           MS. CHUNG:  Your Honor, I think that's prudent

14   here.  The government would agree to any in-custody

15   evaluation.

16           THE COURT:  All right.  After today's hearing,

17   would you be willing to meet and confer with defense counsel

18   about designating who that expert would be?

19           MS. CHUNG:  Yes, your Honor.

20           THE COURT:  If there's agreement, great.  If you

21   got somebody you know, if you could give the CV and

22   information to the government, then I'm sure the -- MCC has

23   facilitated this in the past so I don't think that -- it's

24   never convenient when you're dealing with in-custody

25   situations but it's not an insurmountable hurdle.

1          So maybe after the hearing today regardless of the

2     outcome, the parties can meet and confer on that.  And then

3     I'll tell you no matter what happens in the hearing today, I

4     have an open mind on the issue, I do; and if there's an

5     alternative resolution or if he can get care in a way that's

6     better suited, then whatever happens after today, I have --

7     I'm going to write on that with a blank slate just so you

8     know.  Okay.

9          MR. VANZANT:  Two points for the record on that,

10    your Honor.  My partner, Holly Blaine, just informed me that

11    based on our investigation, it does not appear that

12    Mr. Storme could be admitted through an in-custody

13    evaluation.  It's got to be out of custody.  I don't know the

14    details on that but we got to look further into that so that

15    is going to be an issue that could come up.  I think that

16    that's -- at least in my view, I think that's a little

17    separate than the detention issue we're talking about now.

18          THE COURT:  Well, it's also a two-step, too,

19    because if there's an in-custody evaluation, even if that

20    might not be a predicate under the facilities' rules, they

21    might have to do their own, right?

22          MR. VANZANT:  Exactly.

23          THE COURT:  So at least we'd arm the parties with

24    the information, hey, we just had the expert, here's a

25    500-page thing saying that he would not only be fit with

1  medication but safe with medication --

2  MR. VANZANT:  Right.

3  THE COURT:  -- and the only issue here is not

4  custody or out of custody, it's whether or not, you know, he

5  gets medication X, Y, and Z and here are the procedures the

6  parties agreed to that would ensure that he stays on the meds

7  and therefore, hey, let's go back to bond, right?  That's one

8  potential.  I don't know.

9  Or, maybe he does go into -- he's released from

10  custody but goes into an inpatient facility for his

11  protection and the protection of others but maybe that's a

12  two-step process.

13  MR. VANZANT:  That's kind of my thought, your

14  Honor, is that once we figure out -- once you decide whether

15  it's in or out, then we can proceed accordingly.

16  The second point I just wanted to make before we

17  get back to the testimony is the -- I just want to be very

18  clear that we understand why the Court did what it did on --

19  last week and we don't question the Court's intent, but we

20  have to object when he's in and I just want to make that

21  really clear.  I don't think anybody in this room is not

22  concerned about Mr. Storme's mental health so I just want to

23  make that very clear on the record before we go forward --

24  THE COURT:  Okay.

25  MR. VANZANT:  -- for what it's worth, I guess.

1    THE COURT:  Well, yeah.  On the one hand, you're

2    saying you understand what I did but on the other hand you're

3    going to the Appellate Court saying -- and agreeing with the

4    government when I don't know why the government agreed to it

5    that I -- that what I did was a procedural error.  I don't

6    know how anyone reads the statutes and the Court's inherent

7    authority to produce absurd -- absurd result which would

8    endanger the defendant but, you know what, I don't want to

9    beat a horse anyway.

10    MR. VANZANT:  No.  That's --

11    THE COURT:  But to the degree you're saying you

12    don't question my in intentions, I suppose that's a nice

13    thing to say so I'll take that with a smile.  And I know you

14    guys don't have any bad intentions either even if I disagree

15    with your legal position and even if I don't understand the

16    government's position why they would say I errored upstairs

17    and then -- but anyway.  Again, water past the bridge,

18    whatever it's called.

19    MR. VANZANT:  Fully understood, your Honor.

20    THE COURT:  All right.  So let's -- okay.  All

21    right.  So at some point the parties are going to confer

22    about an in-custody evaluation.  And then to the degree

23    whatever happens today needs to be followed up on with

24    additional proceedings or filings, the parties are going to

25    meet and confer and talk to my Courtroom Deputy.

1       And please, if there's any communication -- my
2   Courtroom Deputy takes calls all the time.  If there's any
3   miscommunication, if you need something other than what she
4   suggests, she's the most -- she's the nicest and most
5   efficient person in this building.  And if what she's
6   proposing doesn't make sense, you got to -- you got to raise
7   your hand and ask for help and she'll be the first one to
8   step up and help you on that because she's the Court's right
9   hand on scheduling; and when she tells me something is set by
10  agreement, that's how I take it.  And, like I said, she can't
11  read your mind if you wanted something on a different
12  timetable.
13      One other thing.  Technically, the appeal is still
14  pending --
15              MR. VANZANT:  Yes.
16              THE COURT:  -- right?  And I'm sure you may or may
17  not at some point want to have me -- have them look at
18  whatever I do today.
19      Is that something that's going to happen
20  immediately or is -- or is -- are we going to run this course
21  that we're discussing where there would be a reconsideration
22  by the government if I order release or by defense if I order
23  detention?  What are your thoughts on that?  Because, on the
24  other hand, the Seventh Circuit is basically -- I don't know
25  if they stayed.  I think they just ordered this and then they

1    said they're not going to rule on anything else.  But still,

2    the case is still up there.  What am I supposed to do with

3    that?

4              MR. VANZANT:  Essentially what they did in my

5    understanding, your Honor, is under -- Appellate Rule 9(a),

6    they have the authority to release the defendant immediately

7    pending resolution of the appeal so the ultimate question, I

8    think, is more related to whether or not he was properly

9    taken into custody.  And then if the Court continues to

10   detain him after this, then I will supplement the record on

11   this so the Seventh Circuit could look at it.  That's my

12   understanding of their intent.

13             They certainly ordered the transcripts as quickly

14   as possible and I know that they -- they did the request on

15   the order so I don't believe the Seventh Circuit is done and

16   I think that's largely because it doesn't know what we're

17   going to do today.

18             THE COURT:  Okay.  All right.

19             MR. VANZANT:  That's my understanding.

20             THE COURT:  Well, should I just cancel any of those

21   other things and just let that appeal run its course because

22   that could take a long time?

23             I'm not interested to spending a lot of judicial

24   resources if, in fact, what you guys want to do is to have a

25   long appellate thing because -- I mean, if, for example,

1    there's an evaluation and some resolution, it seems to me

2    that would moot the appeal but why you would want -- I mean,

3    you guys do what you want but I don't want you wasting my

4    time either.

5              MR. VANZANT:  I understand.

6              THE COURT:  I mean, I lost an entire trial day

7    today.  There's a defendant and 14 people who are in here

8    involuntarily.  And I understand that all the cases are

9    important.  I have also have a bunch of defendants who have

10   been in custody since COVID waiting for a trial, too.  So I'm

11   giving you an entire day and that's at a high price, right,

12   and I'm happy to do it for your client because this is an

13   important case but I'm hesitant to be wasting my time too if

14   all we're going to do is -- I mean, what are your thoughts?

15             MR. VANZANT:  My general thought, your Honor, is if

16   he stays in custody, then it's straight back to the Seventh

17   Circuit.  If he's out today, then we have different

18   discussions but that's --

19             THE COURT:  Okay.

20             MR. VANZANT:  -- that's essentially it.  I want him

21   out of custody today and into mental health treatment.

22             THE COURT:  Okay.  Maybe the -- are you saying I

23   shouldn't pursue the evaluation thing?

24             MR. VANZANT:  I don't see any reason why we can't

25   pursue that based on whatever the Court's ruling is today.

1  If the Court orders him detained or orders that, you know,

2  some sort of conditions are okay pursuant to an evaluation,

3  we can deal with that.

4     THE COURT:  Well, that's my point.  I wouldn't be

5  able to determine that, right, absent those additional things

6  and you're saying, no, we're not going to wait for that,

7  we're going to go up and we're going to do the appeal.  So if

8  you're done with me and you're upstairs, then why would I

9  spend any more judicial resources trying to have a process

10  run its course?

11     MR. VANZANT:  My understanding is the Appellate --

12  part of the issue with the Appellate Court was there was no

13  record developed on your thought process and that is what --

14  my understanding was today was about, was to develop the

15  record so that you can make your findings on the record.

16     THE COURT:  And what we just discussed as part of

17  that analysis that even if I -- I'm making -- the only reason

18  I'm making a decision today is because I've been forced to do

19  so; right.  My plan was to do it with enough time for the

20  parties to actually go through the entire process.  That's

21  fine.

22     But if, in fact, you want me to go through that

23  entire process, have an evaluation, look at it, have an

24  opportunity for either side to reconsider it after such an

25  evaluation happens -- which it will not happen within the

1    next -- I guess we're at 12 hours now -- then how, then

2    you're not letting the trial court process run its course

3    before you appeal.  You're preemptively appealing me.  And if

4    you're doing that, why would I waste any time continuing the

5    process and going through these additional things which we're

6    not able to decide today.  That's my thought.

7                    MR. VANZANT:  I understand your point, your Honor.

8                    THE COURT:  And is it fair to me?

9                    MR. VANZANT:  That's --

10                   THE COURT:  If I'm still working hard to do this

11   the right way, why wouldn't you give me enough time to do it?

12   And if you're not, then why don't I spend my time on another

13   case?

14                   Do you need a moment with your client?

15                   MR. VANZANT:  No, your Honor.  I'm just processing

16   the -- what you said so I can address that properly.

17                   THE COURT:  Well, take your time.

18                   What does the government think?

19                   MS. CHUNG:  Your Honor, I think depending on the

20   outcome of today, the government is more than willing to

21   continue to work with the defense counsel here and your court

22   to find whatever -- whatever facility, whatever condition,

23   whatever in-custody evaluation makes sense and to run that

24   process down prior to potentially going back up to the

25   Appellate Court.  That said, the appeal was prompted by

92

1    defense counsel so we would necessarily be responding to what

2    defense counsel decides to raise.

3              THE COURT:  It would seem to me that based on what

4    the Appellate Court said -- and, in fact, they don't like to

5    do piecemeal litigation either because they don't want to

6    take up two appeals and the timetable we're talking about is

7    not months.  I don't know how quickly we can get an

8    evaluation, but it would be -- it wouldn't be outside the

9    realm of possibility that the parties would agree to an

10   appellate stay until that process runs its course.  And then

11   the Appellate Court would not only have the basis of today's

12   preemptive hearing, which is what it is -- it's before the

13   parties are ready in many senses because there's a bunch of

14   information you guys can't give me right now that I've asked

15   for and entitled to -- and it's not a reflection on you, it's

16   just a reflection on the complexity of the case -- it would

17   certainly seem that the Appellate Court would want a benefit

18   of that as well especially if, in whatever ruling I do today,

19   I've just indicated to you that I'm happy to consider a

20   motion to reconsideration with the things both sides just

21   told me would be relevant to fashioning an appropriate

22   remedy, which is the whole point, so.

23             MR. VANZANT:  Two points on that, your Honor.  The

24   first, he can go to the ER today and get a full evaluation if

25   he's out.

1          THE COURT:  I don't know that he could.

2          MR. VANZANT:  That is what Thorek is telling --

3          THE COURT:  If he's released, but then he could

4    also go and kill himself too and --

5          MR. VANZANT:  He can certainly do a lot of things,

6    your Honor.

7          THE COURT:  Well, you want me to risk that?  You

8    want me to risk him going and killing himself for that?  That

9    would be part of the risk assessment in having him go outside

10   of custody to an ER evaluation.

11         MR. VANZANT:  That's kind of -- the entire point of

12   the appeal, your Honor, is we don't believe that needs to be

13   part of the risk assessment under the BRA.

14         And I understand -- I fully understand the other

15   arguments for this but our overriding problem is that there

16   is no basis for sending Mr. -- revoking Mr. Storme's pretrial

17   release and throwing him in MCC because he's got a mental

18   health issue and I don't think the BRA covers that at all.

19   This is also --

20         THE COURT:  Mental -- mental health is part of the

21   totality of the circumstances the Court looks at and also

22   behavior that is a result of mental illness and the record is

23   replete with that and we can talk about that as we go

24   forward.

25         If the parties are at the position where they don't

1  think there's a stay, I'm going to schedule other matters.

2  If you think the record is complete for appeal and you don't

3  think it's worth the Appellate Court and this Court -- the

4  Appellate Court having the benefit of this Court pursuing

5  other things -- then I'll take the case as I find it, too.

6          MR. VANZANT:  All right.

7          THE COURT:  All right.  Let's -- are we ready for

8  the hearing?

9          MR. VANZANT:  May I make a record really quick,

10 your Honor?

11         THE COURT:  Yeah.

12         MR. VANZANT:  So what I was about to say was, this

13 is why I asked the Court what we were doing today -- whether

14 this was a revocation, whether it was reopening or something

15 else --

16         THE COURT:  It's both.

17         MR. VANZANT:  -- because it matters a lot.  If

18 we're just talking about modifying conditions of release,

19 then Mr. Storme is getting out and we can just talk about

20 whether those conditions are --

21         THE COURT:  That's not how -- counsel, that's not

22 how that works.  A detention hearing and a bond hearing, the

23 Court is looking not just at the ability to make sure he

24 appears or the danger to the community or others -- and it's

25 "community" or "others," right; it's two different things.

1    It's also, as part of that analysis, you know, I have to look

2    at the conditions or combinations of conditions.  So in every

3    detention hearing, one of the things you're considering is

4    does he have to be detained or are there less restrictive

5    means that will accomplish everything so that's always part

6    of the analysis.  It's the part of the analysis here and

7    we're doing both things, so.

8           But if you don't want me to have a complete record

9    on that and you don't want me to have the benefit of that and

10   you want to take me up, then you litigate how you want.

11   That's --

12          MR. VANZANT:  Your Honor, your Honor, that's not

13   what I'm saying and I just want to make sure I'm clear.  My

14   understanding -- and this is my understanding.  If I'm wrong,

15   the Seventh Circuit could tell me and I will take that

16   gladly.

17          Mr. Storme is on pretrial release.  What happened

18   now is his pretrial release was revoked.  That is dealt with

19   by 3148 and there are preconditions to that including, if the

20   preconditions are met, we can have a detention hearing at

21   which we would consider 3142(f) factors; that's fine.  That

22   is different than a detention hearing de novo or reopening

23   it, which is what we're kind of talking about.

24          THE COURT:  Well, we're doing both and we've

25   already discussed that.  We're doing both.  The Court has the

1    authority to do both and I'm going to do both and I'm going

2    to make alternate rulings and you're going to have to be able

3    to discuss both on appeal.

4         MR. VANZANT:  I understand that, your Honor, and

5    that's why I wanted to clarify because if -- because we're

6    doing both, we need an evidentiary hearing.  If it was just

7    the revocation issue, we'd probably be okay with the Court

8    just making its findings but it depends on what the Court

9    wants to do.

10        THE COURT:  Yeah.  Okay.  Well, we're doing both so

11   let's have the hearing.  If there's no interest in a stay of

12   appeal, I'll have to decide whether or not additional

13   findings here or additional opportunities for the parties to

14   present new or other evidence.

15        If you're not going to give me the benefit of

16   looking at that evidence as part of an appeal, then I don't

17   see why I would chase it down but that's up to you guys.

18        Okay.  Let's recall the witness.

19        MS. CHUNG:  Yes, your Honor.

20        THE COURT:  I have an open mind on that but that's

21   just my initial thought.  If you want to go up and say I

22   erred when the conversation is still ongoing with respect to

23   an evaluation, that's on you.

24        All right.  Go ahead.  Recall the witness.

25        MS. CHUNG:  Your Honor, I'll just note that the

 1    government -- the government is willing to enter into an

 2    appellate stay.  Obviously, it is defendant's appeal,

 3    however.

 4              THE COURT:  I know, I know.  It makes sense but --

 5    and I can't control how people want to litigate their cases.

 6    Go ahead.

 7              MS. CHUNG:  Yes, your Honor.  We'll call Pretrial

 8    Services' Officer Justin Wiersema back up to the stand.

 9              THE COURT:  Good afternoon, sir.

10              THE WITNESS:  Good afternoon.

11              THE COURT:  You're still under oath.

12              Go ahead, counsel.

13              MS. CHUNG:  Your Honor, actually at the time your

14    Honor called the break, I was done with my questioning so

15    I'll tender the witness for cross examination.

16              THE COURT:  Let me ask a couple questions first.

17    Are you moving any of the reports as exhibits for the

18    purposes of the evidentiary hearing, are you moving them in?

19              MS. CHUNG:  If your Honor would like us to, we can.

20    I know they're already available to the Court.  I know that

21    the contents obviously are sensitive and should likely remain

22    under seal.  But if your Honor wishes them to be moved into

23    evidence, then yes, we would move all of Pretrial Services'

24    status and violation reports in Mr. Storme's case into

25    evidence at this time.

1    THE COURT:  Okay.  So that includes the pile you

2    handed me and the ones that were filed on the docket.  And

3    what about this thing you just handed me this afternoon, the

4    August 3rd memorandum, is that being moved in as well?

5    MS. CHUNG:  Yes, your Honor.  I would move for this

6    memorandum from the MCC dated August 3rd, 2023, which the

7    government received over the lunch break to be moved into

8    evidence as well.

9    THE COURT:  All right.  Any objection to the

10   admission of the exhibits?  I know you --

11   MR. VANZANT:  No, your Honor.

12   THE COURT:  What?

13   MR. VANZANT:  No objection.

14   THE COURT:  Okay.  All of those are moved in as

15   exhibits for purposes of the hearing.

16   Sir, have you had an opportunity to review the

17   government's two filings?

18   THE WITNESS:  I have.  Yes.

19   THE COURT:  Okay.  And by that, I mean the -- their

20   response on appeal and then their motion to revoke bond?

21   THE WITNESS:  I have.  Yes, Judge.

22   THE COURT:  Okay.  There's a bunch of facts in

23   there.  Some of them relate or purport to characterize things

24   that you reported or things that you're aware of either

25   personally or by information received from others.  Based on

1    your review, are those two documents true and accurate?

2              THE WITNESS:  They are, Judge.

3              THE COURT:  Okay.  Go ahead.  Cross examination.

4              MR. VANZANT:  Thank you, your Honor.

5    JUSTIN WIERSEMA, GOVERNMENT'S WITNESS, PREVIOUSLY DULY SWORN

6                        CROSS EXAMINATION

7    BY MR. VANZANT:

8    Q    Officer Wiersema, do you still have your reports up

9    there?

10   A    I do.  Yes, sir.

11   Q    Okay.  Feel free to refer to them.  I'm going to walk

12   through them step by step so that we can get everything on

13   the record.  Okay?

14   A    Great.  Thank you.

15   Q    I want to start with the -- let's see.  So there was

16   initially the pretrial bail report that was first filed back

17   in 2020.  September 25, 2020.  Correct?

18   A    Correct.

19   Q    Okay.  There was also an addendum filed on September 29,

20   2020, correct?

21   A    Correct.

22   Q    Okay.  And then it was after this that the previous

23   judge granted release of Mr. Storme, correct?

24   A    Correct.

25   Q    Okay.  That happened on September 30th of 2020, correct?

1    A    Yes.

2    Q    Mr. Storme was released on September 30th?

3    A    Yes.

4    Q    What happened the next day?

5    A    "The next day" being?

6    Q    October 1st.

7    A    October 1st.  As outlined in the first report, the first

8    status report on October 1st, it outlines -- and if you'd

9    like me to read it, I can.  It just outlines that on that

10   evening, we received a call from the defendant's mother

11   indicating --

12              THE COURT:  Slow down, slow down.

13              THE COURT REPORTER:  I'm sorry.

14              THE COURT:  You can't go over 300 words a minute.

15              That's Docket Entry 16, which is already in

16   evidence, but go ahead.

17              THE WITNESS:  Yes.  That report summarizes a call

18   from the defendant's mother indicating she feels the

19   defendant attempted suicide.  The report goes on to list the

20   next few days of what happened and the follow-up care that

21   was provided.

22   BY MR. VANZANT:

23   Q    Okay.  Thank you.

24              No violation report was filed off of -- based on

25   defendant's attempted suicide, was there?

1  A    That's correct.

2  Q    The next report --

3  A    No report -- yeah, no report was filed.

4  Q    Sorry.  Go ahead.

5  A    That is correct.  No report was filed based on that.

6  You're right.  No violation report was filed.

7  Q    Thank you.

8        Do you happen to know why -- or have you had an

9  opportunity to discuss with Mr. Storme why he attempted

10  suicide?

11  A    Mr. Storme and I have discussed that before, yes.  He's

12  expressed -- and back then and expressed forward that, you

13  know, he feels this case is the end of his life and that he

14  can't proceed, he cannot be convicted, so we discussed that

15  at length shortly after it happened when he came home.

16  Q    And has he linked his fear to his initial custody at

17  Kankakee?

18  A    That was one of the things, yes.  At the very beginning,

19  we discussed at length and that was very traumatic -- first

20  the arrest and the first couple days in custody were very

21  traumatic to him and he's expressed that to me.

22        THE COURT REPORTER:  I'm sorry.

23        THE COURT:  You can't go that fast.

24        THE WITNESS:  Sorry.

25        Yes, he's expressed that that custody time in

1   Kankakee has impacted him; yes.

2          MR. VANZANT:  Okay.

3          THE COURT:  So the custody is linked to his fear of

4   the conviction that it's not just being convicted felon but

5   being convicted felon and going to jail, those are part of

6   the different aspects of the same fear?

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.

9   BY MR. VANZANT:

10  Q    If you can, explain in a little more detail about the

11  conversations you had with the defendant regarding his fear

12  of going back into custody.  And summarizing is fine; it's

13  okay.

14  A    Sure.

15         THE COURT:  Do you want to lay a -- orientate the

16  witness as to what time frame because there's obviously a lot

17  of series of different conversations happening at different

18  points in time.

19         MR. VANZANT:  Certainly, your Honor.

20  BY MR. VANZANT:

21  Q    Let's start with the earliest time after the defendant's

22  attempt of suicide in October 2020.  I know you've discussed

23  this subsequently but what I'd like the Court to be able to

24  understand is in detail what Mr. Storme told you about his

25  fears.

Wtersema - Cross by Mr. Vanzant

1   A    He expressed to me shortly after that how his life was

2   over and it was -- it was very traumatic to be pulled into

3   custody and held in custody and this case has impacted him

4   many ways -- financially, his job, his family -- all these

5   things that happened and that has kind of led him to feel

6   that there's no -- in his words, there's no "why can I go on"

7   I believe he's told me before, "this is the end, I can't go

8   to jail, my life is over."

9   Q    Prior to being arrested in this case, to your knowledge

10  did Mr. Storme have any mental conditions such as depression,

11  suicidal ideations, things like that?

12  A    I would have to look at those original bond reports to

13  see if he reported any but I'm -- I'm not aware of any.

14  Q    Okay.  If you want to take a look, go ahead just to make

15  the record clear but I'm pretty sure that it's --

16          THE COURT:  Look at what?  Are you directing him to

17  look at something particular or the entire docket?  That

18  doesn't make sense.

19          MR. VANZANT:  Let's look at the initial Pretrial

20  Services' report dated September 25, 2020, and I'll direct

21  your attention to Page 3 under "mental health and substance

22  abuse," if you can take a look at that.

23          THE COURT:  For the record -- and let me know if

24  I'm misquoting.  I think I have the right part.  Defendant

25  indicated, defendant indicated, no substance abuse history or

1  history of substance abuse treatment.  He stated that he sees

2  his therapist on a biweekly basis ever since a prior

3  relationship of his ended.  He did not report being diagnosed

4  with any mental illness and did not report any prior or

5  current suicidal ideations due to operational changes in

6  response to COVID-19 global pandemic.  A voluntary urinalysis

7  was neither requested of the defendant nor collected at this

8  time."

9       MR. VANZANT:  That's correct, your Honor.

10       THE COURT:  Is it your position defendant doesn't

11  have any substance abuse problems?

12       MR. VANZANT:  As of right now, I have no idea, your

13  Honor.  That's not --

14       THE COURT:  Has he had any history of substance

15  abuse problems?

16       MR. VANZANT:  Not to my knowledge but I don't --

17       THE COURT:  Wasn't there a condition regarding

18  excessive drinking also?

19       MR. VANZANT:  I think that came out differently,

20  your Honor.  That was a different report.  I definitely will

21  get to that.  I can't say one way or another what his --

22       THE COURT:  Do you know whether or not based on

23  your knowledge of the record defendant has any substance

24  abuse issues, history of it?  If you need time to confer.

25       MR. FINKE:  Yes, your Honor.  My understanding is

1   that there was a period where Mr. Storme admitted to Mr.

2   Wiersema that he had been using alcohol as a means to cope

3   and this Court, as a result of that report, instituted

4   conditions regarding his substance abuse.  And our

5   understanding is that -- I believe that was two-and-a-half

6   years ago; and that since that time, he has remained sober

7   and there have been no incidents of any substance abuse.

8           THE COURT:  Based on your knowledge of the record,

9   does the defendant have any history of mental health illness?

10          MR. VANZANT:  Not to my knowledge, your Honor.

11  This is what -- what I've got.

12          THE COURT:  So the statements and the suicidal

13  attempts, you don't see that as evidence of mental illness?

14          MR. FINKE:  Well, I think he understood that to

15  mean before, so.

16          THE COURT:  I mean on a record.  The Court -- the

17  Court is not doing a snapshot at some point in the distant

18  past.  The Court is doing totality of circumstance based on

19  the history up to and including to today and whatever

20  additional evidence the parties will allow me to obtain after

21  today's hearing.

22          So answer the question as posed which is, to your

23  knowledge as we sit here today, does the defendant have any

24  history of mental illness?

25          MR. VANZANT:  Yes, your Honor; but my point is that

1    he did not have a history of mental illness prior to being

2    arrested in this case.

3              THE COURT:  Well, he was arrested in this case and

4    it's very common for defendants to fear incarceration.  In

5    fact, that's usually the primary motivator for people

6    becoming a flight risk, among other things.  So since he's

7    been arrested and he's had the pending charges, he -- it's

8    fair to say that he has mental health issues --

9              MR. VANZANT:  Oh, yes.

10             THE COURT:  -- right?  Okay.

11             MR. VANZANT:  That's -- that was where I was going

12   on my next question, your Honor.

13             THE COURT:  Okay.  Go ahead.  I interrupted you.

14   Go ahead.  Pose a question.

15   BY MR. VANZANT:

16   Q    Officer Wiersema, subsequent to his initial appearance

17   in 2020, was Mr. Storme diagnosed with a mental health

18   condition such as PTSD?

19   A    Repeat the question.

20   Q    Sure.  After the initial appearance back in 2020 when he

21   was first let out, was he subsequently diagnosed with any

22   mental health conditions such as PTSD?

23   A    Since his release, yes.

24   Q    Okay.  And to your knowledge, does that diagnosis have

25   anything to do with anything other than this case?

1    A    I don't know the answer to that.

2    Q    That's fine.  All right.  What I'd like to do next is

3    move to the next Pretrial Services' report which was dated

4    10-2-20.  So this is October 2020 I believe the day after he

5    was released.  Do you have that?

6    A    I do, yes.

7    Q    Okay.  This was the one that -- where you reported to

8    the Court the attempted suicide, correct?

9    A    That's correct.

10   Q    Did you report any violations to the Court related to

11   that attempted suicide?

12           THE COURT:  Counsel, is that 10-20 or 10-19?

13           MR. VANZANT:  The report I'm looking at, your

14   Honor, is dated 10-2, 2020.

15           THE COURT:  10-2?

16           MR. VANZANT:  That's what it says on the date line,

17   your Honor.

18           THE COURT:  I want to make sure I'm on the same

19   one.

20       (Brief pause.)

21           THE COURT:  Gotcha.  Okay.  Go ahead.  I'm on the

22   same one now.  Go ahead.  Sorry for the interruption.

23           MR. VANZANT:  Okay.

24   BY MR. VANZANT:

25   Q    So moving on to the next one, this one is actually a

1    violation report.  This was the one dated 1-26-2021.  Do you

2    have that?

3    A    I do.  Yes, sir.

4    Q    All right.  Now this is a violation report, correct?

5    A    It is, yes.

6    Q    What's the difference between a violation report and a

7    status report?

8    A    A violation report outlines some noncompliance with a

9    condition of release.

10   Q    Okay.  My understanding from reading the report is that

11   the alleged violation was a number of curfew violations; is

12   that accurate?

13   A    That is correct.

14   Q    There was something like ten separate occasions during

15   November, another ten in December, and some in January 2021;

16   is that accurate?

17   A    That is accurate, yes.

18   Q    After this violation report was submitted to the Court,

19   what was the Court's action, if any?

20   A    I don't recall but -- I don't recall but I don't think

21   the Court took any action.

22   Q    Since this violation report in 2021 on 1-26-2021, have

23   there been any subsequent violations of curfew that you have

24   reported to the Court as a violation of his supervised

25   release?

1  A    Reviewing my notes, no.  No other curfew violations have
2  been reported.
3  Q    Okay.  So the last curfew violation was sometime in
4  January of 2021; is that fair?
5  A    That is fair.  That's correct.
6  Q    And the Court took no action off this violation report,
7  correct?
8  A    That's -- I believe so.  That's correct.  Yes.
9  Q    All right.  Moving to the next one, this one is dated
10  2-2-2021.  February 2nd, 2021.  This is also a violation
11  report.  Do you have that?
12  A    I do.  Yes, sir.
13  Q    Now this was within days of the previous report,
14  correct?
15  A    Yes.
16  Q    This report alleged that defendant had been taken into
17  custody as part of a stalking investigation, correct?
18  A    Yes.
19  Q    And that was related to the ex-girlfriend of the
20  defendant?
21  A    The defendant reported she was an ex-girlfriend to me;
22  yes.
23  Q    Okay.  That individual is not one of the alleged victims
24  in this case, correct?
25  A    Correct.

 1            THE COURT:  So that alleged stalking incident
 2    happened while he was on pretrial release?
 3            THE WITNESS:  That's correct.
 4            THE COURT:  And resulted into an order of
 5    protection?
 6            THE WITNESS:  That's correct.
 7            THE COURT:  To your knowledge, did the State's
 8    Attorney pursue any criminal charges?
 9            THE WITNESS:  They have not to date.
10            THE COURT:  Did the U.S. Attorney's Office pursue
11    any criminal charges?
12            THE WITNESS:  They have not to date.
13            THE COURT:  Okay.  Go ahead.
14    BY MR. VANZANT:
15    Q    After your conversation with Detective Edmondson, the
16    police department did -- strike that.  Sorry.  My mouth is a
17    little dry.
18        (Brief pause.)
19    BY MR. VANZANT:
20    Q    Was Mr. Storme released without charges?
21    A    Yes.
22    Q    And this violation report was filed with the court?
23    A    Yes, it was.  Yes.
24    Q    Did the court take any action on this violation?
25    A    I believe a subsequent hearing was held before Judge

1   Lee; yes.

2           THE COURT:  Because originally it was Judge

3   Pallmeyer and then Judge Lee was on the case; is that right?

4   Do you remember?

5           THE WITNESS:  I don't recall Judge Pallmeyer being

6   on the case.

7           THE COURT:  Well, I mean -- I think back in -- and

8   I saw some orders with her signature early on.

9           THE WITNESS:  I don't believe we -- if she was

10  presiding over the case, we did not submit any reports to

11  her.  I didn't have any contact with her about this case.

12          THE COURT:  Okay.  Okay.  Go ahead.

13  BY MR. VANZANT:

14  Q    I don't remember my last question.  But subsequent to

15  filing this, did the Court revoke Mr. Storme's supervised

16  release?

17  A    No.

18  Q    Did the Court add any other conditions?

19  A    Yes.

20  Q    And those were the alcohol-related conditions?

21  A    Yes.  One of a few, yes.

22  Q    Were those conditions related to the stalking incident,

23  the alleged stalking incident on January 29?

24  A    If I recall, the judge amended the location monitoring

25  from a curfew to a home detention.  So yes, it was a result

1    of the investigation for stalking.

2    Q    Okay.  So he was moved from location monitoring to home

3    detention related to the stalking?

4    A    He was moved from -- he's on location monitoring -- that

5    refers to the bracelet -- but he was on a curfew and was

6    moved to a more strict level called home detention.

7    Q    Got it.  So the court modified the conditions but did

8    not revoke bond?

9    A    Correct.

10   Q    The court also added the alcohol conditions and I

11   believe -- correct me if I'm wrong -- that was related to

12   your conversations with Mr. Storme in which he stated that he

13   had been drinking and was depressed and emotional; is that

14   accurate?

15   A    Yes.  Just one clarification.  He did report that to my

16   partner --

17   Q    Thank you.

18   A    -- but it was an officer of Pretrial Services who was

19   handling the case at that particular time; but yes.

20   Q    Thank you.

21        Other than those two issues that the court

22   addressed related to this violation report, were there any

23   other violations that we have not talked about at that time?

24   A    None.

25        THE COURT:  Other than the 30-plus violations of

1    curfew, electronic monitoring, and the stalking incident?

2         THE WITNESS:  Correct.

3         THE COURT:  Okay.

4         MR. VANZANT:  I should say unresolved is what I'm

5    asking at this point.

6    BY MR. VANZANT:

7    Q    We obviously had the first violation, which was the

8    curfew.

9    A    Uh-huh, yes.

10   Q    That was resolved by the court.  Correct?

11   A    There was no follow up, no hearing set so --

12   Q    Right.

13   A    -- there was no action taken by the court at that time.

14   Q    Okay.  And then the second violation, there was a

15   hearing.  It resulted in changes to his conditions that made

16   the location more restrictive and also added an alcohol

17   condition, correct?

18   A    That is correct.

19   Q    And there were no other pending unresolved violations to

20   address at that point?

21   A    Correct.

22   Q    Okay.  Thank you.

23        Since Mr. Storme was placed on these two

24   conditions, have there been any subsequent violations related

25   to stalking?

1    A    None.

2    Q    Have there been any subsequent violations related to

3    interaction with law enforcement?

4    A    None.

5    Q    Have there been any subsequent violations related to

6    excessive drinking?

7    A    None.

8    Q    Moving on to the next report, this is dated 10-13-2021.

9    Are you with me?

10   A    Yes, sir.

11   Q    All right.  So now we're in October of 2021.  This is a

12   status report, correct?

13   A    That's correct.

14   Q    And it was not docketed on the public system, correct?

15   A    Correct.

16   Q    This was not a violation report?

17   A    Correct.

18   Q    Moving to the next one, this is dated November 9, 2022.

19   This is a -- the format is a little bit different but it

20   appears to be a status report?

21   A    It is.  Our template changed.  We updated some things so

22   it's the same similar -- it's a status report.  Yes, sir.

23   Q    Got it.  It is not a violation report, however?

24   A    Correct.

25   Q    Moving to the next.  This is the August 4th, 2023,

 1   status report.

 2   A    Yes, it is.

 3   Q    And this like the previous one is also a status report,

 4   not a violation report?

 5   A    That's correct.

 6   Q    And I'm asking a little bit of an open-ended question

 7   here because I just don't know --

 8              THE COURT REPORTER:  I'm sorry.  Can you slow down?

 9              MR. VANZANT:  I'm sorry.  Thank you.

10   BY MR. VANZANT:

11   Q    I don't know the details on this so I'm going to ask a

12   little open-ended question.

13              MR. VANZANT:  I believe that this was originally

14   submitted to the Court in draft format before the 3rd but I'm

15   not sure.

16              THE COURT:  Which one?

17              MR. VANZANT:  This is the August 4, 2023, report,

18   your Honor.  Let me rephrase my question a little bit.

19              THE WITNESS:  Yeah.  Please.

20   BY MR. VANZANT:

21   Q    So Mr. Storme was taken into custody on August 3rd,

22   correct?

23   A    Correct.

24   Q    Okay.  This is dated August 4th, right?

25   A    Correct.

1   Q    Was this report provided in any form to the court before
2   he was taken into custody?
3   A    It was.  The information in this report was provided to
4   the Judge in chambers a few days prior to the August 3rd
5   hearing.
6   Q    Do you recall how far in advance of the August 3rd
7   hearing?
8   A    I believe it was January -- I'm sorry, July 25th so the
9   week prior.
10  Q    About a week?
11  A    Yes.
12  Q    What was your recommendation to the Court?
13  A    We did not -- Pretrial Services did not make a
14  recommendation to the Court at that time.
15  Q    Got it.  Is the report that we have dated August --
16           THE COURT:  I'm sorry.  I thought you indicated at
17  that time that you thought he needed to be detained because
18  he was going to kill himself?
19           THE WITNESS:  That is correct, your Honor.  We did
20  say that in -- with -- in front of you.  Yes, we did say
21  that.
22           THE COURT:  Okay.  So I'm glad you --
23           THE WITNESS:  I apologize.
24           THE COURT:  I'm glad you corrected your under oath
25  testimony.

1          THE WITNESS:  Yes.

2          THE COURT:  Go ahead.

3    BY MR. VANZANT:

4    Q    That will actually lead me to my next few questions but

5    I want to nail this down first.

6    A    Sure.

7    Q    This August 4 report that we have in evidence, is that

8    substantially the same as the one you provided to the Court

9    or are there any differences?

10   A    It's substantially the same.

11   Q    Okay.  No material differences?

12         THE COURT:  Well, there was also an in-person

13   conversation at length --

14         MR. VANZANT:  Understood, your Honor.

15         THE COURT:  -- just so the record is clear on that.

16   I can take judicial notice of the conversation I participated

17   in.  Go ahead.

18         THE WITNESS:  So the question is -- can you repeat

19   the question?

20   BY MR. VANZANT:

21   Q    I just want to make sure that what you gave the Court is

22   the same as what's in evidence right now.

23   A    Substantially the same, yes.

24   Q    Okay.  Are there any material differences?

25   A    There are some words that are different probably but it

1    was -- the conversation that we had was summarized in this

2    report.

3            THE COURT:  And a recommendation that he be revoked

4    pending a hearing?

5            THE WITNESS:  Including the recommendation, yes.

6    BY MR. VANZANT:

7    Q    All right.  So that takes me to my next question.

8    Looking through these reports, what struck me is that

9    early on -- and I'll direct you to --

10           THE COURT:  And let me make sure it's clear for the

11   record.  Recommended that he be revoked in a safe manner

12   pending a hearing and further order of court.  Go ahead.

13           MR. VANZANT:  Make sure I find the right one.  I

14   would like to go back to --

15           (Brief pause.)

16           MR. VANZANT:  I just want to make sure I got the

17   right report here.  Okay.

18   BY MR. VANZANT:

19   Q    This is the February 2nd, 2021, report which addressed

20   the violation related to the stalking.  I'd like to draw your

21   attention to -- no; excuse me.  I'm looking at the earlier

22   one.

23           Moving to -- yes, 10-13-21.  Do you have that?

24   A    10-13-21.  10-13-21?

25   Q    10-13-21 is the one I'm looking at.

1   A    Is that a status report?  What is that?

2   Q    This is a status report.

3   A    Yes.  I have it here.

4   Q    All right.  I want to draw your attention to the third

5   paragraph of the main body starting "since August 31st," do

6   you see that?

7   A    Yes.

8   Q    All right.  The last sentence of that paragraph relates

9   a conversation with Mr. Storme's therapist Ms. McKinley; is

10  that accurate?

11  A    Yes.

12  Q    Quote, the defendant's therapist, Ms. McKinley,

13  expressed that while she does not believe the defendant is at

14  risk of harming himself now, she does believe that any change

15  in the case that the defendant perceives as negative, such as

16  a negative ruling or a finding of guilt, the defendant is

17  likely to attempt suicide, end quote.

18           Did I read that accurately?

19  A    Correct.  Yes.

20  Q    Is that based on a conversation you personally had with

21  the defendant or with Ms. McKinley or someone else?

22  A    That was a conversation that -- I had a conversation

23  with Ms. McKinley.  She reported that the defendant -- she

24  reported that her professional opinion was that sentence

25  there.

1   Q    All right.  So what I want to dig into here is that last

2   little bit such as a negative finding -- negative ruling or

3   finding of guilt, that specific one.

4   A    Uh-huh.

5   Q    Earlier we were talking about your conversations

6   directly with Mr. Storme, right?

7   A    Yes.

8   Q    And I believe -- and correct me if I'm wrong -- that

9   Mr. Storme was expressing that he could not be convicted in

10  this case; is that accurate?

11  A    He has said that before.  Yes.

12  Q    In this particular pretrial report, however, we for the

13  first time see a negative ruling or a finding of guilt.

14  Where did that come from?

15  A    Those are -- that is what Ms. McKinley told me.

16  Q    That's not from a conversation directly with Mr. Storme?

17          THE COURT:  Well, wasn't it consistent with the

18  conversations you had with him about knowing which way the

19  hearing would go?

20          THE WITNESS:  Yes.  That is -- that is correct.

21  BY MR. VANZANT:

22  Q    Okay.  And those are later conversations, correct?

23  A    Correct.

24  Q    All right.  I'm trying to go in order so we've got the

25  chronology.

1    A    Sure.

2    Q    So at this point, had Mr. Storme ever told you that he

3    might commit suicide if there was a negative ruling in the

4    case?

5    A    Has he used those words, no, he did not.  But we

6    discussed over the course of the supervision, he discussed

7    pending motions.  He would tell me that his attorney was

8    attempting to -- was going to be filing a motion.  And in the

9    course of conversation with the counselor, he discussed that

10   as well.  So we would have con -- in speaking with the

11   counselor, she would say that everything is pending on this

12   motion, he's very hung up on this motion; and if this motion

13   doesn't go well in his favor, he is a high risk for suicide

14   and she believed he would attempt suicide.

15        So the conversation was any negative ruling, be

16   that a finding a guilt, be that a motion to suppress denied,

17   be that some other negative ruling he would be in severe

18   danger of harming himself.

19   Q    Let me untangle that a little bit.  Was this from your

20   conversations with Mr. Storme directly?

21   A    Yes.  I've had conversations with him about that; yes.

22   Q    All right.  When you're talking about the negative

23   finding or -- negative ruling or finding of guilt, that comes

24   from the therapist, correct?

25   A    Yes.

1              THE COURT:  That phrasing?

2              THE WITNESS:  Yes.  That is -- that is her phrase.

3              THE COURT:  Okay.  But the defendant used other

4    words to the same degree, including not going back to prison,

5    knowing how the hearing would go if it didn't go well, and

6    that today, August 3rd, was going to be the big day, he used

7    all those words himself, not a therapist told you what he

8    said?

9              THE WITNESS:  That is correct.

10             THE COURT:  Okay.

11             MR. VANZANT:  Got it.

12   BY MR. VANZANT:

13   Q    All right.  Moving to the next one dated November 9th,

14   2022, I'm going to draw your attention to the fourth

15   paragraph starting "since August 31st, 2021," do you see

16   that?

17   A    Yes.

18   Q    It appears to me, and correct me if I'm wrong, that this

19   paragraph is identical to the one in the previous status

20   report dated 10-13-21?

21   A    It appears so.  Yes.

22   Q    Based on that, this status report is not reporting

23   anything new, correct, related to this paragraph?

24   A    That paragraph -- that paragraph report said nothing

25   that the Court didn't already have but the prior three does.

1    Q    Got it.

2                THE COURT:  The prior three paragraphs do?

3                THE WITNESS:  Yes.

4                THE COURT:  Okay.  Or three -- okay.

5                THE WITNESS:  Prior three paragraphs do submit new

6    information.

7                THE COURT:  Okay.

8    BY MR. VANZANT:

9    Q    Which was my next question --

10   A    Yes.

11   Q    -- so looking at that starting with the paragraph

12   "Mr. Storme," second paragraph --

13   A    Uh-huh.

14   Q    -- he expressed he was very upset and depressed about

15   his attorney's decision to withdraw from the case.  During

16   this session, defendant made several statements about ending

17   his life in the event he's convicted.  Correct?

18   A    Yes.

19   Q    Nothing about an adverse ruling, correct?

20   A    Correct.

21   Q    The defendant denied any attempt -- strike that.

22                The defendant denied any imminent plan to harm

23   himself but repeated he will kill himself if he is convicted,

24   correct?

25   A    Correct.

1    Q    No imminent plan as of the date of this report, correct?

2    A    Correct.

3    Q    And no statement that the defendant would hurt himself

4    in the event of an adverse ruling, correct?

5    A    Correct.

6    Q    The following paragraph, he reiterated he has no plans

7    to harm himself at this time.  Correct?

8    A    This is the paragraph that begins "since"?

9    Q    Excuse me.  On November 8, 2022, third paragraph.

10   A    Correct.

11   Q    Now this one does have a recommendation on Page 2.

12   A    It does, yes.

13   Q    Looking at the recommendation, quote, Pretrial Services

14   respectfully recommends that should a finding of guilt in

15   this case be made, defendant's bond be revoked and he be

16   remanded in order to ensure the safety and well-being of the

17   defendant; is that right?

18   A    That's correct.

19   Q    No recommendation that his bond be revoked if there's an

20   adverse ruling, correct?

21   A    That's correct.

22   Q    Moving to the August 4, 2023, report, fifth paragraph

23   down starting with "Mr. Storme," do you see that?

24   A    Yes.

25   Q    I want to talk about the last sentence.  Quote, it was

Werpehma - Cross - by Mr. Vanzant

1    the belief of this officer and the defendant's counselor that

2    the defendant would attempt suicide after court if he

3    determined that the motion hearing does not go his way even

4    if a ruling on the motion is not issued, correct?

5    A    Correct.

6    Q    That is your belief?

7    A    Mine, and also the professional.

8    Q    And that's based on a conversation with the therapist?

9    A    Yes.

10   Q    What is the basis for your belief?

11   A    Over the course of my conversation with Mr. Storme, he

12   has informed me that this is -- in his words, he's informed

13   me it's an important hearing, this is where it's going to be

14   determined; there's going to be some finding and we're going

15   to go forward from there.  And in his words, it will be

16   dismissed, this will be over, his case will be over, he'll be

17   moving on.  He's expressed that he's going to leave town,

18   he's moving away.

19              So he would -- he refused to -- in conversations

20   that I had with him, I would -- I would ask him, you know,

21   and if it doesn't go that way, what if things do not go in

22   your favor essentially; and he would say, well, if it doesn't

23   go that way, I -- it's going to be over.

24              And I would kind of safety-plan with him

25   essentially, well -- you know, assess for danger, those

 1   things that we do every day with individuals, and he really

 2   wasn't receptive to any feedback in that way.  And based on

 3   all of that and what he said to the professional and the

 4   psychiatrist, that was -- that's my position; yes.

 5   Q   And who is the psychiatrist?

 6   A   Don't remember the exact name.  It's a contracted

 7   psychiatrist through the facility that he sees Amber at,

 8   Ms. McKinley at.

 9   Q   Got it.  That belief, was that ever based on anything

10   Mr. Storme expressly said about killing himself after the

11   hearing if it didn't go his way?

12   A   He said to me repeatedly that he -- he will end it, it

13   will be over, he cannot go to prison, he cannot be convicted,

14   all the things he said that whole time.  So he has -- he has

15   said many times that that's how that will go.

16   Q   Got it.  Moving to the next paragraph starting "at a

17   counseling session."

18   A   Yes.

19   Q   I want to ask you about this first sentence.

20   "Mr. Storme advised his counselor that he has contacted an

21   attorney and is transferring all his assets to his mother's

22   name in advance of the motion hearing."  Is that accurate?

23   A   Yes.

24   Q   Where does that information come from?

25   A   Ms. McKinley advised me of that.

Wiersema - Cross by Mr. Vanzant

1    Q    Is that word for word or is that summarized?

2    A    I believe the second half of the sentencing

3    "transferring all of his assets to his mother's name" is word

4    for word.

5    Q    Did you ever ask Mr. Storme about the asset transfer?

6    A    I did.

7    Q    What was his response?

8    A    As outlined on the top of the next page, I believe, the

9    next day or a few days later, July 24th, I asked him about

10   that -- and it's outlined in that report -- that he wanted to

11   make things easier on his mom.  And when I asked him what

12   that meant, he said I will not be convicted of this offense.

13   I then asked a direct question are you going to kill

14   yourself, and he said I'm not going to be convicted, and he

15   said, as I quoted, I've been saying what I'll do all along.

16   Q    Who is the attorney?

17   A    I don't know the name of the attorney.  I didn't ask

18   that question.

19   Q    Did you make any efforts to investigate what the --

20   aside from talking to Mr. Storme, what the purpose of the

21   asset transfer was?

22   A    I did not.  He had just expressed to me what's written

23   in there that it was easier, making it's easier on his mom.

24   Q    All right.  Finally under the Recommendation, it states

25   "the Court was verbally made aware of the majority of the

1   information contained above."  Correct?

2   A    Correct.

3   Q    What information was the Court not made aware?

4         THE COURT:  What does that mean?  Do you understand

5   that question?

6         MR. VANZANT:  Let me rephrase that.

7         THE COURT:  Okay.

8         THE WITNESS:  I don't understand.

9   BY MR. VANZANT:

10  Q    The report says essentially that you told the Court the

11  majority of the information, correct?

12  A    Uh-huh.

13  Q    What did you leave out?

14  A    The various -- the third line of this report discusses

15  that his bond was revoked on August 3rd.  Obviously, when I

16  spoke with the Court, that wasn't -- hadn't happened yet --

17  Q    Got it.

18  A    -- so that is something that wasn't reported to the

19  Court.  We all know it happened but that's what I meant by

20  that.

21  Q    Okay.  Thank you.

22        The recommendation concludes "therefore, this

23  report is being submitted for informational purpose."  Is

24  that correct?

25  A    Correct.

1    Q    Is there any recommendation to take Mr. Storme into

2    custody at that time?

3    A    At that time, there was no need for recommendation.  The

4    defendant was already in custody.  There was not a pending

5    matter before -- a bond matter before the Court so therefore

6    a recommendation wasn't necessary in our report.

7    Q    Did you make -- so this is not the recommendation you

8    gave the Court?

9             THE COURT:  Did you or did you not recommend that

10   the defendant be remanded pending further order of Court in a

11   hearing?

12            THE WITNESS:  We did.

13            THE COURT:  All right.

14   BY MR. VANZANT:

15   Q    Was that verbal?

16            THE COURT:  Yes.

17            THE WITNESS:  Yes.

18   BY MR. VANZANT:

19   Q    Got it.  Not in this report, correct?

20   A    Correct.

21   Q    All right.  Let me wrap this up.

22            Based on our discussion of the reports, it's my

23   understanding that there were two specifics violations of

24   supervised release alleged over the course of this case; is

25   that accurate?

1    A    Two reports were submitted, yes.

2    Q    Okay.  So we've got the curfew violations, right?

3    A    Yes.

4    Q    And we've got the stalking issue and related --

5    unrelated alcohol issue, correct?

6    A    Correct.

7    Q    To your knowledge, are there any other violations of

8    supervised release that have been reported to the Court that

9    have not been discussed today?

10   A    None.

11   Q    To your knowledge -- and I'm looking at the conditions

12   of release on one of the status reports.

13   A    Okay.

14   Q    To your knowledge, has Mr. Storme in the past -- I guess

15   since the last violation report -- violated any of these

16   conditions of supervised release?

17   A    None.

18        MR. VANZANT:  One moment, your Honor.

19        (Counsel conferring.)

20        MR. VANZANT:  Just two follow-up questions on that.

21   BY MR. VANZANT:

22   Q    You know Biscuit, right?

23   A    I do.

24   Q    And he is Mr. Storme's support animal, correct, German

25   Shepherd?

1   A    Yes.  It's his animal.  Yes.

2   Q    All right.  When did he get Biscuit?

3   A    Approximately two years ago.

4   Q    And that was after his suicide attempts, correct?

5   A    That's correct.

6   Q    Has he ever expressed to you the importance of Biscuit

7   to him?

8   A    Many times.

9   Q    What has he said?

10  A    He -- he has expressed that the dog has been very

11  helpful to his mental status.  He feels kind of a purpose to

12  get up in the morning to help the dog, take the dog out, take

13  the doing for walks.  He's very active with the dog.  He even

14  takes the dog to counseling and Amber has expressed that it's

15  good for him, it keeps him moving and keeps him -- it keeps

16  him moving and keeps him thinking -- focusing on something

17  else outside of the case.

18  Q    Has Mr. Storme ever talked to you about what he would do

19  with Biscuit in the event that he chose to commit suicide?

20  A    Never.

21  Q    Do you have any knowledge of any plans to put Biscuit in

22  care?

23  A    We never discussed that; no.

24  Q    Prior to his -- the revocation of his bond last week,

25  had he done anything to your knowledge related to finding a

1    separate home for Biscuit?

2    A    The only thing remotely close is he said his mom really

3    loved Biscuit and that Biscuit loved when they traveled to

4    Virginia and got to be there.  But no, we never discussed any

5    plans for the dog.

6    Q    Before he got Biscuit, did he ever leave the house very

7    much?

8    A    He left the home sometime -- I mean, I don't understand

9    the question.

10   Q    Yeah.  Let me rephrase that.  It was a little badly

11   phrased.

12            Mr. Storme was on home detention for a period,

13   correct?

14   A    He was, yes.

15   Q    Other than being compelled to remain in his home, did he

16   voluntarily leave the house frequently prior to getting

17   Biscuit?

18   A    I would say no, not frequently.

19   Q    Has that changed since he got Biscuit?

20   A    Yes.  Ever since he's got Biscuit, he is out of the

21   house more now that -- the curfew has been reinstated so he's

22   allowed out more.  But yes, he's out often with the dog; what

23   I believe to be with the dog.

24   Q    Obviously you've been sitting here today and this is a

25   revocation detention hearing, et cetera, et cetera.  Have you

W'rer Serma - Cross by Mr. Vanzant        133

1    provided any recommendations to the Court regarding what
2    should be done in this case?
3    A    Our recommendation stands that Mr. Storme should be in
4    custody for his own safety.
5    Q    Why?
6    A    Because we feel Mr. Storme is a danger to himself.
7    Q    Okay.  My question to you then is:  Are you aware of any
8    legal basis or policy basis for that recommendation?
9              THE COURT:  Are you asking him a legal question?
10   What's the purpose of that?
11             MR. VANZANT:  His understanding, your Honor.
12             THE COURT:  Well, you can ask him a nonleading --
13   nonlegal question.  And if you're asking for a legal
14   determination about something, I don't know how --
15             MR. VANZANT:  Let me rephrase.
16             THE COURT:  Yeah, go ahead.
17   BY MR. VANZANT:
18   Q    Are you aware of anyone -- any other pretrial supervisee
19   ever being taken into custody or their bond revoked?
20             THE COURT:  What's the relevance of that?
21             MR. VANZANT:  I don't think this has ever happened
22   before, your Honor, and that's why -- well.
23             THE COURT:  Okay.  And either -- at least the Court
24   is either -- it needs facts in this case and what has
25   happened or did not happen in another case, how would that

1    tend to move or not move a fact of relevance for the factual

2    portion?  If you got a theory of why it's relevant, I'm happy

3    to hear it.  Isn't assessment an individual assessment

4    always?

5              MR. VANZANT:  My view, your Honor -- and I would

6    argue this later -- is that this has never happened before

7    because it's not permitted to take someone into custody based

8    solely on their mental health or risk to themselves.

9              THE COURT:  Well, that didn't happen in this case,

10   but go ahead.

11             MR. VANZANT:  That was -- my question is, other

12   than this case, are you aware of that ever happening in

13   another case.

14             THE COURT:  Okay.  And why would that be relevant

15   factually?

16             All right.  You can't offer a relevance but I'll

17   allow it.  We don't have a jury.  Go ahead, answer the

18   question.

19             THE WITNESS:  I can't recall.

20             THE COURT:  Do you know of a case that's like this

21   one?

22             THE WITNESS:  Judge, I can't recall one, no.

23             THE COURT:  Okay.

24             MR. VANZANT:  And -- sorry, your Honor.  I was

25   taking a sip of water.  But the relevance on this one happens

1    to be if Pretrial Services has never made this recommendation

2    before, I think that should weigh very heavily in what the

3    Court will decide.  The fact that no one has used this

4    condition, if it is a condition, even if it is permissible,

5    that is something the Court needs to take into consideration.

6            THE COURT:  Well, the Court takes into

7    consideration their recommendations.  Their recommendations

8    have no binding effect on the Court at all.  In fact, the

9    Court agrees with them sometimes and disagrees with them the

10   same way I do with Probation, you know, when I got a PSR or a

11   recommendation.  It's -- I like to hear their views but it

12   has no legal effect, either persuasive or otherwise, or

13   binding on the Court.  It's simply another assessment which

14   the parties can discuss and ultimately the Court has to make

15   a -- its own determination.

16           I'm the one that gets affirmed or reversed.  I'm

17   the one every day in this courtroom having to make calls; and

18   they're not just balls and strikes like the famous quote is.

19   They're important determinations, determinations about civil

20   cases and criminal cases, whether a person has their freedom,

21   whether a person loses their business, and I got to make

22   those based on the facts and the law.  And I look for

23   whatever advice or recommendation happens or can be offered

24   by other parties but at the end of the day doing it right or

25   getting it right -- whether I do so or not, whether I live up

1    to that impossible ideal or not -- rests with me.

2              So you go ahead and ask the question; but in the

3    scope of things, I think the facts and the law and what I

4    need to assess, I think that's the most important thing.  But

5    you go ahead and ask whatever question you think is

6    appropriate.

7    BY MR. VANZANT:

8    Q    I'm sorry.  Did you answer the question?

9    A    I don't recall a case like this before, no.

10   Q    Okay.  Thank you.

11             MR. VANZANT:  I have nothing further, your Honor.

12             THE COURT:  Redirect?

13             MS. CHUNG:  Very briefly, your Honor.

14                       REDIRECT EXAMINATION

15   BY MS. CHUNG:

16   Q    Officer Wiersema, you were asked about your knowledge of

17   various actions that the Court took in response to reports

18   that you filed.  Is it fair to say that you answered based on

19   your best recollection sitting here today?

20   A    That's correct.

21   Q    And is it also fair to say that the docket would

22   accurately reflect what, if any, actions were taken?

23   A    Yes, it would.

24   Q    You were also asked about stalking -- an alleged

25   stalking incident that occurred in or around January of 2021

1 | that was reported early the following month to the Court and

2 | your report noted an order of protection in that case.

3 | Do you know whether that order of protection is

4 | ongoing?

5 | A    I verified this morning that order of protection is

6 | ongoing until October 5th of 2023.

7 | Q    And lastly, you were asked about your knowledge of

8 | whether bond has ever been revoked for a defendant based on

9 | his suicide risk in your experience with Pretrial Services.

10 | Are you aware of every case that Pretrial Services has ever

11 | handled?

12 | A    Of course not.

13 | MS. CHUNG:  That's it, your Honor.

14 | THE COURT:  Does the government -- has it, through

15 | either Pretrial Services or otherwise, ever obtained any

16 | police reports based on the stalking arrest?

17 | MS. CHUNG:  Not to my knowledge, your Honor.

18 | THE COURT:  Did you get any reports?

19 | THE WITNESS:  I do have those.  Yes, I believe.

20 | THE COURT:  Where are they?

21 | THE WITNESS:  They're in our system.

22 | THE COURT:  All right.  Can you print them out and

23 | give them to the parties?

24 | THE WITNESS:  Of course.

25 | THE COURT:  Okay.  Are you going to move to admit

1  those?

2  MS. CHUNG:  I will, your Honor, once we have them.

3  THE COURT:  Okay.  All right.  Any objection to the

4  admission of those?

5  MR. VANZANT:  That's fine, your Honor.  I just have

6  one follow up on that.

7  THE COURT:  All right.  They'll be -- you can

8  follow up on it.  Do you want to get them now because they

9  might want to ask --

10  THE WITNESS:  I can.  I'm very certain they're

11  there.  I need to see them but I'm very certain they're

12  there.

13  THE COURT:  Okay.

14  MR. VANZANT:  The specific question I had, your

15  Honor, was whether or not Officer Wiersema is aware of any

16  violations of that order of protection.

17  THE COURT:  Okay.  Maybe he knows.  Do you know?

18  THE WITNESS:  I am not aware of any violation of

19  that order of protection.

20  THE COURT:  The order of protection is in place;

21  but to his knowledge, there is no violation of it.

22  MR. VANZANT:  Yes, your Honor.  That's all I have.

23  THE COURT:  All right.  No other questions.

24  I do ask that you stick around because there might

25  be follow up and if you could in the interim try to get those

1    police reports so the parties can review them.

2              THE WITNESS:  I will do that now if the Court is

3    inclined.

4              THE COURT:  Yeah.  Thank you.  You're excused.

5         (Witness excused.)

6              THE COURT:  Government want to call your next

7    witness?

8              MS. CHUNG:  Yes, your Honor.  The government calls

9    FBI Special Agent Michael Devine to the stand.

10             THE COURT:  Good afternoon, Agent.  Please raise

11   your right hand.

12        (Witness sworn.)

13             THE COURT:  All right.  Go ahead, have a seat.

14   Counsel, whenever you're ready.

15             MS. CHUNG:  Thank you, your Honor.

16      MICHAEL DEVINE, GOVERNMENT'S WITNESS, FIRST DULY SWORN

17                     DIRECT EXAMINATION

18   BY MS. CHUNG:

19   Q    Special Agent Devine, are you the case agent who

20   investigated the defendant, Mr. Storme?

21   A    Yes.

22   Q    And were you involved in the preparation of a criminal

23   complaint that was filed in this matter?

24   A    Yes.

25   Q    And do you have a copy of the complaint in front of you?

1    A    I do.

2    Q    While you were preparing the complaint, did you have a

3    chance to participate in drafting the complaint?

4    A    Yes.

5    Q    Did you also have the chance to review it prior to

6    signing?

7    A    Yes.

8    Q    And did you have the chance to make any necessary

9    changes?

10   A    Yes.

11   Q    At the time that you signed the criminal complaint, was

12   the information inside your affidavit true and accurate to

13   the best of your knowledge?

14   A    It was.

15   Q    And have you continued to be involved in Mr. Storme's

16   case since the swearing out of this criminal complaint?

17   A    Yes.

18   Q    Earlier today, did you have the chance to once again

19   review and refresh your recollection with respect to the

20   criminal complaint?

21   A    Yes, I did.

22   Q    And sitting here today, is the content of your affidavit

23   still true and accurate to the best of your knowledge?

24   A    Yes, it is.

25             MS. CHUNG:  And, your Honor, at this time I would

 1    move to admit the complaint which is already on the docket at

 2    Docket Number 1 into evidence for purposes of this hearing.

 3                THE COURT:  Any objection?

 4                MR. VANZANT:  No.

 5                THE COURT:  Oral -- motion to admit Docket Entry 1

 6    for the purposes of the evidentiary hearing is granted.

 7                MS. CHUNG:  Your Honor, at this point I don't have

 8    further questions so I will tender the witness for cross

 9    examination.

10                THE COURT:  Cross examination?

11                         CROSS EXAMINATION

12    BY MR. VANZANT:

13    Q    Do you have a copy of the complaint up there, Agent?

14    A    Yes, I do.

15    Q    Okay.  Can I talk to you about Page 3, Paragraph 6?  Are

16    you there?

17    A    Yes.

18    Q    Paragraph 6, Line 2 states "Soon thereafter, Storme

19    began a campaign of threats and harassment against her."

20    This is responding to Individual A.

21                THE COURT:  What page?

22                MR. VANZANT:  Page 3, Paragraph 6, your Honor.

23                THE COURT:  Got it.  Go ahead.

24    BY MR. VANZANT:

25    Q    Specifically about that "campaign of threats," what were

1    those threats?

2    A    The threats were that her reputation would be ruined

3    through the course of the website that was established.

4    Q    Okay.  How many times did he make that threat?

5    A    Well, based on the number of accounts that he created

6    and based on the number of individuals he disseminated that

7    information to would be the number of counts.

8    Q    How many is that?

9    A    I don't know.

10   Q    And this occurred on or around May 7, 2020?

11   A    Correct.

12   Q    Since this case began -- or strike that.

13        Since Mr. Storme was arrested, are you aware of any

14   threats made by Mr. Storme against Individual A?

15   A    No.

16   Q    Also in Paragraph 6 -- one, two, three, four, five --

17   six lines down the line starting "private messages," do you

18   see that?

19   A    I'm sorry.  Where?

20   Q    The line starting "private messages."

21   A    Still in Paragraph 6?

22   Q    Yes.

23   A    Okay.

24   Q    I want to ask you about the clause "including nude

25   photographs of Individual A."  Do you see that?

1    A    Yes.

2    Q    Is that accurate?

3    A    Yes.

4    Q    They were nude photographs?

5    A    I believe I saw a photograph of Individual A naked and

6    tied to a bed.

7    Q    Is that one of the ones he distributed?

8    A    If I can recall, yes.  I believe so.

9    Q    When was that distributed?

10   A    I can't remember.

11   Q    Was it more than one?

12   A    I also can't remember that.

13   Q    Okay.  I'd like to ask you next about Paragraph 14 on

14   Page 6.  Actually, strike that.

15            Has Mr. Storme made any true threats in this case?

16            MS. CHUNG:  Objection, your Honor.  Calls for a

17   legal conclusion.

18            THE COURT:  Is that a legal question or a factual

19   question?  If it's a legal question, then sustained.

20   Otherwise --

21            MR. VANZANT:  That's a good question, your Honor.

22   I'd say mixed, I guess.

23            THE COURT:  Do you understand what he means

24   because if he's -- if you're using -- if you're using a

25   specialized way, I don't know that he's going to understand

1    the meaning of it.  It's up to you.  Pose whatever question

2    you want; but if you're going to argue that he's rendering a

3    legal opinion, I don't know if that's what the evidence

4    actually is but I'm sure the government can explore it on

5    redirect but -- so ask whatever you want.

6              MR. VANZANT:  Yeah --

7              THE COURT:  Again, there's no jury so the evidence

8    is easy.  There's -- the rules are less and there's no jury,

9    so go ahead.

10             MR. VANZANT:  So let me clarify my question.

11   BY MR. VANZANT:

12   Q    Are you aware of the difference between a threat and a

13   true threat?

14   A    No.

15             MR. VANZANT:  Don't worry about it then.

16             THE COURT:  Okay.

17   BY MR. VANZANT:

18   Q    Have there been any threats of violence made by

19   Mr. Storme against anyone else in this case?

20   A    No.

21   Q    Oh, last one.  There is an allegation in Paragraph 32,

22   Page 12.  Let me know when you're there.

23   A    Uh-huh.

24             THE COURT:  Page 12?

25             MR. VANZANT:  Page 12, Paragraph 32, your Honor.

1    BY MR. VANZANT:

2    Q    It states "video surveillance footage obtained from

3    Individual A's property management company captured on or

4    about July 17, 2020, depicted a man fitting the physical

5    description of Storme engaging in the act of slashing the

6    tires of Individual A's vehicle."

7    A    Yes.

8    Q    This is based on video footage?

9    A    Yes.

10    Q    Did you provide that video to the U.S. Attorney's

11    Office?

12    A    Yes, I did.

13            MR. VANZANT:  Just for the record, your Honor, I

14    don't know if I'm correct on this but we took a look, we do

15    not have this in discovery.  I don't know whether that's here

16    nor there for this hearing but just to make that record.

17            THE COURT:  Do you need discovery for your hearing?

18            MR. VANZANT:  No, your Honor.  I'm questioning

19    whether the video actually exists and we don't have it so

20    that's -- it may be neither here nor there, I don't know, but

21    I want to make the record on that point.

22            THE COURT:  Well, you can't make a record with a

23    question mark so let's figure it out.  Are you aware if the

24    video exists?

25            MS. CHUNG:  The video does exist, your Honor.  It

 1  was tendered to the U.S. Attorney's Office.  It is part of

 2  our discovery files.  I had thought that we had produced it

 3  to defense counsel.  We certainly produced it to former

 4  counsel and then produced all of the discovery in this case

 5  to current defense counsel on their request when they said

 6  that former counsel had not turned it over.

 7          THE COURT:  Yeah, because there was -- I think Gal

 8  Pissetzky turned it over to you, or at least he was supposed

 9  to.  Do you need a continuance to chase that down --

10          MR. VANZANT:  No, your Honor.

11          THE COURT:  -- or deal with the record as it is?

12          MR. VANZANT:  The record is fine, your Honor.

13          THE COURT:  Okay.

14          MR. VANZANT:  I just wanted to make sure that it

15  was actually in existence.

16          THE COURT:  Okay.  It is at least based on the

17  proffer.

18          MR. VANZANT:  Nothing further, your Honor.

19          THE COURT:  Okay.  Redirect?

20          MS. CHUNG:  No redirect, your Honor.

21          THE COURT:  Okay.  All right.  Thank you, Agent.

22  Step down.

23          (Witness excused.)

24          THE COURT:  I can't remember if the government

25  moved the August 3rd MCC memo.  Did you move that into

1    evidence?

2                    MS. CHUNG:  Yes.  We did, your Honor.

3                    THE COURT:  Okay.  My bad.

4                    Any disputes about the factual statement in there,

5    on behalf of the defense?

6                    MR. VANZANT:  I'm sorry.  Which one was it, your

7    Honor?

8                    THE COURT:  The thing we got today, the August 3rd

9    MCC, any disputes on the fact -- I mean, you're going to call

10   your witness.  So if you dispute anything, it seems like

11   you'd be able to address most of that, if not all of it, but

12   it's up to you.

13                   Are you disputing anything in the memo?

14                   MR. VANZANT:  Let me ask Mr. Storme, your Honor,

15   since we just saw this.

16                   THE COURT:  Okay.  We can take a break and go ahead

17   and look at that.

18                   MR. VANZANT:  Thank you.

19      (Counsel conferring.)

20                   THE COURT:  While he's conferring, whenever

21   Pretrial -- whenever you get a copy of those reports, just go

22   ahead and make copies.  Okay?

23                   MR. WIERSEMA:  It's on its way up here right now.

24                   THE COURT:  Oh, excellent.  Thank you so much.

25                   MR. VANZANT:  Your Honor, as to the report we were

1    just discussing, Mr. Storme has no dispute as to those facts.

2                THE COURT:  Okay.  Great.  Thank you so much.

3                MS. CHUNG:  And, your Honor, very briefly and

4    because -- we just received another report.  This is a report

5    from the United States Marshal Service.  It's a Field

6    Operational Report that was just provided to us relating to

7    the transfer of Mr. Storme.

8                THE COURT:  Fresh off the presses?

9                MS. CHUNG:  Fresh off the presses, fresh off of

10   Office of General Council clearance to disclose these

11   reports.

12               THE COURT:  All right.  Well, that's not

13   surprising, which is why the Court thought that a preemptive

14   hearing was -- that the parties would need time to actually

15   go through this because the nature of this record -- and I

16   knew it last week -- is something that would require some due

17   diligence and time.

18               Can you make copies for the defense --

19               MS. CHUNG:  I have copies.

20               THE COURT:  -- and copies for the Court and then

21   we'll go off the record and give my court reporter a short

22   break.  She's been going an hour and a half at this point.

23   We'll give her a mental break and we'll go through that and

24   you can talk to your client.  I have no idea what's in it,

25   so.

149

```
1              MR. VANZANT:  Thank you, your Honor.

2              THE COURT:  Or maybe I do.  I don't know yet.  I'll

3    find out.  All right.  We're going to take a short recess.

4              MR. VANZANT:  Thank you.

5              MS. CHUNG:  Thank you.

6         (Recess taken.)

7              THE COURT:  Ready to go back on the record?

8              MS. CHUNG:  Yes, your Honor.

9              MR. VANZANT:  Yes, your Honor.

10             THE COURT:  Okay.  The parties have had an

11   opportunity to review the Field Operational Report from the

12   U.S. Marshal Service dated 8-4, 2023, and the underlying

13   police reports from the Arlington Heights Police Department.

14             Does anyone need any more time to go over those

15   materials?

16             MS. CHUNG:  No.

17             MR. VANZANT:  No, your Honor.

18             THE COURT:  Okay.  Is the government moving both of

19   those into evidence for the purposes of the hearing?

20             MS. CHUNG:  Yes, your Honor.

21             THE COURT:  Any dispute regarding the facts set

22   forth in both of those exhibits?

23             MR. VANZANT:  Not in the first, your Honor, the

24   Marshal's report.  Mr. Storme does inform me that he takes

25   issue with some of the characterizations in the police
```

1    reports --

2              THE COURT:  Okay.

3              MR. VANZANT:  -- but I don't know if that's

4    material to what we're discussing today.

5              THE COURT:  Well, it is so --

6              MR. VANZANT:  Thank you.

7              THE COURT:  -- let me just say this:  To the degree

8    there's a dispute -- I know you're calling him.  I'm going to

9    assume that you're going to raise any disputes; and to the

10   degree you don't raise a dispute, I can consider the rest of

11   the report true and accurate.  Is that --

12             MR. VANZANT:  That's fair, your Honor.

13             THE COURT:  Okay.  That's the only efficient way to

14   get through that.  All right.  Both of those are admitted and

15   that's the record regarding any factual dispute on it.

16             Okay.  Any additional testimony or evidence from

17   the government?

18             MS. CHUNG:  No, your Honor.

19             THE COURT:  Any evidence or -- that the defense

20   wants to put on?

21             MR. VANZANT:  Yes, your Honor.  Mr. Storme will

22   testify and my partner, Andrew Finke, will handle the direct

23   examination.

24             THE COURT:  Okay.  Sounds great.  Take the stand.

25        (Brief pause.)

1          THE COURT:  Good afternoon, sir.  Have a seat.

2    Please raise your right hand.

3          (Witness sworn.)

4          THE COURT:  You got to keep your voice up.

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  Counsel, whenever you're ready.

7          MR. FINKE:  Thank you, your Honor.

8     VINCENT STORME, DEFENDANT'S WITNESS, FIRST DULY SWORN

9                    DIRECT EXAMINATION

10   BY MR. FINKE:

11   Q    Good afternoon, Mr. Storme.

12        You've been able to witness a number of -- some

13   testimony regarding your mental health here today; is that

14   correct?

15   A    Yes.

16   Q    Can you tell me about -- you heard the Pretrial

17   Services' officer describe a diagnosis of post-traumatic

18   stress disorder.  Can you tell me more about that?

19   A    What -- what exactly --

20        THE COURT:  You're going to have to keep your voice

21   up so the court reporter can write down what you're saying.

22   Try again.

23        THE WITNESS:  What exactly do you want to know?

24   BY MR. FINKE:

25   Q    Before you were indicted in this case, did you suffer

1    from post-traumatic stress disorder?

2    A    No, I did not.

3    Q    When did you begin suffering from post-traumatic stress

4    disorder?

5    A    The -- the day of being arrested on September 23rd,

6    2020.

7    Q    And to the extent that you're able to discuss it today,

8    can you describe what happened during that arrest?

9    A    15 FBI agents broke down my door while I was sleeping

10   and they pointed guns at me and then they took me from my

11   home and -- yeah.  That's -- and then ever since then, it's

12   just been -- they put me in detention and --

13   Q    After they took you into custody, where were you held?

14   A    Kankakee.

15   Q    How long were you held in Kankakee?

16   A    A little over a week.

17   Q    And can you describe the conditions that you experienced

18   while being held at Kankakee?

19   A    It was during COVID lockdowns.  It was before there was

20   a vaccine.  Donald Trump was still President so there was no

21   vaccine.  They kept us in the cells for 23 hours a day.  I

22   was denied a mask for like the first like four or five days

23   and I -- I didn't know what was going on.  I didn't know why

24   I was -- like I understand the charges.  I don't understand

25   why I'm being prosecuted.

1   Q    After you were detained in Kankakee, you were released,
2   correct?
3   A    Yes.
4   Q    And after your release, you attempted suicide?
5   A    Yes.
6   Q    And after -- after that suicide attempt, you began
7   seeing a therapist as well as a psychiatrist, correct?
8   A    I began seeing a psychologist initially beginning late
9   October, early November.  His name is Dr. Allen.  And then I
10  started seeing Amber McKinley, a therapist, in January of
11  2021.  And also Dr. Vedak, the psychol -- psychiatrist that
12  prescribes me my medication or in listening time.
13  Q    Did any of those providers who you met with, did any of
14  them diagnose you with post-traumatic stress disorder?
15  A    The psychiatrist and the psychologist, both
16  independently.  PTSD, severe situational depression, night
17  terrors and panic attacks.
18  Q    Did they provide you with any medication for you?
19  A    Yeah.  The psychologist recommended I go on to Zoloft
20  and then the psychiatrist gives me Zoloft, the generic brand;
21  Trazodone to help me sleep because I have a lot of
22  nightmares; and Quetiapine.
23  Q    Are you currently able to access all of that -- all of
24  that medication at MCC?
25  A    No.

1    Q    What medication are you on at MCC?

2    A    They give me half of my dosage of Zoloft and they only

3    give me a quarter of my Trazodone prescription and they

4    give -- and they give -- they don't give me any Quetiapine at

5    all.  And with Trazodone, they don't -- they give it to me at

6    4:00 p.m. when I need it to go to sleep so it kind of defeats

7    the purpose.  Not only are they giving me a low dose but

8    they're not giving it to me when I need to take it at the

9    time I need to take it so I can sleep.

10   Q    Are you experiencing any other effects as a result of

11   this difference in the -- in your medication?

12   A    Could you clarify?

13   Q    Are you able to determine sitting here today whether or

14   not -- do you feel any other -- any effects as a result of

15   not having your -- the prescriptions that you were having

16   before you were taken to the MCC?

17   A    I'm not sleeping as well as I was before so it's been

18   hard.

19   Q    Okay.  I want to change gears here a little bit and talk

20   about -- you've heard a number of conversations that have

21   been described about you talking about an asset transfer to

22   your mother.  Do you have any idea what they're talking about

23   there?

24   A    I have an idea.  I -- yes, I have an idea.

25   Q    Have you planned any transfer of assets to your mother?

1    A    The only transfer -- yes.  Yes.

2    Q    What have you -- what are those plans?

3    A    So the only plan was I started the process of

4    transferring my mortgage, doing a mortgage assumption to my

5    mother and also to transfer the property deed.  But I can't

6    do the property deed until I figure out the mortgage

7    assumption which my mother has to be -- I have to submit the

8    application first, which I still haven't done.  My mother has

9    to be approved and that's a whole convoluted process that I

10   told -- that I was told would take about 90 days before I

11   could actually transfer the deed of my property over to my

12   mom's name.

13   Q    We might be getting ahead of ourselves here and I

14   apologize.  In November 2020, that's when you were initially

15   terminated from your job at PayPal?

16   A    Yes.

17   Q    And after that -- after that for the most part, who has

18   been paying your mortgage while you've been -- while you've

19   been on pretrial release?

20   A    My mother.

21   Q    And is there any reason why you were deciding to

22   transfer that mortgage to her as well as the deed via

23   quitclaim deed?

24   A    I mean, one, she's paying for it so she's built up

25   equity, but also she can't properly file taxes because

1    everything is in my name.  So while everything is in my name,

2    she's -- it's -- essentially she's just throwing money

3    without being able to file taxes on it.

4    Q    And is that something that you've discussed with your

5    mother?

6    A    Yes.

7    Q    Have you discussed that with your stepfather as well?

8    A    Yes.

9    Q    Did you discuss that with your therapist?

10   A    Yes.

11   Q    What did you tell your therapist regarding this

12   transfer?

13   A    It's -- it's actually something I brought up long before

14   now.  I think I initially brought it up in -- end of 2021,

15   early 2022, but I never got around to getting into it more

16   until more recently because I didn't think that this case

17   would go on this long.

18             But I essentially told them the same thing, like my

19   parents have been paying for my home and they can't file

20   taxes so I need to -- yeah, I need to transfer it or they

21   can't file taxes.

22   Q    Did you ever discuss this with your Pretrial Services'

23   officer?

24   A    Yeah, I did.

25   Q    What did you tell him?

1    A    So he came to my condo one day and he brought up the
2    fact that Amber told him that something -- like he said,
3    like -- Amber mentioned something about you trying to
4    transfer your property and I said yeah, I'm trying to
5    transfer it over to my mom and I started looking for a lawyer
6    to help me with that.

7    Q    Do you remember when this conversation occurred?
8    A    It was in late July after I got back from visiting my
9    family in Virginia.

10   Q    Did you tell him anything else about the reason for your
11   transferring those assets, specifically your mortgage and
12   ownership of the condo?

13   A    Did I tell him -- could you repeat that, please?
14   Q    Is there anything else that you -- can you remember
15   anything else about that conversation with him?

16   A    I just wanted to make it easier for my parents just
17   because they've already given a lot to me throughout this
18   whole process.  And so if they're able to actually properly
19   file taxes and do deductions, then that helps them too.

20   Q    Now I want to go back a little bit more and talk about
21   Biscuit.  You originally obtained Biscuit or began -- or met
22   Biscuit in, I believe, it was May of 2021; is that correct?
23   A    May 2021.

24   Q    How did you -- how did you find Biscuit?
25   A    I found him online.

1    Q    Biscuit is a companion animal?

2    A    No.  He's a service dog.  I've trained him for the last

3    two-and-a-half years.

4         MR. VANZANT:  If the record could reflect that Mr.

5    Storme is crying right now.

6         MR. FINKE:  Please take as much time as you need

7    to.

8         THE COURT:  The record will so reflect.  There's

9    tissues there if you need some tissues, sir.

10        THE WITNESS:  Thank you.

11   BY MR. FINKE:

12   Q    Mr. Storme, can you describe your condition in the time

13   leading up to when you got Biscuit?

14   A    After I was arrested in January, I never left -- I think

15   I was given some time allotted outside -- I think it was like

16   maybe eight hours, it might have been less -- but I never

17   left my condo or my bedroom with the exception of going to

18   see Dr. Allen in person, the psychologist.  And Pretrial

19   actually even called me on video call one day because

20   I -- they were curious like you're not ever leaving your

21   bedroom.  So, yeah.

22   Q    And after you got Biscuit, how if anything did

23   that -- did Biscuit affect your life?

24   A    I started going outside more.  I started working with

25   him because I got him at 11 months and he had some bad habits

1    from his first owner so it was a lot of work to train him and

2    now he goes everywhere with me.

3    Q    You also heard -- turning to some of the other testimony

4    you heard today, I believe the Pretrial Services' officer

5    indicated a conversation which you related to him that you

6    felt you had the ability to read the hearing -- and referring

7    to the August 3rd hearing -- and read the Judge and make

8    determinations about how the Judge was set to rule.

9            Do you recall a conversation with the Pretrial

10   Services' officer to that effect?

11   A    I recall a conversation but I never said that.

12   Q    What did you say?

13   A    I said trying to determine what the Judge is thinking

14   during oral arguments for a motion.  So I watch -- or I

15   listen to the Supreme Court oral arguments all the time and

16   one of the things that people say when they listen to Supreme

17   Court oral arguments is it's like reading tea leaves, you can

18   try to guess what the judges are thinking based off of the

19   questions that they ask but you won't actually know anything

20   until an order is issued regarding, you know, what they're

21   going to do.  It's like reading tea leaves.  I used those

22   words specifically when talking to Justin.

23            THE COURT:  How often did you come to the courtroom

24   to watch the Court in other matters that had nothing to do

25   with you?

 1            THE WITNESS:  Fairly often.  I would say like once

 2   or twice a week.

 3   BY MR. FINKE:

 4   Q    Why did you do that?

 5   A    To learn.

 6            THE COURT:  To learn what?

 7            THE WITNESS:  In case this has to go to trial.  I

 8   just want to learn how the process goes.

 9   BY MR. FINKE:

10   Q    Did you observe trials in this courtroom?

11   A    Yes.

12   Q    Did you specifically observe trials because you wanted

13   to observe trials as opposed to some other procedure?

14   A    Could you repeat that?  Sorry.

15   Q    Did you choose trials in particular to observe?

16   A    I came to trials and motion hearings.

17            THE COURT:  And that was over a course of how many

18   weeks did you come into the court to review and --

19            THE WITNESS:  It's been off --

20            THE COURT:  -- observe the way the Court conducted

21   rulings in both trials and motion hearings?

22            THE WITNESS:  It's been off and on for, I want to

23   say, the last six months.

24            THE COURT:  Yep.  That's consistent with the

25   Court's recollection.  He's come in to watch the Court for

1    over six months on a regular basis.  Go ahead.

2    BY MR. FINKE:

3    Q    Apart from watching court, have you had any

4    communication directly with any members of the court?

5    A    I mean, Gloria recognizes us when we're walking in and

6    she's very friendly.

7            THE COURT:  That's the Court's Courtroom Deputy.

8    BY MR. FINKE:

9    Q    And by "us," are you referring to you and Biscuit?

10   A    Yes.

11   Q    Have you made any attempts to contact Judge Blakey

12   directly?

13   A    No.  I know that that's not proper.

14   Q    Have you discussed with your Pretrial Services' officer

15   the fact that you were attending court?

16   A    I've told him and he obviously knows because I'm on GPS

17   monitoring.

18   Q    Did he provide any advice to you or any commentary in

19   response to the information when you gave it to him?

20   A    I don't think so.  I think he said that that's a good

21   idea just so you can learn the process.

22   Q    Very briefly, I want to talk about the communications

23   with your therapist.  Regarding the asset transfer, do you

24   recall discussing that with your therapist at all?

25   A    Yes.

1    Q    And do you recall what information you provided -- what

2    you said to her regarding that as best as you can recall?

3    A    So the first time I brought up with my therapist was

4    initially over a year ago but I never actually followed

5    through with it until more recently.

6              But I essentially said like they've been

7    paying -- my -- "they" being my family -- has been paying my

8    mortgage for the last two-and-a-half years and it's in my

9    name and I have no income right now so if I file taxes,

10   it -- it doesn't do anything whereas they can get -- they can

11   claim deductions.

12   Q    Did you ever tell your therapist that it was to make

13   things easier once you killed yourself?

14   A    I never said that phrase specifically.  I said it would

15   be easier for my family regardless if things don't go the way

16   I wanted as in if I'm wrongfully convicted.

17             THE COURT:  Did you tell your therapist or Pretrial

18   that you were going to kill yourself depending on how the

19   case progressed?

20             THE WITNESS:  Could you be more specific?

21             MR. FINKE:  Actually, if I may.

22             THE COURT:  No.  I'm going -- Nope.  You're going

23   to get a chance to ask any question you want and my question

24   stands.

25             Did you or did you not tell your therapist or your

1    Pretrial Services' officer that you're going to kill yourself
2    depending on how the case progressed?
3                 THE WITNESS:  Only --
4                 THE COURT:  And if you want -- hang on a second.
5    And if the defense wants to object based on privilege or
6    something else, you can assert an objection to the question.
7                 MR. FINKE:  No objection, your Honor.
8                 THE COURT:  Okay.  Go ahead.  Answer the question.
9                 THE WITNESS:  Only if I'm wrongfully convicted.
10                THE COURT:  So you did make those statements?
11                THE WITNESS:  If I'm wrongfully convicted, yes.
12                THE COURT:  And so when you made those statements,
13   you qualified it in saying that it would only be a conviction
14   where you would kill yourself?
15                THE WITNESS:  I said something to the effect
16   of -- if I remember my exact phrasing, it was something to
17   the effect of I don't want to live if I'm wrongfully
18   convicted because Ashley breaks the law and I used Ashley's
19   name specifically.
20                THE COURT:  How many times have you attempted to
21   kill yourself?  Actually.  Not threatened.
22                THE WITNESS:  Twice.
23                THE COURT:  Go ahead, counsel.  Pose any question
24   you want.
25   BY MR. FINKE:

1    Q    Did you tell your therapist that you intended to kill

2    yourself as a result of any rulings at the hearing on August

3    3rd?

4    A    No.  I wanted to go home and watch Star Trek.

5    Q    Before August 3rd, did you tell your therapists that you

6    had any intent of killing yourself as a result of any rulings

7    this Court made before trial?

8    A    No.

9    Q    So to clarify the Court's question, to the extent that

10   you've expressed any desire to kill yourself based on how

11   this case progressed, "how this case progressed" to you means

12   if you're wrongfully convicted?

13   A    Yes.

14   Q    You've attempted to commit suicide twice?

15   A    Yes.

16   Q    I apologize for having to delve into this so quickly and

17   now, but why did you try to kill yourself last Thursday on

18   August 3rd?

19   A    I didn't know why I was being taken in and it triggered

20   what happened on -- in 2020.  I didn't find out what was

21   happening until the following -- this past Monday.

22   Q    You said earlier that day, your plans were to go home

23   and watch Star Trek?

24   A    Yes.

25   Q    What Star Trek?

1  A     Star Trek:  Strange New Worlds, Episode 9, I think, just

2  came out; or it came out last week.

3  Q     If released, would you agree to submit to commitment at

4  any kind of psyche ward or any kind of medical provider?

5  A     Yes.  It's better than being locked up.

6  Q     And would you do that understanding that if that

7  provider determined that you were a suicide risk, that you

8  would be unable -- would you be willing to enter into a

9  situation where if that provider determines that you were a

10  suicide risk, you would be unable to leave that institution?

11  A     Yes.  I mean, that's happened before.

12        THE COURT:  What's the relevance of those questions

13  if the parties do not anticipate allowing the evaluation to

14  go forward?

15        MR. VANZANT:  For use later if necessary, your

16  Honor.  We need --

17        THE COURT:  Find a microphone, please.

18        MR. VANZANT:  For use later necessary -- if

19  necessary, your Honor.  It matters for establishing the

20  factual record now while we're here.

21        THE COURT:  Well, the factual record -- if, in

22  fact, you want to pursue that course, the Court is happy to

23  expand the record to include that but you have to ask for it

24  and that would require -- because it can't happen between now

25  and the next two hours from now that you allow that to run

1    its course and you're telling me you're not going to do that.

2         The government has offered a stay of the appellate

3    process to have a complete record, including that portion of

4    the record, but you've indicated that depending on what the

5    Court does today on the incomplete record that you would --

6    there's no interest in a stay.

7         So if you want a stay and you want me to actually

8    pursue an evaluation along those lines related to those

9    questions, now is the time to ask me.

10        MR. VANZANT:  I do not want a stay, your Honor.

11   Mr. Storme needs to be out today.  That's my overriding --

12        THE COURT:  Okay.

13        MR. VANZANT:  -- objective here.  He needs to be in

14   a hospital; not a jail cell.

15        THE COURT:  Go ahead, counsel.  Pose any question

16   you feel is necessary.

17        I'll note for the record that on appeal -- and I'm

18   sure the Seventh Circuit is going to read this in its

19   entirety -- to the degree they don't have information, the

20   defense doesn't have information from an evaluation, I'm

21   making a finding that they've waived it because the Court has

22   given them an opportunity to obtain it and they've declined

23   so I'm finding waiver; putting it on the record.

24        Go ahead, counsel.

25        (Counsel conferring.)

1    BY MR. FINKE:

2    Q    Vincent, if you're released, do you intend to commit

3    suicide?

4    A    Not -- not today, not any time in the foreseeable

5    future.

6    Q    Why not?

7    A    My dog mostly, but also I'm hoping that this is

8    dismissed as it should be.

9    Q    Why your dog?

10   A    He helps me a lot with coping and he needs me and I need

11   him.

12            MR. FINKE:  No further questions, your Honor.

13            THE COURT:  Cross examination?

14                     CROSS EXAMINATION

15   BY MS. CHUNG:

16   Q    Good afternoon, Mr. Storme.  I know you've had a chance

17   to review the August 4th, 2023, report that was filed by

18   Pretrial Services.  If you would like a copy of that report

19   for reference, please just let me know.

20   A    Please.

21   Q    In one of the paragraphs on the first page, there's a

22   reference there to a conversation that you had with Pretrial

23   Services' Officer Wiersema where he wrote that the defendant

24   advised this officer that at the upcoming motion hearing, he

25   will be able to see which way the Court is leaning by the

1  questions the Court asks.

2          Do you deny saying -- making that statement?

3  A    I said I can guess but it bears no meaning because, just

4  like Supreme Court oral arguments, you don't actually know.

5          THE COURT:  Is that what you told him or is that --

6          THE WITNESS:  Yes.  I said it's like reading tea

7  leaves.  It's pointless.

8  BY MS. CHUNG:

9  Q    The -- another -- a portion of the same report states

10  that in a counseling session on or about July 20th, 2023, you

11  advised your counselor that you have contacted an attorney

12  and are transferring assets to your -- into your mother's

13  name specifically in advance of the motion hearing.

14          Do you deny that the timing of the motion hearing

15  prompted your transfer of assets?

16  A    It's not -- it's not the timing.  I've been thinking

17  about it for a while and I did initially reach out to my

18  mortgage lender about a year ago but I never continued the

19  process.

20  Q    But you continued the process and took steps to complete

21  that process ahead of the motion hearing; is that right?

22  A    No.  I barely even started.  I haven't even submitted

23  any paperwork yet to transfer the mortgage.

24  Q    Lastly, the report also notes that on July 24th, 2023,

25  the Pretrial Services' officer asked you about the

1  transferring of assets into your mother's name and that you

2  advised that you are doing this to make it easier on your

3  mother and reiterated that you will not be convicted of this

4  offense.

5          Do you deny making both of those statements in

6  response to the Pretrial Services' officer's question?

7  A     That was a long question.  Could you please break it

8  down?

9  Q     Yes.  The report also says that you -- when you were

10  asked about the transferring of assets to your mother's name

11  that you advised that you were doing this to make it easier

12  on your mother and that you reiterated that you will not be

13  convicted of this offense.  Do you deny making both of those

14  statements in response to Officer Wiersema's question?

15  A     I said it would be easier for my mother so that way she

16  could file taxes.

17  Q     And so you deny also saying that you will not be

18  convicted of this offense?

19  A     I said I don't want to be wrongfully convicted of this

20  offense.

21  Q     And you did make that statement in response to Officer

22  Wiersema asking about the asset transfer?

23  A     Not -- no.  There were other things that we talked

24  about, too.  We didn't just talk about me trying to transfer

25  my mortgage over to my mother's house.  We talked also about

1    the upcoming motion and how I was really excited about it

2    because we made very good arguments.

3                 MS. CHUNG:  Your Honor, may I have a moment?

4                 THE COURT:  You may.  And I'm going to remind you

5    it's not just the question of revocation but reconsideration

6    of initial denial so make sure you're asking all the

7    appropriate questions regarding both a revocation under 3148

8    and the relevant 3142s.  Obviously, 3142 is part of the --

9    depending on what the predicate is for the 3148 analysis, but

10   to the degree the Court is reconsidering based on the request

11   of the parties of its own abilities under the law, you'd have

12   to be able to address the reconsideration of the initial

13   request by the government for detention in light of new

14   circumstance.

15                MS. CHUNG:  Yes, your Honor.

16              (Counsel conferring.)

17   BY MS. CHUNG:

18   Q    Mr. Storme, you were also provided -- you and your

19   counsel were provided a copy of a police report from the

20   Arlington Heights Police Department detailing an incident of

21   alleged stalking by you of a victim and ex-girlfriend in

22   January 2021.

23                MR. FINKE:  Objection, your Honor.  At this time,

24   we move to exclude this line of questioning.  It's outside

25   the scope of the direct.

1          THE COURT:  They can call -- outside the scope of

2     direct?  The scope of the direct is the factors the Court has

3     to address so "beyond the scope" doesn't -- that's overruled.

4     BY MS. CHUNG:

5     Q    Mr. Storme, did you --

6          THE COURT:  Are you telling me he can't elicit

7     testimony on the very thing that was already admitted into

8     evidence?

9          MR. FINKE:  No.  I'm just --

10         THE COURT:  It was admitted into the evidence.

11    It's the police reports.  How is that not part of the

12    hearing?

13         MR. VANZANT:  Your Honor, Mr. Storme is a criminal

14    defendant.  He has Fifth Amendment rights.  We were very

15    careful in what questions we asked him --

16         THE COURT:  You can assert question-by-question any

17    Fifth Amendment you want, go ahead and do that.  But "beyond

18    the scope objection" is not -- is not something that would --

19    first of all, rules of evidence don't apply in the same way

20    in a detention hearing and/or bond revocation hearing,

21    plural, so beyond the scope -- and beyond the scope is also

22    discretionary and it's not beyond the scope because the cross

23    examination is greater than necessarily the direct but a

24    privilege is a live bullet and you can assert that whenever

25    you want.  And if you want, make sure before you answer a

1     question your counsel have an opportunity to assert any

2     privilege objection you want because that's -- that is part

3     of the process, so.

4               She can ask any questions about the cyberstalking,

5     about the complaint affidavit; and if he wants to assert his

6     Fifth Amendment rights, then he can do so.

7               Okay.  Go ahead, pose whatever question the

8     government wants and go ahead and assert any objection you

9     have that's relevant to this proceeding.

10              MR. FINKE:  Thank you, your Honor.

11    BY MS. CHUNG:

12    Q    Mr. Storme, after your relationship with the victim

13    named in this report ended, didn't you repeatedly drive by

14    her house?

15              THE COURT:  Is there an objection?

16              MR. FINKE:  Just to foundation just so we're clear

17    on which report we're referring to.  I believe you did before

18    but just so he understands.

19              MS. CHUNG:  Yes.  I'm referring to the Arlington

20    Heights police report that was -- a copy of which was

21    provided by Pretrial Services to the parties and the Court

22    today.

23              MR. FINKE:  Objection, your Honor.  We're asserting

24    the Fifth Amendment to this --

25              THE COURT:  Fifth Amendment will be sustained.

 1    Don't answer the question.

 2    BY MS. CHUNG:

 3    Q    Isn't it also true, Mr. Storme, that you attempted to

 4    contact the victim on or about September 30th, 2020, using

 5    your mother's telephone number?

 6              MR. FINKE:  Same objection, your Honor.

 7              THE COURT:  Sustained.

 8    BY MS. CHUNG:

 9    Q    Did you -- isn't it also true, Mr. Storme, that you also

10    the following day sent her an image of a handwritten suicide

11    note?

12              MR. FINKE:  Same objection, your Honor.

13              THE COURT:  That's -- that's Fifth Amendment?

14              MR. FINKE:  Yes, your Honor.

15              THE COURT:  Okay.  Sustained.

16    BY MS. CHUNG:

17    Q    Isn't it also true that on or about January 25th, 2021,

18    that you began following the victim in a Lexus SUV?

19              MR. FINKE:  Same objection, your Honor.

20              THE COURT:  Sustained.

21    BY MS. CHUNG:

22    Q    And isn't it also true that you had been parking in her

23    neighborhood for a period of time after the relationship

24    ended?

25              MR. FINKE:  Same objection, your Honor.

1               THE COURT:  Sustained.  Is it fair to say that the

2   defense is going to sustain any objection to any question on

3   cross regarding the Arlington Heights police report and the

4   incidents that's contained therein?

5               MR. VANZANT:  Yes, your Honor.

6               MR. FINKE:  Yes, your Honor.

7               THE COURT:  Okay.  All right.

8               MR. FINKE:  I need to pause to process all that.  I

9   appreciate it.

10              THE COURT:  So to the degree the Court is going to

11  rely on it without any clarification, I'm free to do that,

12  right?

13              MR. FINKE:  Yes.

14              MR. VANZANT:  I don't think --

15              THE COURT:  It's in evidence and you can choose --

16  if you want to assert the Fifth, you're free to do that.  But

17  if you present evidence or don't present evidence, I have to

18  rule based on the record that's in front of me.

19              Right now, I've -- and the rules of evidence don't

20  apply but certainly Fifth Amendment does.  If he chooses not

21  to give his side of the story, he's free to do that and he

22  will not be penalized for that but the Court will make a

23  ruling based on the facts in the case including that exhibit

24  which is in evidence without objection so you can go ahead

25  and decide what you want to do.

1          MR. FINKE:  Yes, your Honor.

2             (Counsel conferring.)

3          MR. FINKE:  We understand that the report is in

4    evidence and that your Honor may refer to the report and rely

5    on it to the extent that it deems it's relevant.

6          THE COURT:  Okay.

7          MR. VANZANT:  One point to make a record on that,

8    your Honor.

9          THE COURT:  Microphone, microphone.

10         MR. VANZANT:  Oh, sorry.  I forget about the

11   microphone sometimes.

12            Just to make a record, your Honor.  I will object

13   to any adverse inference from Mr. Storme taking the Fifth

14   Amendment related to this issue.  I understand that the

15   reports are in evidence; but to the extent that Mr. Storme

16   has asserted his Fifth Amendment rights, that cannot be taken

17   against him.

18         THE COURT:  I'm not drawing any adverse inference

19   because he hasn't given any statement.  This is a criminal

20   case, not a civil case, so I'm not drawing any adverse

21   inference.

22            But the fact that he's asserted the Fifth Amendment

23   and chooses not to address those questions on cross or during

24   his testimony doesn't change the fact that that exhibit is in

25   evidence and is properly admitted without objection and I'm

1    free to rely on the exhibit.

2            He has an opportunity, if he wants, to put evidence

3    in if he wanted to do that.  If he chooses not to do that, it

4    can't be used against him.  But he also has to the

5    opportunity to do it if he wants to.  And if he chooses not

6    to do that, then all I have is -- I don't have the benefit of

7    his version of whatever those facts are.  All I have is what

8    I have.

9            So I'm not drawing any adverse inferences but I

10   will make inferences on the case and the reasonable

11   inferences based on the facts that are elicited in the

12   testimony.  I'm not using a Fifth Amendment to determine

13   that -- you know, the fact that he's asserting the Fifth

14   Amendment means that he's lying about the Arlington Heights

15   police report.  I have no inference I can draw from the Fifth

16   Amendment because there's no evidence.  Is that -- do you

17   object to the Court proceeding in that way?

18           MR. VANZANT:  If I'm understanding it correctly,

19   your Honor, I --

20           THE COURT:  I'm allowed to make factual findings

21   and draw reasonable inferences based on the evidence that's

22   in the record especially stuff that's in the record by

23   agreement.  If a defendant in response to a question asserts

24   a Fifth Amendment and does not give an answer, that's

25   nonevidence so there's nothing I can do with that.  I don't

1   draw negative inference but I also don't have the benefit of

2   some hypothetical answer that -- for example, let's say he

3   goes yeah, my ex-girlfriend in the Arlington Heights Police

4   Department, she was lying about the whole thing and here's

5   why; right.

6           If he had testified to that, I could consider that.

7   I'd have to assess his credibility on it, right, but there

8   you go.  If he doesn't give me that, I'm just giving him the

9   opportunity to give me that statement if he wants to do so.

10  The only issue is if he did that, then he can't do that and

11  assert the Fifth Amendment at the same time.

12          So he can testify about it if he wants but he can't

13  be compelled to testify about it.  If he doesn't testify

14  about it, I'm not drawing any adverse inference.  I'm just

15  dealing with the record as it is without the benefit of his

16  version of the story.

17          Is there any issue or -- constitutional or

18  otherwise -- for the Court proceeding in that fashion?

19          MR. VANZANT:  Provided that it's clear that we are

20  not stipulating to those facts, your Honor, I think that's my

21  main concern here.

22          THE COURT:  Well, it's an agreed exhibit and I gave

23  you the opportunity to present any evidence that you want to

24  dispute it and right now it's undisputed.  So you haven't

25  stipulated that it's true but you also haven't disputed it.

1           So if you want to call, for example, the Arlington

2    Heights police officer, if you want to call the victim in

3    that case, if you want to present any other exhibit or

4    evidence that would undermine the credibility of the exhibit

5    that is now in there -- and it's a very detailed exhibit --

6    it's admissible because the -- obviously, and I mentioned

7    this before and I'll mention again, the rules of evidence

8    don't apply in the same way in this proceeding, whether it's

9    a reconsideration of a detention or a bond revocation,

10   regardless, those rules are not the same as a jury trial.

11          So if you have any legal or procedural or

12   constitutional objection, now is the time to make it.  I'm

13   allowing him to assert the Fifth in response to questions

14   that are relevant to the issues in the case and I'm not

15   drawing any adverse inference at all.

16          MR. FINKE:  Based on that, we have no objection,

17   your Honor.

18          THE COURT:  Okay.  All right.  Any other --

19   obviously based on that Fifth Amendment, does the government

20   intend to ask any other questions regarding the Arlington

21   Heights report?

22          MS. CHUNG:  I do not, your Honor.

23          THE COURT:  Okay.

24          MS. CHUNG:  I next intended to ask questions

25   relating to the assertions in the criminal complaint and the

1    allegations made in the indictment.  I'd like to ask, just to

2    avoid wasting time, if the defense counsel intends for

3    defendant to assert his Fifth Amendment privilege with

4    respect to that line of questioning.

5              THE COURT:  Do you intend to assert a Fifth

6    Amendment privilege in response to any questions on cross

7    regarding either the allegations set forth in the indictment

8    or the criminal complaint, which is Docket Entry 1?

9              MR. FINKE:  Yes, your Honor.

10             MR. VANZANT:  Yes, your Honor.

11             THE COURT:  All right.  That objection and

12   assertion of the Fifth Amendment will be honored.  The same

13   rules of procedure as the Arlington Heights.  It's the

14   indictment and the complaint, including the live testimony of

15   the agent, that's all in the record.  You've been given an

16   opportunity to refute it if you wanted to but you certainly

17   can't be complied to -- forced to.  And if you assert the

18   Fifth Amendment, no negative inference based on the refusal

19   will be drawn.  The Court is free, however, to make factual

20   findings based on the evidence that is in the record and draw

21   reasonable inferences from there.

22             So based on that, is there any legal or

23   constitutional objection what I've just stated?

24             MR. VANZANT:  Fifth Amendment and scope, your

25   Honor.

1          THE COURT:  Fifth Amendment and scope?

2          MR. VANZANT:  Scope.

3          THE COURT:  What's your -- all right.  Get near a

4     microphone and tell me what your objection is.

5          MR. VANZANT:  Make sure I articulate this right,

6     your Honor.  The problem that I keep coming back to is it

7     seems like the Court is putting the burden on us to come

8     forward with evidence to dispute what the government is

9     putting in.

10         THE COURT:  I am not.  If that was your impression,

11    that is not the case.  The burdens are set forth in the

12    statute and I will apply the burdens correctly.

13         MR. VANZANT:  My concern based on the Court's

14    comments is that we are not stipulating to these facts so

15    they can't be taken as true.  If the Court wants to make some

16    findings on that, that's different, but I want to be very

17    clear that -- strike that.

18         THE COURT:  Well, you did agree that some of the

19    facts were true and I thought we did that this morning.  That

20    didn't relate to the criminal complaint or the Arlington

21    Heights but it related to a bunch of things.  Are you -- are

22    we undoing all the work we did this morning?

23         MR. VANZANT:  No, your Honor.  Those are different

24    issues.  I'm talking specifically about this Arlington

25    Heights issue because it is factually complicated and this

1    is -- I think it's far beyond the scope of what this hearing

2    can and should be about.

3              THE COURT:  Well, I mean, according to you, this is

4    3148, right, and part of that analysis under 3148(b) would

5    be -- (b)(1)(A) is the question the Court has to understand

6    is whether there's probable cause to believe the person has

7    committed a federal, state, or local crime on release.

8              Certainly the series of events set forth in the

9    Arlington Heights would be relevant to that question so I

10   don't understand how you're saying the Arlington Heights is

11   not relevant to the question when that's -- that's one of the

12   issues the Court has to make a determination on.

13             MR. VANZANT:  I suppose for the record I'll state

14   that this Arlington Heights thing occurred over two years

15   ago.

16             THE COURT:  Do you have any legal authority that

17   that creates this use or lose statute of limitations on the

18   ability of the government to seek a revocation of bond

19   because, as I indicated earlier, that creates an -- first of

20   all, there's no legal authority for that.

21             Second of all, it creates this absurd result where

22   the government, if they have a violation of bond, would have

23   to decide contemporaneously that they have to move to revoke

24   and they would not have the ability in their discretion to

25   either try to see if other bond conditions might work and

1    then change their mind later and say, oh, based on additional

2    new evidence we're going to go back and reassert that or just

3    wait and see.  I mean, the government does that all the time.

4    In fact, that's to the benefit of defendants and it's

5    consistent with the case law and the congressional intent

6    that, you know, there are alternatives to detention and the

7    parties should be working collaboratively and the Court

8    should be viewing the matter in a totality of the

9    circumstances and with exercising its authority in an

10   individual way.

11                Do you have a case or a statute that says that the

12   stalking incident -- and we call it a stalking incident.  It

13   actually represents a series of potential felonies and

14   misdemeanors ranging from stalking down to traffic

15   violations, steroid use, a bunch of things in there.  Do you

16   have any authority for the proposition that there's a statute

17   of limitations and that if the government doesn't move to

18   revoke based on certain conduct within a certain time frame

19   that they cannot come back and say, you know what, we're

20   going to actually move to revoke based on this prior conduct

21   because of the course of conduct including all the things

22   that have happened up and to today's date, do you have any

23   authority for that proposition?

24                MR. VANZANT:  Not in front of me, your Honor, but

25   I'm happy to file a supplement to explain our positions.

1      THE COURT:  Well, we don't have time because you

2  refused to allow the Court to go past today.  So if you want

3  a continuance, I'll give you all the time in the world not

4  only to develop the factual record but the legal record.

5      So you're the one that put us on the clock -- you

6  did, not me -- and we're on the clock now and now you're

7  saying you could give me a cite but I don't have it today?

8      MR. VANZANT:  I've been here all day, your Honor.

9      THE COURT:  I know, I know.

10      MR. VANZANT:  I've been standing in front of you

11  this entire day.

12      THE COURT:  I'm not criticizing that part.  I'm

13  criticizing the fact that there's the -- the agreement to

14  have the -- to do this in the proper amount of time not only

15  to have the proper factual record made but also to develop

16  whatever legal issues you have and to give the Court full

17  opportunity instead of doing it preemptively on a 24-hour

18  hair trigger which is what you -- the position you and the

19  government have put me in.  So that's not my fault that you

20  don't have the case with you and I will give you all the time

21  in the world to do it but you have to ask.

22      MR. VANZANT:  May I respond, your Honor?

23      THE COURT:  Yes.

24      MR. VANZANT:  Mr. Storme should not be in custody

25  at all, at all right now.  He is sitting in a jail cell

1    because he was taken in last week without a hearing without

2    notice.  We could have gathered all of this evidence.

3           THE COURT:  People -- that happens all the time,

4    counsel.  The Court will have issue with what's happening

5    with a person on bond, they issue a no bond warrant under

6    seal, he's arrested and he's temporarily detained and then

7    the parties either have the hearing within a -- the set

8    amount of time or agree to a continuance so there's nothing

9    strange or unusual about that.  That's exactly what happened

10   in this case.

11          MR. VANZANT:  May I continue my response, your

12   Honor?

13          THE COURT:  Yes.

14          MR. VANZANT:  What the Court appears to be doing

15   here is attempting to retroactively justify the decision to

16   take him into custody last week.  3148 specifically allows

17   issuance of a warrant on a violation of a condition of

18   release.  So far as I've been able to establish, the only

19   violations of a condition of release that occurred were two

20   years ago and they've already been dealt with by I believe it

21   was Judge Lee.  So there's nothing new that has happened

22   related to the conditions of his release that would have

23   warranted issuing a warrant and taking him into custody

24   pending a hearing.  That's the problem.

25          I ran straight up to the Seventh Circuit because

1    Mr. Storme is mentally -- he is mentally ill and should be in

2    a hospital instead of sitting in the SHU over at MCC.  That's

3    why I cannot and will not ask for an extension.

4              THE COURT:  All right.  But if you -- if I offer it

5    to you and you reject it, you can do it for whatever reason

6    you see fit, but you can't complain on appeal that you didn't

7    get a chance to develop a particular legal argument because

8    you didn't have a case.  And if you didn't have a case, you

9    can't fault me later for not ruling on a case you never cited

10   so you have to make a decision because it is waiver.  You're

11   waiving left and right, counsel.

12             MR. VANZANT:  Make I make a record, your Honor?

13             THE COURT:  Yeah.

14             MR. VANZANT:  We're here on the government's motion

15   to revoke.  It is the government's burden to identify the

16   basis for revocation and what the government's motion

17   contains is an extensive discussion of his current mental

18   health.  It is not asking the Court to revoke solely based on

19   something that happened two years ago.  That will be a very

20   different scenario and I --

21             THE COURT:  They're moving to revoke based on the

22   entire record; and even if they never filed anything, the

23   Court has the authority -- and I discussed the Court's

24   inherent and statutory authority -- that includes not only

25   the inherent authority and the statutory powers but the Court

1   can -- has those abilities and can act on the government's

2   motion, it can act on a pretrial request whether it's written

3   or oral or sua sponte on its own motion.  That's supported by

4   the statute and the Court's inherent powers.  It can do that

5   either by way of revocation of bond.  It can also do that by

6   way of reconsideration of a prior non-final order that it has

7   jurisdiction over.  That's the law.

8           So the -- the Court is going to -- and we've

9   already -- I don't want to retread area we've already gone

10  over.  If you have some objection that -- and you have some

11  authority regarding this most recent objection, I think we

12  got a little off track here, you said you had a Fifth

13  Amendment objection to me sustaining your Fifth Amendment

14  assertion and not drawing any inference so I'm trying to

15  figure out what objection you're making that's based on Fifth

16  Amendment.  I sustained the objection and I'm not drawing any

17  negative inference.  What's your Fifth Amendment objection?

18          MR. VANZANT:  Your Honor, may I make a record about

19  your previous statement?

20          THE COURT:  Well, answer my question first and then

21  you can make a record on anything you want.

22          MR. VANZANT:  We're objecting based on scope which

23  I understand the Court has already raised.  And since the

24  Court is concerned about waiver, I am standing on the Fifth

25  Amendment assertion as well.

1          THE COURT:  How is scope and Fifth Amendment -- how

2    is -- how is beyond the scope a lawful procedural error in

3    this hearing?  It does -- the beyond the scope, that's part

4    of the rules of evidence, right?

5          MR. VANZANT:  Yes.

6          THE COURT:  Okay.  Do the rules of evidence apply

7    to this hearing?

8          MR. VANZANT:  They're lucent, your Honor.

9          THE COURT:  Uh?

10         MR. VANZANT:  They're lucent.  It's not that they

11   don't apply, period.

12         THE COURT:  Okay.

13         MR. VANZANT:  I mean, that's --

14         THE COURT:  So you're saying it was an abuse of

15   discretion to sustain your objection to the questions?

16         MR. VANZANT:  No, your Honor.  I'm asserting

17   that --

18         THE COURT:  Because I don't see how there's any

19   procedural error or whether it's -- and it's -- certainly

20   there's none and if there was, it would certainly be harmless

21   because the beyond the scope objection was irrelevant because

22   you asserted a Fifth Amendment objection which was sustained.

23   So where is the complaint on appeal about what I did now?

24         MR. VANZANT:  The Court asked me to state my

25   objections clearly for the record.

1          THE COURT:  And you haven't; and so if you don't

2    develop an argument, it's waived.  You're saying I made a

3    Fifth Amendment violation.  I don't know what it is.  Tell me

4    what it is so I can do the right thing.

5          MR. VANZANT:  I haven't said the -- I was raising

6    an issue that can come up later.  I have an objection to the

7    government asking questions that implicate Mr. Storme's Fifth

8    Amendment rights.  Entirely separate from that, I was raising

9    my concern based on the Court's comments that the Court might

10   be taking that against Mr. Storme.

11         THE COURT:  And I said no so -- and then I asked if

12   there was any objection.  Your co-counsel said no and then

13   you said you do have one.  I asked you to articulate it.  I'm

14   trying to figure out where the error in prejudice is to

15   sustaining a Fifth Amendment objection and confirming on the

16   record unequivocally that I'm not drawing a negative

17   inference.

18         What did I do wrong under the Fifth Amendment,

19   counsel, because you haven't told me?

20         MR. VANZANT:  I haven't said that you have done

21   anything wrong under the Fifth Amendment, your Honor.

22         THE COURT:  All right.  Do you have a Fifth

23   Amendment objection to the Court that you haven't already

24   raised and been sustained?

25         MR. VANZANT:  To the question or --

1    THE COURT:  To the procedure.  What have I done on

2    the Fifth Amendment that you find unconstitutional?

3           MR. VANZANT:  To be clear, your Honor, as best as I

4    can -- and I am trying very hard.  I'm very tired.  It's been

5    a long day and a long week.

6           THE COURT:  I know.  And if you're tired, guess

7    what, guess what my answer to that is?  I don't feel like we

8    have to do this all in a rush but that's what you're telling

9    me you want to do so don't complain about the fact that

10   you're tired.  I'm sure you're tired.  I'm sure the

11   government is tired.  I'm sure the defendant is tired.  I'm

12   sure the Marshals are tired.  I know my court reporter is

13   tired and -- but the only reason that's happening is because

14   of the schedule that you've precipitated so you can't really

15   complain about that.

16          MR. VANZANT:  Mr. Storme tried to kill himself

17   because he was taken into custody and didn't know why last

18   week, your Honor.  He cannot spend any more time in jail.

19   That is why -- I can't agree to a continuance because of

20   that, that he cannot spend any more time in jail.

21          THE COURT:  You can make whatever decisions you

22   want but decisions have consequences.  And if you don't give

23   me an opportunity to do certain things or you don't give

24   yourself an opportunity to do certain things, you can't use

25   those as a basis for error on appeal, so.

 1          And the question is, do you -- if there are

 2   important things that you think I need to do that we can't do

 3   in the time allotted, then I'm giving you the opportunity for

 4   all the time that you need.  And you can take it or not but

 5   you can't refuse it and then complain that you didn't have

 6   time because you got it and you decided not to use it so

 7   that's -- and that's called waiver or forfeiture so you go

 8   ahead and do what you want to do.

 9          MR. VANZANT:  Is -- I wasn't sure if you were done,

10   your Honor.

11          THE COURT:  I'm done.  I mean, I don't even know --

12   I don't know where we left off before --

13          MR. VANZANT:  I don't know.

14          THE COURT:  -- we went off into that spinoff into

15   the shoulder there a little bit.

16          MS. CHUNG:  Your Honor, we -- I had just wrapped up

17   my line of cross examination with Mr. Storme.  I have no

18   further questions.

19          MR. VANZANT:  I -- I'm sorry, your Honor.  I

20   remembered --

21          THE COURT:  Okay.  Anything else to put on the

22   record?

23          MR. VANZANT:  Yes, your Honor.  I just remembered

24   where we started here.

25          THE COURT:  Okay.

1           MR. VANZANT:  Talking about the government's

2    motion, I -- I don't know why I didn't realize this earlier,

3    we got it this morning on our way to court so it is

4    physically impossible for me to adequately respond to things

5    that they've raised in a motion that was filed right before

6    we came in here and the Court is asking me why I don't have

7    authority.

8           THE COURT:  Okay.

9           MR. VANZANT:  That's --

10          THE COURT:  And the remedy for that is a

11   continuance and it's granted if you want it.

12          MR. VANZANT:  And this is exactly my concern, your

13   Honor.  I have been -- the Court has been encouraging me to

14   make waivers or make stipulations.

15          THE COURT:  I haven't encouraged any waivers.  I'm

16   finding waivers based on decisions you're making and I've

17   encouraged because I thought -- and this -- and I've already

18   said this previously.  I think that there's no reason to have

19   a rush to judgment on this issue.  I think it's important and

20   I think it should be done correctly on a complete record not

21   only factually but legally where both the government's

22   attorney and -- both defense counsel have an opportunity not

23   only to review the law on a complicated issue but to present

24   that to the Court in a way that I -- gives me enough time to

25   consider it before everybody runs upstairs and says I screwed

1    it up.

2            So if you believe as I do that this should be done

3    properly, I'm happy to give a continuance.  And if you want

4    to do it until tomorrow, you want to do it until the day

5    after tomorrow, you want to do it to any agreeable date that

6    is, I will move my jury trial for you, but you have to ask.

7    And if you don't, you can't say that you didn't have time to

8    make an argument and you can't complain upstairs and say this

9    is -- this is what was legally wrong when you didn't give me

10   a chance legally to get it right.

11           MR. VANZANT:  The record that I'm trying to make,

12   your Honor -- let me make sure I phrase it correctly -- I

13   would agree with everything you just said but for the fact

14   that Mr. Storme was taken into custody before any of these

15   questions were addressed.

16           THE COURT:  Being taken into custody pending a

17   detention is -- happens all the time.  It's not pleasant for

18   the defendant but it happens all the time.  It's contemplated

19   in the rules and the Court's inherent power and is implicit

20   and explicit in the Seventh Circuit's ruling in this case.

21           They did not order him immediately released.  They

22   detained -- they stayed their order to allow this hearing to

23   go forward.  And they specifically said in that order that as

24   part of the process -- let me -- sorry.  As part of the

25   process, the Court will decide and promptly -- the Court will

1  hear and decide as promptly as possible, okay, consistent

2  with the provisions of 3142(f) including those relating to

3  any further temporary detention pending outcome of such a

4  motion.

5       They did it on 24-hour notice and then gave us the

6  option to do it correctly but you have to ask me because if

7  you don't ask me for a continuance, then we have to do it

8  today.  And if that means I get it wrong, you can't complain

9  about something I didn't do that I would have done with a

10 different or more complete factual record or more developed

11 arguments.

12      So do you want to finish it tomorrow?  If so, I got

13 to tell my jury not to come tomorrow.

14      MR. VANZANT:  No, your Honor.  I will not ask for a

15 continuance.

16      THE COURT:  Okay.

17      MR. VANZANT:  What I will point out is the Seventh

18 Circuit also cited *United States versus Higgs* from the Third

19 Circuit in its order and *Higgs* dealt with a situation very

20 similar to this where a defendant were taken into custody --

21      THE COURT REPORTER:  I'm sorry.  Can you slow down?

22      MR. VANZANT:  Sure.  Sorry.

23      *Higgs* dealt with a situation fairly similar to this

24 where a defendant was taken in custody without a prior

25 hearing and the Third Circuit had a lot to say about that and

1   in fact --

2           THE COURT:  Well, he has a hearing now.

3           MR. VANZANT:  And that's -- that's a different

4   story.  The problem is he's still in custody, your Honor.  I

5   would be completely fine with taking --

6           THE COURT:  You're saying that the -- the temporary

7   detention pending further order and a detention, that doesn't

8   happen all the time in this district and across the nation?

9           MR. VANZANT:  Yes, when there's a violation that's

10  been alleged.  There was no violation alleged whatsoever

11  before the Court took him into custody.

12          THE COURT:  I know you believe that the Court can't

13  act without a motion.  Those cases are wrongly decided.

14          MR. VANZANT:  I'm not saying --

15          THE COURT:  Well, then I can move without a motion.

16  And if there's a violation, there's also no legal authority

17  for you to say that the stalking violation is somehow timed

18  out.  I'm allowed to look at that and make that part of the

19  3148 analysis and I'm able to do it on a current record.

20          I'm also able -- because the statute also talks

21  about amending orders and it also talks about -- and I quoted

22  this stuff first thing this morning about temporarily

23  detaining someone pending the outcome of a motion -- whether

24  it's the government's motion or the Court's own motion -- and

25  also revisiting a prior determination and that's

1    determination for detention or against detention based on new

2    material facts.

3              So the -- your legal analysis that I didn't have

4    the authority to remand him safely pending the determination

5    of the outcome, there's no basis for law that you've shown me

6    that says that that was unlawful nor would the remedy be

7    immediate relief.  The remedy would be hearing and that's

8    exactly what the Seventh Circuit gave you and this Court is

9    giving you.

10             MR. VANZANT:  May I respond, your Honor?

11             THE COURT:  Yes.

12             MR. VANZANT:  I agree with you that you can't sua

13   sponte raise these things but when we're --

14             THE COURT:  That I can or cannot?

15             MR. VANZANT:  Can.

16             THE COURT:  What?

17             MR. VANZANT:  Can.

18             THE COURT:  Can, okay.

19             MR. VANZANT:  It does not require a government

20   revocation motion.  I've read those cases so I agree with

21   that.

22             THE COURT:  Okay.

23             MR. VANZANT:  The problem is 3148 specifically

24   requires a violation to have been alleged.  It specifically

25   says charged with a violation prior to an arrest warrant

1    being issued.

2                THE COURT:  No.  It says probable cause to believe

3    the person has committed a federal, state, or local crime

4    while on release.  Right?

5                MR. VANZANT:  And so -- so far as I can determine,

6    there was nothing before the Court last week that indicated

7    Mr. Storme had violated his condition of pretrial release.

8                THE COURT:  I knew all about the cyberstalking and

9    that was part of the record.

10               MR. VANZANT:  It certainly wasn't made part of the

11   record last week, your Honor.

12               THE COURT:  You knew about the cyberstalking.  It's

13   been a part of the record since it occurred.

14               MR. VANZANT:  No.  That's not what I'm talking

15   about, your Honor.  I'm talking about perceiving that as a

16   violation of supervised release.

17               THE COURT:  It's a violation if the Court

18   determines that -- at least it's a violation that would

19   require a hearing.  If I see -- If I see that there was a

20   condition of bond and I have a sufficient factual predicate

21   that he violated it, then I can order him detained pending a

22   hearing and there's no time limit on that.

23               And if the more recent events cast -- and I said

24   this before, I'll say it again -- old events can be cast in

25   new light based on more recent events and the Court has to

1    look at the entire record and do so up to date based on the

2    status of the landscape that the Court -- at the time the

3    Court is making the determination.  The Court's inherent

4    authority recognizes that.  The language of the statutes,

5    including the ones we've been talking about, recognize it.

6    They have express language about reconsideration.  They have

7    express language about the Court doing it on its own motion.

8    They have express language about temporary detention pending

9    further hearing.

10                And within -- other than the fact that I was in the

11   hospital on Friday the 4th, I was not -- I got that order

12   setting the hearing on the books within a business day.  And

13   I also made clear in the August 3rd minute order that this

14   whole thing was subject to further order.

15                So your argument that he needs to be released

16   because of what happened on August 3rd -- I mean, you might

17   say "factually, Judge, you're wrong, he should be released on

18   bond, don't reconsider detention, don't revoke his bond," and

19   that's to the merits; that's fine.  But to say that the

20   remedy now, because you think I messed up on August 3rd --

21   which I didn't -- is because you have no authority on your

22   own to temporarily detain him pending notice and a hearing,

23   you don't have any authority for that, at least you haven't

24   given me any.

25                MR. VANZANT:  What I'm trying to explain, your

```
1    Honor, is the basis for -- strike that.  We got off on a --
2                MR. FINKE:  Can you get him off the stand?
3                MR. VANZANT:  If Mr. Storme is done, your Honor,
4    may he come down from the stand while we discuss this?  I
5    don't --
6                THE COURT:  Well, let's -- let's do this.  You
7    don't have any additional questions, correct?
8                MS. CHUNG:  That's correct, your Honor.
9                THE COURT:  Okay.  Do you have -- government --
10   does defense have any additional questions?
11               MR. VANZANT:  No, your Honor.
12               MR. FINKE:  Nothing.
13               THE COURT:  Okay.  Sir, go ahead.  Have a seat.
14   Have a cup of -- glass of water, whatever you need.
15         (Witness excused.)
16               THE COURT:  Any additional testimony or evidence
17   from the defense on the issues presented to the Court?
18               MR. VANZANT:  No, your Honor.
19               THE COURT:  Okay.
20               MR. VANZANT:  On to the --
21               THE COURT:  And it's both issues.  It's revocation
22   of bond and it's reconsideration of the prior denial.  Any
23   additional testimony or evidence?
24               MR. VANZANT:  No, your Honor.
25               THE COURT:  Okay.  Do you want a continuance to
```

 1    develop the legal or factual record at all?

 2              (Counsel conferring.)

 3              MR. VANZANT:  I'm not asking for a continuance,

 4    your Honor.  What I am is making a record that

 5    Mr. Storme should -- I would have no problem if he was out.

 6              THE COURT:  I know you wouldn't but that's not how

 7    it works.

 8              MR. VANZANT:  Well, and that's what we're arguing

 9    about here.

10              But secondly, that police report from Arlington

11    Heights, nobody even saw that until today as far as I know.

12    I don't think the Court had that.  So to the extent we're

13    arguing --

14              THE COURT:  I have the allegations and I have the

15    evidence.  It's present now.  It's already been admitted

16    without objection.

17              MR. VANZANT:  We did object to the facts and we

18    certainly can stipulate, your Honor.

19              THE COURT:  You didn't object to the facts.  You

20    just said you didn't stipulate to it.  And the exhibit is

21    already in evidence without objection.

22              MR. VANZANT:  And we've objected based on burden

23    shifting on that point, your Honor.

24              THE COURT:  It's not burden shifting.  The

25    government is actually presenting evidence to carry its

1     burden so the Court is not shifting any burdens.  That's a

2     mischaracterization of the record.  I'm making that finding,

3     too.

4           The remedy for you saying you're surprised by a

5     piece of evidence is time to take care of it so I'm ready to

6     give you that remedy.  If you don't want it, then you can't

7     complain.  That's how that works, too.

8           MR. VANZANT:  No, your Honor.  This needs to be

9     decided today.

10          THE COURT:  Okay.

11          MR. VANZANT:  I am not asking for a continuance.  I

12    will not ask for a continuance.

13          THE COURT:  All right.  Then any complaints

14    regarding whether or not you had enough time to get ready for

15    the hearing, those are waived.

16          MR. VANZANT:  I would object to that, I suppose,

17    but that's I guess on the record.

18          THE COURT:  You can object and then I'll sustain

19    your objection and give you a continuance.  We can go in

20    circles all you want.

21          Do you want time to go -- develop the factual or

22    legal record, yes or no?  I'll do it if you want it.

23          MR. VANZANT:  No.  It needs to be --

24          THE COURT:  Okay.  You don't.  So then we're going

25    forward on the factual legal record because that's what you

1    chose to do.

2            Okay.  All right.  Is the government ready to argue

3    both issues?  Let's do the -- let's do them sequentially.

4    Let's do the revocation of bond first and then we'll deal

5    with the reconsideration of the prior denial of detention.

6            MS. CHUNG:  Yes.  We are ready, your Honor.

7            And so as the government flagged in a footnote in

8    its motion to revoke bond, the government does see 3148(b)

9    revocation as an avenue for taking defendant into custody

10   here.

11           In the government's view, here there is under

12   3148(b)(1), first, probable cause to believe that the

13   defendant committed a federal, state, or local crime while on

14   release based on the information provided in the Arlington PD

15   report and/or under Subsection B clear and convincing

16   evidence that the defendant violated any other condition of

17   release, namely, the ten -- pardon me, the approximately over

18   35 violations of curfew and location monitoring that were

19   undisputed in the record.

20           With that first predicate satisfied, the government

21   now turns to 3148(b)(2).  There, the statute provides that

22   this Court must find that, A, based on the factors set forth

23   in 3142(g), there's no condition or combination of conditions

24   of release that will assure -- that will assure -- and that's

25   not will reasonably assure, that will assure -- that the

202

1    person will not flee or pose a danger to the safety of any

2    other person or the community or that the person is unlikely

3    to abide by any condition or combination of conditions of

4    release.

5            Here, the government submits that both of those

6    alternatives have been proven by a preponderance of the

7    evidence which the government submits is the appropriate

8    standard under 3148(b).

9            Here, with respect to the -- under the 3142(g)

10   factors, we have a situation where the nature and

11   circumstances of the offense charged -- here,

12   cyberstalking three separate victims over various periods of

13   time -- are, one, that are serious -- serious offenses.  And

14   this Court already has additional information about the

15   allegations submitted as part of the parties' briefing on the

16   consolidated pretrial motions.

17           Second, the government would submit that the weight

18   of the evidence against Mr. Storme is strong.  There -- there

19   is a substantial amount of communications of witness

20   interviews and other discovery that was indexed in the

21   exhibit that the government filed as an attachment to its

22   response to the consolidated pretrial motions outlining the

23   types of evidence that the government expects to rely on at

24   trial.

25           Third, the history and characteristics of

1    Mr. Storme.  Here, the government notes in particular the

2    history of Mr. Storme's performance on pretrial release.  The

3    fact that there have been these prior violations themselves

4    in the government's view can again be considered as part of

5    his history and characteristics.  This Court can also

6    consider I think most importantly here the evidence that we

7    have both in the Pretrial Service reports as well as the live

8    testimony of Officer Wiersema about Mr. Storme's chronic

9    suicidal ideations, his multiple attempts at suicide.  These

10   include the October 2020 attempt that was not disputed, the

11   most recent attempt on August 3rd that's outlined in the

12   report submitted into evidence from the MCC, and the

13   government also notes its concern with respect to the

14   contents of the Marshal's report which stated that while

15   Mr. Storme was in the Marshal's custody to be transported to

16   the MCC, that he twice banged his head on the floor before

17   the Marshals were able to intervene and keep him from harming

18   himself.

19          In addition to all of this, the government notes

20   that the Pretrial Services' reports also outline Mr. Storme's

21   other risks for nonappearance as well as risk for danger to

22   the community.  With respect to risks for nonappearance, they

23   highlighted the fact that he had lived abroad before and that

24   he did not have many ties to this district.  That risk here

25   is heightened, that risk factor is heightened here where

1    Mr. Storme's mother and former third-party custodian has

2    since been allowed to leave the district and go back to

3    Virginia further reducing any ties and any precautions that

4    could be in place for Mr. Storme while he's in our district.

5            With respect to the risks of danger to another

6    person or the community, the Pretrial Services' officer in

7    their -- Pretrial Services in their initial bond report

8    specifically noted of course the nature and circumstances of

9    the offense which at that time was limited to just the

10   criminal complaint and the allegations against Individual A.

11           Since then, the government has obtained a

12   superseding indictment that alleges additional disturbing

13   conduct with respect to two other live victims and of course

14   there's also the information in the record about the stalking

15   of a -- his ex-girlfriend who is not among the victims in the

16   federal case.

17           I think under the 34 -- 3142(g) factors then that

18   the government --

19           THE COURT:  And the Arlington Heights was while on

20   bond here and the superseding indictment victims were -- all

21   predate his arrest?

22           MS. CHUNG:  Pardon me, your Honor?

23           THE COURT:  The alleged victims in the superseding

24   indictment relate to conduct that precedes the arrest and the

25   Arlington Heights one is allegations that were while on bond

1    in the case, yes?

2              MS. CHUNG:  That's correct, your Honor.

3              THE COURT:  Okay.  Go ahead.

4              MS. CHUNG:  Lastly under 3148, with respect to

5    Subsection B, that the defendant is unlikely to abide by any

6    condition or combination of conditions of release, I think

7    here among the conditions of release of course is the

8    condition that defendant appear for all future court

9    appearances.

10             I think here, and I'll note for the Court, I'm

11   relying on the case law cited in the government's written

12   motion with respect to suicide being a form of flight and an

13   appropriate factor to take into consideration in assessing

14   risk of nonappearance.  That here, we have two documented

15   suicide attempts that show that by a preponderance that

16   Mr. Storme is unlikely to abide by that particular condition

17   moving forward.

18             Unless the Court has any other questions, I can

19   either turn to 3142 or we can turn it over to defense

20   counsel.

21             THE COURT:  Why don't you go ahead and do the

22   reconsideration request for reconsideration of the prior

23   denial of detention?

24             MS. CHUNG:  Yes, your Honor.  Under 3142(e), there

25   the standard as the government noted in its motion to revoke

1   bond, is whether the government can show by a preponderance

2   of the evidence that -- that defendant -- that there's no

3   condition or combination of conditions that will reasonably

4   assure defendant's appearance as required and the safety of

5   any other person in the community.  That's under 3142(e).

6          Here, in the government's view -- and this is again

7   incorporating the argument that the government previously

8   presented under the 3142(g) factors, here the government

9   submits that we have met that burden of proof, that it is

10  more likely than not that Mr. Storme presents a risk of

11  nonappearance under -- under the Bail Reform Act.

12         His most recent suicide attempt and ideations, his

13  prior attempt in ideations as well as the breadth of the

14  record in terms of his various mental health issues and his

15  prior violations of his conditions of pretrial release,

16  namely, not abiding by the curfew and location monitoring,

17  and also the allegations of stalking of his ex-girlfriend,

18  together all of the -- with all of this, the government

19  submits that there is a serious risk of nonappearance here,

20  that it is appropriate for this Court to take into

21  consideration defendant's attempts at suicide as well as his

22  risk of suicide moving forward.  And also that at this

23  juncture, the plan that's been proposed by defense counsel --

24  and the government acknowledges and appreciates the work that

25  defense counsel has done in trying to identify an appropriate

1  facility and so forth -- but that it is not sufficiently

2  concrete nor certain enough to mitigate the risk of

3  nonappearance by suicide.

4         THE COURT:  Anything else?

5         MS. CHUNG:  Not at this time, your Honor.

6         THE COURT:  Okay.  On behalf of the defense?

7         MR. VANZANT:  Your Honor, turning first to 3148,

8  your Honor, 3148 deals specifically with sanctions for

9  violation of a release condition.  Under A, it states that a

10  person who has been released pursuant to 3142 and who has

11  violated a condition of his release is subject to a

12  revocation.  I believe we already made an extensive record

13  about the staleness of the alleged violation.  So, first of

14  all --

15         THE COURT:  Staleness is a factual argument or are

16  you saying there's some legal impediment to even proceeding

17  under 3148 because there's some time bar?  Do you have a

18  legal basis to assert a time bar or are you just saying,

19  Judge, yeah, you can consider 3148 but you need to factually

20  not find for the government because the -- factually, you

21  shouldn't draw that inference because it happened before?

22  Which of the two are you arguing?

23         MR. VANZANT:  That was my next sentence, your

24  Honor.  So what I would direct the Court to is --

25         THE COURT:  Hang on a second.  Are you arguing a

1  legal impediment that I can't proceed because there's a time

2  bar on the alleged violations?

3  　　　　　MR. VANZANT:  Legally, no, your Honor.

4  　　　　　THE COURT:  All right.  So legally I have the

5  ability to proceed under 3148 and the question is whether or

6  not factually the government carried its burden; is that fair

7  to say?

8  　　　　　MR. VANZANT:  I don't know, your Honor.  I --

9  　　　　　THE COURT:  Do you need time to think about it

10  because that's an answer I need, too.

11  　　　　　MR. VANZANT:  No.  I'd like to make my argument, if

12  possible, and explain.

13  　　　　　THE COURT:  No.  You need to answer the Court's

14  question.  You don't get to make -- you get to make whatever

15  argument you want in due course but you also need to address

16  the Court's questions.  If you can't answer it, then you're

17  going to waive any issue on it.  So do you need time to

18  consider it -- and I mean time to consider it today --

19  　　　　　MR. VANZANT:  No.

20  　　　　　THE COURT:  -- to collect your thoughts?

21  　　　　　MR. VANZANT:  No.

22  　　　　　THE COURT:  All right.  Then answer my question.

23  　　　　　MR. VANZANT:  If the Court could please restate it.

24  I want to make sure I'm answering the Court's question.

25  　　　　　THE COURT:  All right.  So according to you, the

209

1   Court does have legal ability to proceed under 3148 because
2   there's an alleged violation and that's consistent with the
3   statute and the order from the Seventh Circuit and the issue
4   of staleness is not a legal impediment because there's not
5   the absence of a violation of condition being alleged, it's
6   simply in your view a factual argument that because it's
7   stale or happened previously, that it should -- the
8   government has not carried its burden under 3148 from a
9   factual standpoint but you're not asserting that there's a
10  legal impediment to the Court proceeding under 3148, is
11  your -- is there or is there not a legal impediment to me
12  proceeding under 3148?

13          MR. VANZANT:  I will direct the Court to *United*
14  *States versus Higgs*, which is a Third Circuit case that the
15  Seventh Circuit cited in its order remanding this back to the
16  Court.  *Higgs* talks about this issue.  There are two factors
17  to it.

18          First, as a legal matter, on the last page of
19  *Higgs* -- this is the last full paragraph.  On my copy, it is
20  at the paragraph beginning "we do not suggest."  Quote:  If
21  the government moves for such revocation, however, its motion
22  will permit a response from defendants and a record can be
23  made.  If the trial Court intends to act sua sponte, it must
24  give some appropriate notice of that intention, giving the
25  reasons for that intention, and affording an opportunity for

1    defendants to meet the burden.

2            THE COURT:  Okay.  And that has occurred.  That's

3    happening right now.

4            MR. VANZANT:  Well, the government filed its

5    revocation motion this morning at 8:00 o'clock, your Honor,

6    after Mr. Storme was already taken into custody.

7            THE COURT:  And the remedy if you believe that's

8    error -- it wasn't because the Court has to -- and I read you

9    this before, has the ability to detain based on the statute

10   and inherent authority pending resolution of a motion,

11   whether it's the government's motion or the Court's, pending

12   resolution of it.  And as I indicated before, if you don't

13   think you've had enough time to develop the record legally or

14   factually, you can -- you can -- I will continue this to

15   tomorrow but you -- you can't say that there's a legal

16   impediment that somehow there's not an alleged violation

17   because there is so I don't see how that case is controlling

18   at all.  I hear your side.  I read that case.  I don't know

19   how it controls this instance where we have a hearing on

20   notice and a full opportunity to be heard and present

21   evidence.

22           So the -- unless you're going to argue something

23   different that there's some legal impediment that I can't

24   proceed under 3148 because there's no alleged revocation

25   violation, there is one, the Court can do it on its own

1    motion and the government has done it.  The Seventh Circuit

2    recognized it when it asked that I have this hearing today.

3    So I don't see how *Higgs* is controlling; but if you want to

4    argue something else, go ahead.

5              MR. VANZANT:  May I argue, your Honor?

6              THE COURT:  You may.

7              MR. VANZANT:  So directing the Court -- sticking

8    with the legal contention, directing the Court's attention

9    back to 3148(b), revocation of release, states -- the second

10   sentence states:  A judicial officer may issue a warrant for

11   the arrest of a person charged --

12             THE COURT REPORTER:  Please slow down.

13             MR. VANZANT:  Sorry.  Thank you.  Let me take a

14   sip.

15             A judicial officer may issue -- may issue a warrant

16   for the arrest of a person charged with violating a condition

17   of release.

18             So far as I know, Mr. Storme is not charged with

19   violating a condition of release and that brings us back to

20   *Higgs* on a factual level looking at the second paragraph from

21   the end, the paragraph starting "the record in this

22   instance," quote, the record in this instance does not

23   support the revocation of bail.  The events of which the

24   defendants were convicted occurred more than two years ago.

25   There was no inquiry into and therefore no finding respecting

212

1    the defendant's contemporary activities.  The Court did not

2    find and nothing suggests a likelihood of flight.  The Court

3    did not find and nothing suggests that any defendant poses a

4    danger to any other person.  The conclusion that each is a

5    present danger to the community rests solely upon the

6    evidence that two years ago each conspired to distribute and

7    possess heroin.  No finding was made as to how that evidence

8    requires a conclusion of continuing activity, end quote.

9            So on the factual issues here, all I have heard

10    is -- let's assume for the sake of argument --

11            THE COURT:  That sounds like a factual argument,

12    not a legal one, that the government hasn't carried its

13    burden because the allegations of the violations are too old

14    and there's nothing in the recent activity that casts them in

15    a different light.  Isn't that a factual argument?

16            MR. VANZANT:  In part, although the Court asked me

17    if I had any authority so I suppose that's that.

18            THE COURT:  Well, I asked you if you have any legal

19    impediment to the Court proceeding under 3148.  I still

20    haven't heard it, so.

21            MR. VANZANT:  Well --

22            THE COURT:  You can make a factual argument all you

23    want and you can argue that, hey, here's a similar case or

24    factually the Court found that there were insufficient

25    factual findings and therefore the trial court erred.  But

1    that's really a factual argument, isn't it?

2              MR. VANZANT:  To an extent, your Honor, although I

3    would -- what I am attempting to argue, if I may --

4              THE COURT:  You're attempting to argue that there's

5    a time bar and that's -- there's no authority for that and

6    *Higgs* doesn't stand for that proposition.

7              The issue in *Higgs* was a factual issue and whether

8    or not the Court had a sufficient factual predicate to look

9    at old events in a new light based on more recent events and

10   that's not the facts here at all so that's not a legal

11   argument.  That's a factual argument.  But go ahead and make

12   your record.

13             I want to hear the -- you know, any legal

14   impediment you have under 3148 before we move on to your

15   factual arguments because I think the case turns on the

16   factual arguments but you get to argue whatever you want.  Go

17   ahead.

18             MR. VANZANT:  Sticking with the legal argument

19   then, I understand the Court's point about no statute of

20   limitations, we'll leave that aside for now, but the problem

21   is Mr. Storme has not been charged with a violation of

22   condition of release.  That's -- that is the bottom line.

23             THE COURT:  What do you mean, like he has to be

24   indicted or -- that doesn't make any sense.

25             MR. VANZANT:  No.

1          THE COURT:  He doesn't have to be charged with a

2     state or local crime because, in fact, most violations of

3     conditions of release are not themselves a crime.  I suppose

4     they're all technically violations of a court order which is

5     a contempt of court which is a federal crime -- in fact, it's

6     a felony -- but the phrase "the arrest of a person charged

7     with a violation of conditional release," that doesn't mean

8     that the person was charged, for example, in the state with

9     stalking or charged with possession of a firearm or something

10    along those lines because sometimes the state charge

11    something; sometimes they don't.  Sometimes the government

12    does; sometimes they don't.  One of the reasons sometimes

13    they don't is because the person is on release and they know

14    he's going to be put into custody and the pending case is

15    going to be the appropriate allocation of judicial and

16    prosecutorial resources.

17          So what's the authority for the -- and maybe I'm

18    misconstruing your argument but are you saying a person

19    charged with violating a condition of release, you're saying

20    that this defendant has not been charged with that?

21          The Court has said that that issue is a live

22    bullet.  That needs to be determined.  Pretrial Services has

23    indicated to the Court both orally and in written form and

24    the government has filed a motion to that effect.  So in what

25    sense under the statute has he not been charged with a

215

1    violation of conditional release?

2           MR. VANZANT:  May I respond?

3           THE COURT:  You may.

4           MR. VANZANT:  The violations that the Court is

5    speaking of not only occurred two years ago but they were

6    discharged by the prior judge.  Now I understand the

7    Court's point --

8           THE COURT:  Is that a preclusive effect on whatever

9    I rule, that non-final order?

10          MR. VANZANT:  What I was about to say is it doesn't

11   prevent the Court from returning to the detention hearing or

12   reopening it but we're talking about revocation hearing.

13          THE COURT:  Because the statute actually says I can

14   do that at any time and I can amend at any time.  It also

15   says if there are material issues -- and it's not limited to

16   that, but it also includes material issues that were not

17   known to the movant at the time of the initial detention, but

18   that's jumping ahead to the reconsideration of the prior

19   denial.  I want to stick if we can first to the revocation of

20   bond.  Go ahead.

21          MR. VANZANT:  That's what I was attempting to do,

22   your Honor.  The Court reopening a detention hearing is under

23   3142.  That is a completely different animal than 3148.  3148

24   expressly requires that there's a violation of a condition

25   release.

1          THE COURT:  And there has been.

2          MR. VANZANT:  And my point that I'm attempting to

3     argue is that the violations that are here were dealt with by

4     a prior judge.  Now the Court certainly can reopen that --

5          THE COURT:  Let me just get us real clear for the

6     record; and I'm sorry to interrupt you.  You're not

7     contending that there is a legal time bar, right?

8          MR. VANZANT:  In this case, yes.

9          THE COURT:  In the case you are contending that or

10    you're not contending that?

11         MR. VANZANT:  If I may explain.

12         THE COURT:  Well, can you say "yes" or "no" first

13    and then explain?

14         MR. VANZANT:  Well, my hesitation is I'm concerned

15    that the Court is trying to extract concession from me that I

16    am not certain about.

17         THE COURT:  I'm just trying to figure out what your

18    argument is because that way -- that's the only way I can

19    make an appropriate ruling.  If you make your arguments

20    obtuse, then I can't -- then it all gets revisited on appeal

21    and people reconsider their -- and recharacterize the record,

22    which is not fair to me.

23         So I just want to know, are you saying there's a

24    time bar on a revocation under 3148, yes or no?

25         MR. VANZANT:  Yes.

1      THE COURT:  Okay.  What's that legal authority for

2  that -- that a revocation of bond has to be brought within a

3  time certain, either by statute or case law, for the

4  government?

5      MR. VANZANT:  My position is that 3148(b)

6  and -- 3148 in general requires a live violation, not a

7  historical violation that was dealt with --

8      THE COURT:  I understand your theory now.  I'm

9  asking for your authority.  Do you have any case or any

10  statutory language that imposes upon the government a time

11  bar in bringing a proceeding under 3148 or the Court doing it

12  on its own motion?

13      MR. VANZANT:  I don't have any in front of me but I

14  am happy to brief the Court after this.

15      THE COURT:  Unless you ask for a continuance,

16  that's denied.  Are you asking for a continuance?

17      MR. VANZANT:  I'm not asking for a continuance.

18      THE COURT:  All right.  Then you waived the

19  argument.  You waived the argument.  You waived it.

20      All right.  Let me ask the second thing.  Is the

21  Court's prior determination regarding detention, does that

22  have any preclusive effect on this Court?  It's a non-final

23  order.  Are you saying I don't have the authority to revisit

24  prior orders based on new evidence or reconsideration of old

25  evidence?

1    MR. VANZANT:  What I'm attempting to say, your
2  Honor, is that does have preclusive effect.  That's 3148.  It
3  does not necessarily matter under 3142.  And I'm attempting
4  to argue 3148 here.

5    THE COURT:  Okay.  And if the Court rules on and
6  modifies the conditions when a violation occurs, you're
7  saying that once it modifies the conditions, it's forever
8  barred from determining different conditions or determining
9  that detention is appropriate?  Because once the violation is
10 presented and the Court makes a determination based on a
11 record of the snapshot at that moment in time, you're saying
12 that the Court is not allowed with an additional factual
13 record as time progresses and a larger factual record is not
14 allowed to revisit that because it already modified rather
15 than revoked, is that your position?

16   MR. VANZANT:  I don't believe that's my position,
17 your Honor.

18   THE COURT:  Okay.  So the Court does have the
19 authority -- regardless of the fact that a prior revocation
20 that resulted in a modification rather than a revocation, I
21 have the authority legally -- now maybe I should decide not
22 to do it based on the facts, but legally I have the authority
23 to do that, right?

24   MR. VANZANT:  I'm not certain what that is, your
25 Honor.

219

1    THE COURT:  I have the legal authority to take a

2  violation that previously resulted in a modification and I

3  can consider whether or not it constitutes a basis for

4  revocation under 3148 based on a complete factual record up

5  to the date, which would include not only the things that

6  precipitated the initial violation but the entire record up

7  to the point the Court makes the determination, that's what

8  the law authorizes me to do; is that fair to say?

9    MR. VANZANT:  Yes with an "if," no with a "but."

10  It's more complicated than that, your Honor.  I'm sorry.

11    THE COURT:  No.  That's -- that's super

12  interesting, first of all.  Great answer.  Second of all, go

13  ahead and explain what it means.

14    MR. VANZANT:  This is what I'm trying to say, your

15  Honor.  The problem with referring back to these addressed

16  violations is limited to 3148.  That's can they be used as a

17  basis for revocation.  That's what I'm talking about right

18  now.

19    Under 3148, it is my position that the Court cannot

20  use resolved alleged violations of supervised release

21  historically as a basis for revocation.  Once that ship

22  sailed, it sailed under 3148.

23    THE COURT:  So once a court -- so according to you,

24  once a court modifies rather than revokes, it can't go back

25  and reconsider that decision?

220

1          MR. VANZANT:  For revocation, your Honor?

2          THE COURT:  Yeah.

3          MR. VANZANT:  I'm specifically talking --

4          THE COURT:  So that non-final order is something

5   that the court can't revoke or reconsider.  So if -- for

6   example, let's say -- let's say there's a revocation and the

7   judge determines, hey, you know what, I am going to revoke,

8   then that's the resolution.  And when a defense say, hey,

9   judge, you should reconsider it based on new evidence, you

10  should not revoke, you should modify instead, you're saying

11  he doesn't have any authority to do it?  Because he already

12  resolved it so it's gone.  38 -- excuse me, 3148, those

13  things are set in stone once you make the decision.

14  There's -- it's not dynamic.  Neither side can go forward and

15  give the court additional evidence.  And once you make a

16  determination, you can't revisit it.  You can't adjust it

17  based on new evidence.

18          You know what I do a lot of times, there will be a

19  revocation filed and rather than rule on it, I'll defer and

20  I'll maybe modify and then he doesn't do so well.  And then

21  guess what?  Then we do a revocation hearing and, you know,

22  he goes in.  Or, the opposite.  It looks really bad and then

23  it turns out he has a great record.  And, guess what, the

24  fact that I did one thing at the initial determination didn't

25  prevent me from doing a different thing based on additional

221

1    record because 3148 doesn't have this -- doesn't have this

2    preclusive effect if there's a ruling on a violation.

3         Unless you can show me a statute that says that, I

4    don't know where that argument is coming from.  So do you

5    have any authority for that proposition, that once the Court

6    decides to modify rather than revoke, it can't come back to

7    that later?  Do you have any legal authority for that

8    proposition?

9         MR. VANZANT:  I would point the Court to 3148.

10   I -- I'm happy to provide supplemental authority.  I don't

11   have it in front of me right now because I've been --

12        THE COURT:  That's waived unless you ask for a

13   continuance.

14        MR. VANZANT:  I'm not asking for a continuance,

15   your Honor.

16        THE COURT:  Okay.  It's waived then.

17        MR. VANZANT:  What I'm trying to do is explain my

18   position.

19        THE COURT:  Then go ahead and argue the plain

20   language because that's all you're offering to me.  And if

21   there's a case out there that you didn't cite, it's -- you're

22   not going to be able to argue it on appeal because you didn't

23   get a chance for me to look at it.

24        So go ahead, make your argument.  And we're still,

25   I think, on 3148.

222

1          MR. VANZANT:  Yes.  I am trying to articulate my

2   argument on 3148, your Honor.

3          THE COURT:  Go ahead.

4          MR. VANZANT:  The problem here is that Mr. Storme

5   is not charged with a violation currently live of supervised

6   release.  The only thing the government has is historical

7   violations that were resolved by a prior court.

8          THE COURT:  The charged part is not whether or not

9   the Arlington police charged him.  It's whether he's charged

10   in this proceeding, whether these people have alleged to him.

11   If there's some other reading of the word charged here,

12   charged with violation of current -- of a condition of

13   release, that does not require a charge in the sense of an

14   indictment or the filing of a criminal complaint.  And then

15   when you look at Section 3148(b)(1)(A), it talks about

16   probable cause to believe that a person has committed a

17   federal, state, or local crime while on release.  It doesn't

18   say he has to be even arrested or charged with anything.  So

19   when you're saying it's not live, it's not -- it's not

20   active, it's somehow dormant, it didn't happen.

21          Where is the legal impediment based on the

22   statutory language because I don't know how you're reading

23   that phrase charged.  It seems like you're putting a meaning

24   into it that I don't see in the plain language.  Go ahead.

25          MR. VANZANT:  What I'm trying to articulate, your

223

1    Honor -- may I argue?

2              THE COURT:  You may.

3              MR. VANZANT:  Once a violation has been addressed

4    in a revocation petition, that's it under 3148.  It is not a

5    basis to revoke.  My argument --

6              THE COURT:  So if the government decides to give

7    him a chance and modify rather than revoke, that precludes

8    them from ever -- on new evidence or new circumstance from

9    ever seeking to revoke legally, that's your position?

10             MR. VANZANT:  No.  That's not my position, your

11   Honor.

12             THE COURT:  All right.  So the government can

13   reconsider the determination that a revocation incident

14   should result in revocation later when it first determined

15   that it was a modification, right?

16             MR. VANZANT:  That's not my argument either, your

17   Honor.  What I'm trying to state is my argument.  May I

18   argue?

19             THE COURT:  I just articulated what your argument

20   was and then -- so I'm happy to hear how -- what my

21   characterization mischaracterized what you said.

22             You said that there, it's done.  Once the court and

23   the parties take an incident that constitutes a potential

24   violation of a condition of release -- whether it be the

25   probable cause they committed a crime which is obviously a

1    condition of release or whether it's clear and convincing

2    that the person has violated some other condition of release,

3    and I'm paraphrasing the statute on those -- that once they

4    make the determination that, hey, this is what happened but

5    we're going to give him a chance and we're going to modify

6    rather than revoke, you're saying we can't go back to that?

7           MR. VANZANT:  That we can't go back and revoke

8    based on that prior violation that was already addressed?

9           THE COURT:  You're saying that that decision to

10   modify rather than revoke has preclusive effect from

11   reconsidering it based on more recent developments, that's

12   your argument, right?

13          MR. VANZANT:  It's certainly law of the case, your

14   Honor, but we're also still talking about 3148(a).  We

15   haven't gotten to (b) yet.

16          THE COURT:  Can you answer my question first?

17   You're saying that I can't revisit a -- the factual basis

18   for -- of an incident that resulted in a modification rather

19   than a revocation.  You're saying that because they modified

20   rather than revoked, I can't use that in -- that particular

21   incident or the government can't use that particular incident

22   in conjunction with more recent events to change the

23   modification into a revocation, you're saying that because a

24   legal determination was made at the time that it was going to

25   be modified, not revoked, that we can't go back -- legally,

1    we can't go back, is that your argument?

2              And if the answer is "no, that's not my argument,

3    Judge," then we can go back and we can decide based on the

4    totality of circumstances based on the factual record that we

5    face today that the prior revocation when we decided back

6    then that it was -- should be a modification rather than

7    revocation, that that might have been fine for then but it's

8    not fine for now because now we have a different factual

9    record --

10             MR. VANZANT:  May I state my --

11             THE COURT:  -- right?

12             MR. VANZANT:  May I state my argument, your Honor?

13             THE COURT:  No.  I want you to answer my question.

14             MR. VANZANT:  I disagree with the Court's

15   characterization of my argument.

16             THE COURT:  Am I precluded from considering a

17   revocation of bond on an incident that resulted in

18   modification?

19             MR. VANZANT:  What I'm trying to articulate, your

20   Honor, is that that cannot serve as the basis for initiating

21   revocation.  That's this first step.  So the Court -- the

22   first question the Court asked me was does the Court have the

23   power to do this.

24             My argument here is that the Court does not have

25   the authority under 3148 to initiate revocation proceedings

1    on alleged violations that have been resolved.

2                Now there's a difference between that and I think

3    what the Court is talking about which is --

4                THE COURT:  No, it's not.  It's not what I'm --

5    because I'm saying that there is a violation and whether it

6    was determined -- the incident is what the predicate that

7    3148 requires, that there has to be a factual predicate that

8    he violated a condition of release.  That's what it says.  It

9    says a person who has been released under Section 3142 of

10   this title and who has violated a condition of release is

11   subject to a revocation of release, an order of detention,

12   and prosecution for a contempt of court.

13               So when there's a factual predicate that that might

14   be the case, the Court has to have a hearing.  And the Court

15   might determine based on that that it does revoke right away

16   or it modifies.  And then if the factual record is -- puts a

17   different color on that, then the Court based on that

18   previous conduct, which is still a violation of condition of

19   release, can revisit the 3148 and make a determination.

20               MR. VANZANT:  May I argue, your Honor?

21               THE COURT:  Go ahead.

22               MR. VANZANT:  Under 3148(a) is a precondition to

23   initiating revocation proceedings that there has to be a live

24   violation of a condition of release.

25               THE COURT:  Live?  Where is that?  Where is that?

227

1    The word "live," you just inserted that; and I don't know

2    what you mean by that.  There is a violation of condition of

3    release.  There's multiple ones.  They were alleged and

4    they're realleged.  Where does this "live" come from?

5            MR. VANZANT:  If the Court were correct that it

6    could reach back into any violation ever, then once a

7    defendant violates supervised release in any fashion

8    whatsoever, the Court would then have the authority to issue

9    a warrant forever and bring him in on a revocation forever

10   based on that violation that occurred whenever ago no matter

11   how small it was.  That's the -- that's what I'm trying to

12   say, your Honor.  When we've got these prior violations that

13   happened --

14           THE COURT:  So you're saying there is a time bar

15   and I'm trying to figure out where the authority is for that.

16           MR. VANZANT:  I'm trying to explain my position,

17   your Honor, but --

18           THE COURT:  You don't have any authority for a time

19   bar and then you start arguing a time bar.

20           MR. VANZANT:  I'm trying to argue my position, your

21   Honor.

22           THE COURT:  Well, I'm asking -- you're saying the

23   Court could do it forever, which means what?  The Court can't

24   do it forever which means there is some time bar.

25           MR. VANZANT:  Yes, because --

1           THE COURT:  What is the time bar?  Is it a certain

2   number of days, does it come from a case, does it come from a

3   statute, where does the time bar come from?  You're saying

4   there's a time bar because the Courts can't proceed under

5   3148 after some point in time after the person allegedly

6   violates the conditions of release, so what's the time bar?

7   If it's not forever, when is it?

8           MR. VANZANT:  The Court can proceed on a prior

9   violation if it hasn't been resolved by a prior hearing.

10  Here's my argument.  If I can articulate my argument, I --

11          THE COURT:  Well, you're saying two things.  One,

12  you're saying there's a time bar.  And, two, you're saying

13  once they make a decision, it's stuck in stone forever and I

14  don't -- I don't have any authority, you haven't given me any

15  legal authority for neither one of those.  And when I drill

16  down on it, you start inserting words like live violation and

17  then rearguing the same thing over and over.

18          MR. VANZANT:  I'm trying to articulate my position,

19  your Honor.

20          THE COURT:  I want legal authority for your

21  position.

22          MR. VANZANT:  And I'm directing the Court to the

23  statute; and if we can talk about the --

24          THE COURT:  And there's no language in the statute

25  that supports what you just said.  Go ahead.

1          MR. VANZANT:  If the Court were correct that it

2     could reach back to any violation regardless of when it had

3     been resolved and when it occurred, what's the entirety --

4     what's even the point of 3148?  It would be absurd.

5          THE COURT:  No.  That's not true.  That's not true

6     at all.  The question is whether or not there's a legal

7     impediment that would prevent the Court from reconsideration

8     either because there's some time bar imposed by law, which

9     there isn't, or some preclusive effect that once there's an

10    initial resolution of a violation, that it's set -- becomes

11    set in stone and no one can look at again.

12          Now the absurd result you're referring to is that a

13    court reaches back to some old thing and there's no reason to

14    do so in which case there would be a factual problem with

15    what the court did; not a legal problem.  There would not be

16    a legal impediment to a court going back and saying, well,

17    you violated two years ago and now, you know what, I'm going

18    to -- I'm going to lock you up.  There's not a legal

19    impediment to the court doing that.

20          There could be a factual deficit that, hey, he was

21    on bond for a year and did really great and there are no

22    circumstances so the Court's factual finding that -- under

23    3148 lacks a factual basis.  That's a different argument.

24          But what you're telling me is I don't even have the

25    authority legally to proceed under 3148 because there's some

1    self imposed or some unknown time bar or a preclusive effect

2    when the Court and the parties attempt some resolution, so.

3    And you haven't given me any legal authority for those so go

4    ahead, make your argument.

5         MR. VANZANT:  May I argue, your Honor?  What I'm

6    trying to articulate, your Honor -- I understand your

7    position about revisiting these things, they are different

8    than what I'm talking about.  I am talking specifically about

9    the authority to initiate revocation proceedings under

10   3148(a) and (b).  I'm not talking yet about how the Court

11   resolves it at a hearing.  I'm talking strictly about

12   initiating the revocation.

13        What the Court is proposing that it do in this case

14   is look back two years to violations that have been resolved

15   and have not occurred since.  There is no current allegation

16   of a violation.  I asked the Pretrial Services' officer very

17   specifically are there any current violations of supervised

18   release; there are not.  If the Court -- if the Court's

19   position were correct --

20        THE COURT:  When you say "current," what is that

21   phrase?  What do you mean by that?

22        MR. VANZANT:  New.  Let's say that.

23        THE COURT:  What?

24        MR. VANZANT:  New.

25        THE COURT:  All right.  And by "new," you mean that

1    it's not new because it was already resolved which means

2    what, that there was some initial determination and therefore

3    preclusive effect, never reconsider, right?  I don't see how

4    I've misconstrued your argument.

5              MR. VANZANT:  I don't know if I'm following what

6    you just said, your Honor, but I don't think that's what I've

7    said.

8              THE COURT:  You've used several things.  You used

9    the phrase new violation and you used the phrase live

10   violation.  First of all, none of those are in the statute.

11             Second of all, neither of those is a legal

12   impediment and the absurd result that you're concerned about

13   is a factual issue that would prevent the Court from abusing

14   its discretion or making clearly erroneous factual findings.

15   But you haven't -- you haven't had any legal basis for

16   that -- the violation that's contemplated under 3148 has some

17   time bar or there's some preclusive effect to initial

18   determination.  There's no legal authority for that either in

19   the statute or otherwise.

20             MR. VANZANT:  I am trying to point out the legal

21   authority in the statute, your Honor.

22             THE COURT:  Go ahead.

23             MR. VANZANT:  If the position is once a violation

24   has occurred it can always be used as a basis for revocation,

25   that is absolutely absurd.  There's no possible way in the

1 statute that can be contemplated.  I don't see it in there

2 and I certainly don't think that's the statutory intent and

3 just basic statutory construction indicates that.  And we all

4 know that the old format is not the best written; but in this

5 situation, it is very clear there has got to be a violation

6 of the condition of release that is new.  Otherwise, the

7 court could revoke bond at any time and that's --

8          THE COURT:  So under the plain language of 3148

9 when it says "charged with a violation," it really means

10 charged with a new violation and we're inserting the word

11 "new"?

12          MR. VANZANT:  I'm not inserting anything, your

13 Honor.  I'm saying that the prior violations have been

14 resolved.

15          THE COURT:  All right.  So we're inserting the word

16 "unresolved"?

17          MR. VANZANT:  May I state my argument, your Honor?

18          THE COURT:  Answer my question first.  You're

19 saying -- you're making a plain explain argument without

20 citation of the case law so I'm asking you about your reading

21 of the statutory plain language.  You're inserting either the

22 word "new" or "unresolved" before the word "violation,"

23 correct?

24          MR. VANZANT:  Sure.

25          THE COURT:  Okay.  So you're inserting language

1  into the plain language as part of your argument.  Okay.  Go
2  ahead.

3          MR. VANZANT:  I'm talking about statutory
4  interpretation; not inserting things.

5          The question here is the scope of the Court's
6  authority.  I am trying to explain what our position is.  The
7  problem that I have here is there are no new violations
8  alleged.  I don't believe that's a basis for initiating a
9  revocation proceeding under 3148.  And I understand the
10 Court's point about how I've got no authority or anything
11 like that, that's fine.  I understand that.  I will offer
12 once again to provide supplemental authority when I can
13 actually sit down and look at it.

14         THE COURT:  Well, if you're going to argue about it
15 on appeal, then you have to give me a chance to look at it
16 first so any supplemental authority will be waived on appeal.

17         MR. VANZANT:  Anyway, may I argue, your Honor?
18         THE COURT:  Go ahead.

19         MR. VANZANT:  That is the basis of the position.
20 That's the starting point.  If I'm wrong about that, fine.
21 That's -- what I'm trying to state is my argument.  I'm
22 sorry.  I thought you were saying something, your Honor.

23         THE COURT:  No.  Go ahead.

24         MR. VANZANT:  Where the Court can consider it is
25 during the hearing.  So my position is, one, the Court has no

1    authority to initiate revocation proceedings at this point.

2    Two, even if the Court does, the question of whether those

3    violations were resolved is a separate issue under (b)(1) and

4    (b)(2).

5            So if the Court -- I mean, what the government's

6    argument here is that there's probable cause to believe that

7    the person has committed a federal, state, or local crime

8    while on release.  The only example they've given us is the

9    Arlington Heights police report that was just presented today

10   and was resolved by Judge Lee two years ago.  That is the

11   sole basis for their probable cause determination.

12           If the Court is saying that the Court can find

13   probable cause if you've ever potentially committed a

14   violation, that's an absurd result, too.

15           THE COURT:  I'm not inserting any words about

16   potential.  I'm determining whether there's a factual

17   predicate to have a hearing on the issue and the question is

18   determined by the language of the statute.  Go ahead.

19           MR. VANZANT:  Secondly, under 3148(b)(2) -- or,

20   excuse me, (b)(1)(B), the alternative is to provide clear and

21   convincing evidence the person has violated any --

22           THE COURT REPORTER:  I'm sorry.  Slow down.

23           MR. VANZANT:  Thank you for stopping me.

24           -- any other condition of release.

25           The government pointed to the 35 violations of

235

1    curfew, which is also an allegation that was addressed two

2    years ago and found didn't warrant revocation.  What the

3    government wants the Court to do and what the Court

4    apparently wants to do is look at these violations that

5    occurred two years ago as a basis for revocation now but it

6    is Mr. Storme's conduct now that is at issue.

7            Secondly, under 3548(b)(2), that's where we can

8    consider all of the other things that the government has

9    talked about.  And here, they're only talking about the prior

10   violations and that the allegations are cyberstalking.  Any

11   detention hearing we've ever had, we always talk about

12   the -- about *Salerno* in which it is well recognized that the

13   facts underlying the government's case, they can say they had

14   a strong case whatsoever but 3142 specifically talks about

15   presumption of innocence, too.  That has to be taken into

16   account.

17           So looking at *Higgs*, which the Seventh Circuit

18   specifically cited in its order, there is no basis for

19   revocation when the only violations occurred two years ago.

20   There's nothing showing that the defendant today has violated

21   any conditions of release, that he's likely to violate

22   conditions of release or anything else.  It's --

23           THE COURT:  If he killed himself and didn't show up

24   for court, do you think that that's a likely violation of a

25   condition of release?

1          MR. VANZANT:  No.

2          THE COURT:  Because you don't -- you don't see

3   suicide as a form of flight or at least at a minimum failure

4   to appear as ordered?

5          MR. VANZANT:  No; and that's been dealt with

6   in -- where is my brief?

7          THE COURT:  I know your citations, counsel.  And

8   you're aware also of the government's counters, citations,

9   right?

10         MR. VANZANT:  Well, that brings me to my next

11  point, which is the government's citations; and I need to

12  pull them up.

13         THE COURT:  Do you have a Seventh Circuit case that

14  says that suicide is not evidence of potential flight or at

15  the --

16         MR. VANZANT:  I'm not --

17         THE COURT:  -- minimum failure to appear --

18         MR. VANZANT:  I'm not aware --

19         THE COURT:  -- failure to appear as ordered?

20         MR. VANZANT:  I'm not aware of any, your Honor.

21         THE COURT:  Okay.

22         MR. VANZANT:  What I'm trying to explain is that

23  the Seventh Circuit has already cited this Third Circuit

24  opinion.  Now as to the cases the government is citing --

25         THE COURT:  A Third Circuit opinion that says that

1    suicide is not flight or a failure to -- a potential failure

2    to appear or a Third Circuit cite regarding what we were

3    talking about before?

4           MR. VANZANT:  I have to look at the cases on my

5    phone, your Honor, because we were -- I was in the car when I

6    got the government's motion so I'm pulling them up right now,

7    if I can.

8           THE COURT:  Laura, how are you doing on a break,

9    are you okay?

10          THE COURT REPORTER:  I'll need a break very soon.

11          THE COURT:  Okay.

12          MR. VANZANT:  Do you have a paper copy of the

13   cases?

14          MS. CHUNG:  I don't.

15          MR. VANZANT:  Okay.  Then perhaps we should take a

16   break while I pull this up so the court reporter can have a

17   few minutes, your Honor.

18          THE COURT:  The break is for the court reporter.

19   When -- and we're going to have to take a break before I

20   issue a ruling so let's complete the argument.  It's already

21   30 minutes before 5:00 o'clock and the Court does close and

22   the Court has to make a ruling today.

23          And I'm not going to have the time obviously to do

24   a written order so I'm going to have to make the ruling from

25   the bench, so.  In an absence of an agreement to continue

1   until tomorrow, I'm being forced by the parties to rule now

2   so go ahead and make your argument.

3          MR. VANZANT:  I've reviewed the cases and they

4   don't necessarily support the contention that suicide is a

5   risk of flight.  And there are contrary cases that we've

6   cited in the briefing that the Court has referenced that

7   state exactly the opposite.  The Seventh Circuit does not

8   appear to have weighed in on this yet and I guess they're

9   going to in this case.  But to say that suicide is a risk of

10  flight is --

11         THE COURT:  Well, it's not just flight, it's also

12  failure to appear as ordered.  Certainly if a person is

13  deceased, they will not appear as ordered, right, as a matter

14  of logic?

15         MR. VANZANT:  Well, once someone dies, then the

16  proceeding is also void ab initio pursuant to other cases

17  that have talked about this same thing.  So I think it's a

18  stretch to say that --

19         THE COURT:  Well, once the person becomes dead, the

20  case would be -- have a death suggested cause abated but

21  there would still have been a violation because the

22  person was not -- did not appear when ordered to appear,

23  right?

24         MR. VANZANT:  Well, I don't think it assumes that

25  the person was ordered to appear prior to the death finding.

239

1      THE COURT:  So as long as we find out that he

2   killed himself before the hearing, then it's an issue.  But

3   if we find out when he doesn't show, then it is a potential

4   factual issue?

5      MR. VANZANT:  That's not my argument, your Honor.

6   I'm saying that the cases say it is void ab initio.  There's

7   no problem with imputing flight to suicide.  That's what I'm

8   saying and that's what I'm arguing.

9      So to the extent the government is suggesting

10  otherwise -- I've read their cases, I know what they say; and

11  if I could pull them up, I'd read you the exact cites but I

12  disagree and there are cases cited to it.

13     So as to the revocation, all of the evidence today

14  shows only that Mr. -- it only shows that Mr. Storme is

15  suicidal.  That's it.  And it is unbelievable that the answer

16  is to revoke his supervised release and throw him in jail --

17     THE COURT:  It's not supervised release.  It's

18  pretrial release.

19     MR. VANZANT:  Excuse me.  Pretrial release.

20     -- and throw him in jail which is possibly the

21  worst place humanly possible for someone who is suicidal

22  particularly when his suicidal ideations are directly linked

23  to his prior custody.  That, as far as I can tell, is the

24  only new thing that has occurred since these violations.

25  These violations have been on the books for two years and

1  *Higgs* is pretty clear about what happens then.  They are

2  stale, they're old, and they are not sufficient to carry the

3  burden that the government has to support revocation of

4  pretrial release.

5  THE COURT:  All right.  Do you want to address the

6  reconsideration of the prior denial of detention?

7  MR. VANZANT:  So I think the Court is talking about

8  two different things.  One is -- or at least the way I read

9  the statute, one is a modification of conditions of release

10  which -- I think this is 3142(c)(3).  And obviously the Court

11  can do that at any time.  That's different than revocation.

12  I'm pretty certain based on the --

13  THE COURT:  That's not the only section the Court

14  cited this morning.

15  MR. VANZANT:  If I'm misciting it, I would

16  certainly look at the section the Court cites if the Court

17  could provide me that.

18  THE COURT:  The Court has, based on the language I

19  quoted this morning, both statutory and inherent authority to

20  reconsider any non-final order prior to entering judgment.

21  MR. VANZANT:  Well, and that's not what I'm talking

22  about right now, your Honor.

23  THE COURT:  Well, that's what I'm talking about

24  because that's what a detention order is or the denial of a

25  detention order.  It's a non-final order that the Court has

241

1       jurisdiction over over the course of the case.

2               MR. VANZANT:  I'm trying to address all of the

3       positions that I'm seeing the government take, your Honor.

4       One of those is whether the Court can modify conditions of

5       release under 3142(c)(3).  That's fine.  What the Court can't

6       do under 3142(c)(3) is revoke.  That's covered by 3148.  So

7       if the Court -- if this whole hearing had been about whether

8       should be additional conditions, different story.

9               Now what the Court was just talking about is the

10      ability to reopen a detention hearing in light of new

11      evidence.  The only new evidence that has occurred is

12      Mr. Storme is suicidal.  That's it.

13              THE COURT:  And you're saying that that issue has

14      no material bearing on the issue of whether or not detention

15      was appropriate?

16              MR. VANZANT:  Yes.  That's exactly it.  *Higgs* says

17      that all of the stuff the government is relying on is stale

18      and it's not enough.

19              THE COURT:  What about the Court's inherent

20      authority to revisit non-final orders?

21              MR. VANZANT:  I mean, the Court can certainly do

22      that.  The statute is clear about that.  But the question

23      is --

24              THE COURT:  So even though there's a basis in the

25      statute, that's not the only basis the Court has to act,

242

```
 1    correct?
 2             MR. VANZANT:  Without researching that point, I
 3    don't know, your Honor, and I can't give you a straight
 4    answer on that one way or the other.
 5             THE COURT:  Okay.
 6             MR. VANZANT:  I understand the Court's position on
 7    inherent authority and I have not researched inherent
 8    authority so I don't know.  That's what I got.
 9             THE COURT:  Okay.
10             MR. VANZANT:  So what I'm attempting to say, if the
11    Court is attempting to reopen the hearing, that's fine.
12             THE COURT:  We did.  That's what happened today.
13             MR. VANZANT:  But what has been presented today the
14    only change this entire time is the suicidal ideations and
15    attempt suicides and that is not a basis to detain someone.
16    Mental health and suicide risk is not --
17             THE COURT:  The Court doesn't detain or not detain
18    based on one fact in isolation.  It does it on the entire
19    record, correct?
20             MR. VANZANT:  Yes; and the entire record hasn't
21    really changed.
22             THE COURT:  And the entire record includes both the
23    historical things and the newer developments which are not
24    limited to suicidal ideation, right?
25             MR. VANZANT:  Well, I mean even attempted suicide,
```

1    it's -- what I'm attempting to say, your Honor, is because

2    someone is suicidal, that is not a basis to detain them under

3    the Bail Reform Act.  That is the fundamental bottom line --

4         THE COURT:  That's not the only basis that's been

5    provided.  You keep saying it's the only basis.  That's just

6    not an accurate statement of the record.

7         MR. VANZANT:  I disagree, but I understand the

8    Court's position.

9         THE COURT:  Okay.

10        MR. VANZANT:  So the question now is let's assume

11   this is a reopened detention hearing, which I understand the

12   Court has declared it to be rather than a revocation hearing

13   which I assumed it was, under 3141 -- 3142(g), these

14   historical allegations are not the only thing that the Court

15   has to consider.  And I understand that the statute talks

16   about mental health, sure, but that's in the context of

17   whether or not someone is a risk to someone else and --

18        THE COURT:  And also whether their instability

19   creates an issue whether they're going to show up for court

20   as ordered, right?  Mental instability is part of the

21   totality of the circumstances both as to risk and flight,

22   right?

23        MR. VANZANT:  I'll buy that to some extent, your

24   Honor, but we're not talking about general mental illness

25   here.  We're talking very specifically about suicide.

1      THE COURT:  Well, it's more than that.  He's got

2   mental illness.  It's not just suicidal ideation.  He's got

3   depression.  He's got PTSD.  He's got a variety of things,

4   unfortunately a burden to bear.

5      MR. VANZANT:  I mean, is the Court saying that it's

6   okay to detain somebody because they're mentally ill?

7      THE COURT:  No.  Like I said, you don't take facts

8   in isolation but the person's mental stability is certainly a

9   factor among the totality of the circumstances that courts

10   have long recognized both from a statutory basis and a case

11   law basis as part of the totality of circumstances that the

12   Court would look at in making determinations both as to

13   flight or risk --

14      MR. VANZANT:  Well, in talking about where Mr.

15   Storme is --

16      THE COURT:  -- right; is that fair to say?

17      MR. VANZANT:  I --

18      THE COURT:  I mean, that's not a very controversial

19   statement, is it?

20      MR. VANZANT:  I don't believe so, your Honor.

21      THE COURT:  Okay.  Go ahead.

22      MR. VANZANT:  What I'm trying to say, the evidence

23   that this hearing has put forth, Mr. Storme has not violated

24   any condition of release in two years, not even a whiff.  So

25   these -- to the extent the Court wants to take these

1    historical violations into account, they weigh very, very low

2    because we actually have a track record of him coming to

3    court.  We have a track record that he hasn't threatened

4    anybody.  There's been no violence.  No threats of violence.

5    I asked the agent about that today.  So to the extent the

6    Court wants to look at that historical record, it should

7    carry very little if no weight.

8              THE COURT:  No threats of violence up to a certain

9    point.  There were prior threats of violence including

10    beating -- according to the Arlington police report, he

11    threatened to beat up Reese's ex-boyfriend, right?

12              MR. VANZANT:  I would agree that that's according

13    to the report, your Honor --

14              THE COURT:  Yeah.

15              MR. VANZANT:  -- but we're also talking about third

16    party -- third-degree hearsay, I guess.  So to the extent the

17    Court wants to rely on that as --

18              THE COURT:  Well, it's a report reflecting a -- a

19    citizen who made a complaint, filed a complaint, wanted to

20    press charges, and her -- she had personal knowledge of what

21    the defendant said, right?  At least that's what the evidence

22    is in the record.

23              MR. VANZANT:  So a single threat of violence

24    possibly two years ago --

25              THE COURT:  You just said there were no threats.

1    I'm not saying you take one threat -- thing in isolation.

2    You're the one who wants to divide and conquer.  I don't want

3    to divide and conquer anything.  I want to look at all the

4    facts up from the beginning of -- all the way until now to

5    make a holistic approach and to make the determinations that

6    the law requires me to make.

7           MR. VANZANT:  What I'm trying to point out, your

8    Honor, is that both the agent and Officer Wiersema both said

9    the agent is unaware of any threats of violence -- I

10   understand the Court's point about the Arlington Police

11   Department report that just showed up today which certainly

12   couldn't have been the basis for the government's motions

13   because we didn't have it -- and Officer Wiersema has said

14   that he's -- Mr. Storme has never exhibited any violent

15   tendencies, he's not aware of any threats he's made --

16          THE COURT:  The government doesn't have to make a

17   motion so whether they include it or not doesn't matter; it's

18   before the Court.  And again, the timing issue is not

19   relevant because you're denying the offer of a continuance.

20   And the fact that the government includes it or not, that

21   doesn't matter because the Court can act on its own motion.

22   Go ahead.

23          MR. VANZANT:  The bottom line is if the Court is

24   reconsidering the detention order, which is one of three

25   arguments I've been talking about, under 3142(g) all of the

1    factors indicate that defendant is not by a preponderance of

2    the evidence a risk to anyone else in the community and

3    certainly not by clear and convincing evidence that he's a

4    risk of flight.

5            THE COURT:  As you read the statute, the statute

6    says risk to others and the community.  In what sense is

7    "community" different than "others"?  Because Congress uses

8    two words there; right.  If it simply meant "others," it

9    certainly doesn't mean "others" and "others" so it's --

10   "community" means something other than "others."  What does

11   it mean to you?

12           MR. VANZANT:  Without researching the issue, I

13   couldn't tell you, your Honor, but what I can say is that it

14   certainly doesn't mean the defendant himself.

15           THE COURT:  Well, it means a more generalized issue

16   of safety, right?  And defendant is a member of the

17   community, is he not?

18           MR. VANZANT:  I think that that is not correct

19   based on the statute, your Honor.

20           THE COURT:  You don't think it's more generalized

21   than others?

22           MR. VANZANT:  No.

23           THE COURT:  Well, then why would the two words be

24   in there?  Why would it say "others" and the "community"?

25           MR. VANZANT:  Couldn't tell you without researching

1    it, your Honor.  But the fact that we're talking about the

2    defendant's -- the risk of the defendant's conduct toward

3    others and the community seems to take him out of that and

4    that's what some of the cases have said.

5         THE COURT:  Well, how about this, it's not just

6    risk of others but it's more generalized risk to the

7    community; and depending on the manner of suicide, suicide

8    could implicate a risk to others because when a person kills

9    themselves, they don't put just themselves at risk depending

10   on how they do it, right?

11        MR. VANZANT:  I don't think we've heard any

12   evidence of any risk to any particular person in the

13   community, your Honor.

14        THE COURT:  Well, we've had evidence that one of

15   the methods of suicide was to jump in the lake and that poses

16   a risk to other people trying to save him if they saw him

17   drowning, right?

18        MR. VANZANT:  I disagree with that characterization

19   of the record, your Honor, but --

20        THE COURT:  Well, that's what the uncontested facts

21   in the record is that he was at the lake and was going to

22   throw himself in, right?

23        MR. VANZANT:  And he also stated that he did not

24   intend to kill himself at that time.  He --

25        THE COURT:  Well, that's his testimony and I'll

1    have to assess what his credibility was.  But the issue of

2    someone killing themselves doesn't preclude, in fact, based

3    on the evidence here, it would raise at least the question of

4    whether or not other people more generalized.  I mean, it --

5    certainly I don't think it's a threat to others in a sense

6    that he's threatening to harm some other person.  Certainly

7    he threatened to harm Reese's ex-boyfriend, or at least

8    there's evidence to that effect.  That might be risk to

9    others.  But in terms of the suicide, suicide is not a safe

10   thing.  And the notion that we can preclude exactly the

11   method of which he was -- would kill himself if, in fact, he

12   chose to do so, I don't think that's as clear as the --

13   that's not -- that's more science -- or more art than science

14   trying to figure that crystal ball.

15          But certainly the record in front of me is that one

16   of the methods he was looking at was drowning himself and

17   that puts a risk not just to him but certainly the community

18   generally.  Maybe not to others but maybe to others depending

19   on how he's -- people respond to it.

20          MR. VANZANT:  Well, let's take that as assumed,

21   your Honor, let's take that point and run with it.  Is the

22   remedy then to detain him in a jail cell?

23          THE COURT:  No.  The remedy -- again, I'm not going

24   to divide and conquer.  I'm not going to take one little fact

25   and then say that's the basis for you locking him up.  That's

1    not how that works.

2         The only reason he's locked up now is because the

3    question was presented and I have the authority to detain

4    pending a hearing and that's what we're doing.  The hearing

5    is going to be based on everything and I'm not going to take

6    one thing in isolation and say that's the basis for him to

7    remain in custody pending the rest of the case, whether it be

8    a reconsideration of prior denial or revocation of bond.

9    It's all the facts.  So I like your question and that's the

10   answer to your question.

11        MR. VANZANT:  When talking about all the facts,

12   your Honor -- as I think I've articulated and I'm not going

13   to beat this anymore because I know it's late and we're all

14   tired -- the facts that we have in front of us is a pair of

15   two-year-old violations, one is curfew violations between I

16   think two and 15 minutes that were resolved and have not

17   occurred since.  We're talking --

18        THE COURT:  There's 30 -- 30 different violations.

19        MR. VANZANT:  Which have not occurred since.  We're

20   talking about this stalking incident that occurred two years

21   ago.  There's been nothing since then to indicate that

22   Mr. Storme is a threat to anyone else.  It has certainly not

23   been repeated.  He's had no other contact with law

24   enforcement.

25        THE COURT:  Well, there's an order of protection in

1    place, right?

2                MR. VANZANT:  I mean, that's pretty --

3                THE COURT:  That's the evidence, right?

4                MR. VANZANT:  We certainly haven't heard about any

5    evidence that was presented at the order of protection

6    hearing.  And we also established through Officer Wiersema

7    that there's been no violations alleged of the order of

8    protection so that I don't think really moves the ball way or

9    the other on that.

10               And that takes us to -- and so what that leaves us

11   with, aside from those two things, is Mr. Storme's mental

12   health and the facts alleged in the complaint.  That's it.

13   And he was -- and he was charged, what is this, almost three

14   years ago.

15               THE COURT:  Well, there's more than that.  It's not

16   just the facts in the complaint of mental health.  That's a

17   mischaracterization of the record.

18               MR. VANZANT:  This is what I heard from the

19   government when they were arguing, your Honor, and I'm trying

20   to be as clear as I can, though.

21               THE COURT:  The government argued a lot of things

22   and they also moved a lot of evidence in and they argued

23   things beyond what you just said so that's not -- I'm making

24   it clear for the record that the government argued more than

25   that and the factual basis is beyond that.  Go ahead.

1    MR. VANZANT:  May I ask what else the government

2    argued that I should address, your Honor?

3         THE COURT:  You have to pay attention.  You can

4    look at the transcript when you get a chance.  Go ahead, make

5    your argument.

6         (Brief pause.)

7         MR. VANZANT:  What I recall of the government's

8    argument and looking at their motion is those are the things

9    that are alleged as a basis for revocation or whatever you're

10   going to call it, reopening, et cetera.  Those are not

11   enough.

12        Under any reasonable reading of the Bail Reform Act

13   to say that someone can be taken into custody because of

14   their mental health and because of historical allegations

15   that have not been repeated and violations of bail bond that

16   have not been repeated in two years, so wrapping it up, it

17   is -- it is utterly unbelievable to me that the answer is

18   putting Mr. Storme in custody as opposed to mental health.

19   That -- and I cannot get over that.

20        And the fact that we're even here arguing whether

21   or not he should -- that he should go back to MCC tonight,

22   that is, I'm sorry, ridiculous and that's why I cannot

23   continue this.  That's why I ran up to the Seventh Circuit to

24   deal with this.

25        I have been working on this for five days straight

1  because it is that important and I have heard nothing here.

2  I understand the Court may think differently.  I've heard

3  nothing here that would justify detaining him now based on

4  his current conduct and that's what matters according to *U.S.*

5  *versus Higgs*.

6  Obviously if the Court has any other questions, I'm

7  happy to answer them.

8  THE COURT:  Government need to respond to anything?

9  MS. CHUNG:  Very briefly, your Honor.  I think the

10 language -- the plain language of 3148 is actually quite

11 expansive in terms of referring to any other violations of

12 conditions of release without reference to timing or whether

13 a violation has been addressed in some manner previously on

14 the docket.

15 Also, defense counsel noted repeatedly that the

16 Seventh Circuit order cited to *Higgs*.  The Seventh Circuit's

17 order also specifically referenced permitting the government

18 to submit a motion to revoke and cited to 3148(b) in that

19 context.

20 With respect to -- very briefly, I think defense

21 counsel at one point referenced the standards, the burden of

22 proof with respect to nonappearance versus safety of others

23 in the community and switched them.  It's -- I just wanted to

24 check that it was clear on that and the government --

25 THE COURT:  I caught that as well and that's just

254

1       an honest mistake.  No worries but thank you for clarifying.

2               MS. CHUNG:  Yes.  I just wanted to note that the

3       government believes we have met a burden by a preponderance

4       which we think is the applicable standard as to

5       nonappearance.

6               And I'll also just note for the record in the

7       discussion around -- surrounding the -- how suicide can also

8       be a risk or a danger to others as well as to the defendant

9       himself, I'd also just note that the U.S. Marshal's report

10      that was submitted into evidence also noted that while the

11      defendant was in the Marshal's custody, he asked them to harm

12      him as well.

13              THE COURT:  Okay.  Anything else, counsel?

14              MR. VANZANT:  One last point, your Honor.  I missed

15      this in my argument but I think it's important to make a

16      record.  I am -- I am concerned about the burdens in this

17      case because this entire day it has felt like the Court is

18      putting it on the defense to justify why Mr. Storme should

19      not be in custody.  That is not the standard.  Under any --

20              THE COURT:  That is not the standard the Court has

21      employed at all.  I've simply given you an opportunity to

22      present whatever evidence you had and I put the burden on the

23      government and presented evidence so that's a ridiculous

24      characterization of this -- of the record regardless of how

25      you feel about it.  That's not accurate.  I haven't put any

1  burden on you whatsoever.  I've given you an opportunity to

2  be heard because that was one of your complaints on appeal.

3         MR. VANZANT:  May I finish making my record, your

4  Honor?

5         THE COURT:  Go ahead.

6         MR. VANZANT:  I understand that the Court has said

7  that it won't take that into account.  Based on what

8  the Court has said several times --

9         THE COURT:  Won't take what into account?

10        MR. VANZANT:  That the defense did not produce

11  evidence.

12        THE COURT:  It did produce evidence.  He testified

13  and you had the opportunity to produce evidence.  You didn't

14  have to but you did.  That happens at detention hearings all

15  the time.

16        MR. VANZANT:  May I finish making my record, your

17  Honor?

18        THE COURT:  All right.  Well, you made a reference.

19  I didn't know what you were referring to.  You said I said

20  that I wouldn't take what into account?  I wouldn't take his

21  Fifth Amendment assertion into account.  Of course not.  Is

22  there something else that you're saying I would not take into

23  account?

24        MR. VANZANT:  What I'm attempting to make a record

25  about and obviously the transcript will show what's actually

1    occurred so if I'm wrong, I'm wrong.

2    More than a few times today, the Court has pressed

3    me on why I'm not presenting evidence and why I'm not

4    bringing something in and why I'm not presenting a particular

5    statute to the Court so the feeling that I am getting --

6    THE COURT: Wait a minute. All right. Legal

7    arguments, you're making legal arguments and me asking for it

8    is not a burden shifting. It's me asking you to develop a

9    legal argument you're presenting. For you to make an

10   argument and not give me authority, that's got nothing to do

11   with burden shifting at all. And me offering you the

12   opportunity to be heard, which was the complaint on appeal,

13   is not burden shifting either.

14   MR. VANZANT: May I finish making my record, your

15   Honor?

16   THE COURT: Go ahead.

17   MR. VANZANT: It is my feeling and my concern that

18   the Court is putting everything on the defense here to show

19   that Mr. Storme should not be detained. And I want to

20   emphasize over and over -- and I know the Court agrees with

21   this -- that is not the standard. Liberty is the

22   presumption. So if this is a de novo detention hearing,

23   which I don't think it should be, that -- we still start from

24   the presumption he should be released.

25   So all of this discussion about why he should not

1   be released or putting the onus on us to present arguments on

2   why he should not be detained --

3           THE COURT:  I haven't put onus on you to present

4   arguments.  I've simply -- when you present arguments, I've

5   asked you for your authority and you haven't given them to me

6   or you have depending on the particular issue.  Me asking you

7   what your argument is is not burden shifting at all.

8           MR. VANZANT:  May I finish making my record, your

9   Honor?

10          THE COURT:  Go ahead.  I'm just clarifying the

11  record as we go because you're misstating things.  Go ahead.

12          MR. VANZANT:  I am doing my best, your Honor.

13          THE COURT:  Go ahead.

14          MR. VANZANT:  I am concerned that Mr. Storme is not

15  getting a fair shake here and I want to explain exactly why.

16          From the beginning since the Court took Mr. Storme

17  into custody without notice without a hearing, it has felt

18  like the Court has already made its decision.  I've gotten

19  that feeling all today.  I -- I'm sure the transcript will

20  reflect this that I have been relentlessly interrupted and

21  grilled and the government has been given a pass.  It is not

22  our burden to show the Court why Mr. Storme should not be

23  detained and I want to make that abundantly clear as part of

24  my argument and as part of the record.

25          So unless the Court has any other questions, we're

1    asking that Mr. Storme be released immediately.

2              THE COURT:  I interrupt people to clarify the
3    record when, for example, someone misstates the record or
4    states something that is a mischaracterization of something I
5    saw -- said or requires clarification.  I interrupt both
6    sides.  And it doesn't usually happen evenly because the
7    arguments are usually differently.  And when you're making
8    arguments and the ones you've had -- including, for example,
9    the plain language argument on 3148 where you have no
10   authority -- me pressing you is not surprising and it doesn't
11   show any bias on my part or any predisposition on the outcome
12   of the case.

13             So the fact that you feel that -- whatever your
14   feelings are, they're not accurate.  And I'm telling the
15   Appellate Court right now -- and they can read this -- I have
16   an open mind on this.  In fact, I'm the only one who has
17   suggested that we should have additional evidence and more
18   time to consider a bunch of things that I think are important
19   so there's not a prejudgment of it and not a rush to judgment
20   of it.  So if you have those feelings, those feelings are not
21   accurate.

22             All right.  The Court is going to take the motion
23   under advisement but I'm still making the ruling today so
24   don't go anywhere.  Laura is going to take a break and I'm
25   going to get my notes together and I'll make factual findings

1    today and legal rulings today because I have to and then I'm

2    going to reserve the right to follow up with additional

3    written orders as needed.  Okay.

4              All right.  Court is in a short recess.

5         (Recess taken.)

6              THE COURT:  All right.  The parties can have a seat

7    if you want.  It's going to take a little bit.  All parties

8    are present.  Defendant is present.

9              First of all, I will incorporate by reference some

10   of my opening remarks.

11        (Brief pause.)

12             THE COURT:  I'll incorporate my opening remarks

13   regarding the Court's inherent authority and the statutory

14   authority both on the issue of 3148 revocation of bond and

15   also reconsideration of the prior denial to detain the

16   defendant based on the entire record, including more recent

17   factual issues.

18             I'm just going to add a couple of things in terms

19   of my opening remarks.  Obviously everything I said in the

20   hearing -- because at different points I made legal

21   propositions as part of the Q and A and going back and forth

22   with the parties so unfortunately for the poor Seventh

23   Circuit, they're going to have to -- and hopefully, and I

24   know they will because they're great -- will read the entire

25   record.

1      I will repeat, as I indicated before, the Court has

2  not prejudged the issue detaining a defendant pending a --

3  based on a factual predicate and having it subject to

4  additional hearing.  That's -- there's nothing strange or

5  unusual about that and the Court has not prejudged the issue.

6  The Court also hasn't burden shifted or otherwise violated

7  defendant's Fifth Amendment right in any way.

8      My questions to counsel had to do with legal

9  arguments that he was making, some of which did not appear

10  from the language of the statutes he was citing and I was

11  asking for additional authority and clarifying what his

12  proposition was.

13      And then in terms of the factual issues, I was

14  asking what both parties what they dispute or don't dispute,

15  not to shift the burden in any way, but just to figure out

16  what's disputed because I needed to figure out what the

17  disputes were so that I could make factual findings based on

18  the evidence.  There's no sense in which we should have a

19  bunch of facts about stuff that's not disputed if it's

20  something the Court has already read and considered and that

21  we should have the live testimony about stuff that the

22  parties think needs context or they believe -- or there's a

23  direct conflict that one person says it happened, the other

24  person doesn't.  That's the thing I was trying to do, so.

25      I know counsel is tired.  Both sides are tired.

1    That's just the function of the way that this case presented

2    itself in light of the procedure, which was not the fault of

3    the Court.  And as I indicated multiple times, the Court has

4    given both sides an opportunity to make a complete, factual,

5    and legal record and was fully prepared to continue this over

6    to tomorrow and the next day, whenever.  I was happy to move

7    my jury trial to facilitate what the Seventh Circuit has

8    asked me to do, what the parties need, and this very

9    important issue in this case which is just as important as

10   any other issue or any other case on my docket.

11           A couple of things to add to those initial

12   comments, though.  The Court may temporarily detain a

13   defendant in order to permit a revocation of conditional

14   release.  The Court has inherent authority to reconsider his

15   prior rulings in the same case whether made by him or a

16   previous judge.  That's in a bunch of cases.  One of them is

17   *Santamarina versus Sears*, 466 F.3d 570, Seventh Circuit case,

18   2006.  It also includes the inherent authority to consider a

19   previous detention hearing.  There's some district court

20   opinions to that effect and those are correctly decided.  The

21   *Hudson* case, which is 2004 Westlaw 2032119.  The *Maxwell*

22   case, which is 510 F.Supp. 3 -- excuse me, F.Supp. 3d 165,

23   Southern District of New York case.

24           Under 3142, the Court may consider risk of suicide

25   in determining whether the defendant is a risk of flight or,

1  more specifically, whether defendant is a risk of

2  nonappearance.  There are cases cited by the government.  I

3  believe they're correctly decided.  The cases also include

4  *United States versus Metz,* which is a Sixth Circuit case from

5  2007, 2012 Westlaw 3 -- excuse me, Westlaw 6632501.  *Tug*

6  *Raven,* which is 914 F.2d 536.  It's a Fourth Circuit case.

7  And I'm incorporating by reference the government's citations

8  as well.

9        (Brief pause.)

10        THE COURT:  Let me see.  I'm going to -- okay.  So

11  let me get to the more specifics of it.  The Court is going

12  to go through the analysis first under 3148 which is the

13  violation of bond and then it's going to address the

14  reconsideration of the prior denial of detention secondly.

15        The Court has made factual findings and I've made

16  credibility determinations and I've drawn reasonable

17  inferences from the evidence.  A lot of the evidence isn't in

18  dispute in terms of what the facts are.  Some are and those

19  the Court tried as best as it could today to have the parties

20  outline where those issues are disputed and when they're not.

21  The Court relied for its factual findings today and I'll talk

22  to those as I go through the different legal propositions.  I

23  think that *Metz* case is not a Sixth Circuit case actually.

24  It's a Western District of New York case.

25        So I'm going to go through the -- a variety of

263

1    those factual findings; but from a ten-thousand-foot level,

2    the Court has made factual findings.  It includes the

3    exhibits that were admitted into evidence, most of which were

4    admitted without objection.  It includes the pleadings the

5    parties had filed by way of proffer, and that includes the

6    defense and the government.  It includes the Pretrial

7    Services' reports which were actually formally admitted but

8    it also includes the entire record in front of the Court.

9    And the exhibits also include the Arlington Heights police

10    report and the complaint affidavit in the case.  Obviously,

11    even though those are more historical, they're still relevant

12    and the Court needs to consider them when you're looking at

13    everything so the Court has looked at those things.  To the

14    degree I need to make credibility calls, I'll do that as I go

15    through the various factors and the issues.

16          For the purposes of 3148, defense has made an

17    argument that -- that somehow a violation of a condition of

18    release has to either be new or unresolved; and if it isn't,

19    there's some legal impediment to proceeding under 3148.  I

20    don't -- there's been no -- if that is true, there's been no

21    authority cited for that.  The plain language of the statute

22    does not say new violation, it does not say unresolved

23    violation, and to impose either a use it -- use it or lose it

24    rule on the government would lead to absurd results where the

25    government would be forced to err on the side of revocation

1    when the prudent course might be to wait and see or to try a

2    modification and see how it goes before taking a violation

3    and then doing something about it.

4              And while violations might get old when a case

5    pends a long time -- and certainly that's the case in

6    post-COVID area -- that doesn't mean that the Court needs to

7    look at facts in isolation and only look at the most recent

8    facts.  The Court has to look at all of the facts because

9    even minor things that happen later are in a different light

10   when you look at the entire factual record and old facts have

11   new significance with new facts and the Court has to look at

12   all the facts and the statute contemplates that.  And the

13   prospect of having ancient release conditions resurrected

14   without cause, there's no danger -- first of all, that's --

15   there's no legal issue with that in terms of the statute or

16   any case law that's been presented to me, but there's also --

17   that's not even a realistic result because if the Court

18   doesn't have -- if the Court is simply presented with a

19   factual record where the individual was terrible at the

20   beginning of bond and then did great afterwards and there

21   were no other events, first of all, the Court would not

22   resurrect something.  The Court would not consider as a

23   predicate for looking at either a reconsideration or

24   violation under 3148 in the absence of some cause to do so.

25   And if a court did that as defense counsel says is the great

1   fear which is -- which seems to be his basis for inserting

2   words like "new" or "unresolved" into the statute against its

3   plain language, that would simply be resolved by the

4   Appellate Court in determining that the Court made a factual

5   error about whether or not the defendant actually or

6   the -- should be detained because the government carried its

7   burden under 3148 or as related considerations under 3142.

8         The Court had authority to detain a person pending

9   revocation and I've already indicated what happened on August

10  3rd.  I've always -- I've already indicated -- and I'm not

11  going to repeat all that from the beginning but I am going

12  to implore the Seventh Circuit to look at my remarks from the

13  beginning.  It was clear from this Court's view that the

14  temporary detention was appropriate.  The Court has the

15  authority to issue a warrant.  It also has the authority to

16  remand somebody in court pending what, a hearing, with

17  notice.  And when the Court issues, for example, a no bond

18  *ex parte* arrest warrant, you don't get notice of that because

19  it's not safe.  And when the Marshals execute the warrant,

20  they don't call up the defendant and say, oh, by the way,

21  we're going to come arrest you with a warrant, it's not safe.

22  It wasn't safe in this instance.  In fact, the Court

23  suggested the issuance of an arrest warrant to the Marshals

24  and was told that the threat assessment indicated that that

25  wouldn't be safe, that it could relate into a potential

1    barricade issue and a bunch of other issues and that the

2    safest plan based on the professional threat assessment of

3    how to temporarily detain the defendant, the best way was to

4    do so in court in a way that could preserve the safety of

5    everyone in the proceeding, including the defendant and his

6    dog, and that's what the Court did.

7            The Court's minute order of the 3rd was clear that

8    it was not the final order.  There was going to be additional

9    proceedings.  In fact, I set a hearing prior to receipt of

10   anything from the Seventh Circuit and my understanding was

11   that that was a by agreement date.  There might have been

12   some miscommunication on that and -- but clearly there was no

13   request for anything earlier than the date we set.  The Court

14   would have given a date earlier and as you can tell, the

15   Court would have done that because that's exactly what the

16   Court did because we had a hearing today and I moved a jury

17   trial to accommodate this issue, certainly consistent with

18   the Seventh Circuit's order but I would have done that upon

19   request either.

20           The Court did not issue a date for detention

21   hearing on the date of August 3rd.  It was the close of

22   business.  The officers needed to get the defendant out of

23   there because of the building closing.  Also, the parties had

24   no idea about the more recent issues and that would have been

25   relevant to the nature and extent of the proceeding.  And we

1   can tell from the record today that the complexity of the

2   case might have -- would have been great if the parties had

3   an opportunity to meet and confer with Pretrial before

4   setting that, which is what the Court contemplated.

5       The Court was not in session on the 4th.  The Court

6   was in the hospital getting a CT scan.  And then earlier on

7   Monday, I set it for a hearing and then the additional orders

8   proceeded.  It was always the Court's intention to have

9   notice and hearing.  The remand of the defendant was

10  temporary.  If it's not clear from the record, it should be

11  clear now.  Hopefully, it is.  All I can tell you is the

12  truth and people can characterize it all they want.  The

13  Court has that authority to do that.

14      The Court has authority under 3148 to make

15  determination here.  The defendant has been released under

16  3142 of the title, which is part of 3148, Section A, and

17  there's a factual predicate that he may have violated a

18  condition of his release and he was -- could be subject to a

19  revocation of a release and order of detention or even a

20  prosecution for contempt of court.  The predicate under A is

21  there.  Now whether the government carries its burden on that

22  is another matter which is why you have a full hearing with

23  the parties having full possession of all the information --

24  not just the historical information, but the more recent

25  stuff -- the ability to meet and confer on disputes,

268

1   potentially find experts.  In fact, I was considering having

2   an evaluation, maybe a medical expert, as part of the

3   proceeding but that -- because of the way the case was

4   presented to the trial court, the Court did not get that

5   opportunity.

6           The defense concedes that a motion by the

7   government for revocation of bond is not required.  The Court

8   can do it on its own accord.  The Court could do it on its

9   own accord because of the statute and because of its inherent

10  authority.  I talked about that at the beginning of the

11  proceeding.  And to the degree the Court needs to supplement

12  its oral findings today, which will be the Court's findings

13  for the purposes of the Seventh Circuit's directive, the

14  transcript is my findings but I'm going to reserve based on

15  the hour -- the building is going to close in three minutes.

16  I'm going to reserve the right to supplement additional

17  factual or legal findings if -- to the degree I'm able to do

18  so.

19          The judicial officer under Section 3148 shall enter

20  an order of revocation in detention if, after hearing, the

21  judicial officer -- okay.  We had the hearing.  We had

22  notice.  And as I indicated, the parties were given an

23  opportunity for additional days of hearing or more time to

24  prepare, either legally or factually.  No one took me up on

25  it.  So this is our hearing.  And the Court shall enter an

269

1   order of revocation in detention if, after the hearing, the

2   judicial officer finds that there is either, A, probable

3   cause to believe the person has committed a federal, state,

4   or local crime while on release; or, B, clear and convincing

5   evidence the person has violated any other conditions of

6   release.  Those are essentially the two-prong predicate.  You

7   have different standards.  Probable cause is the first and

8   clear and convincing evidence is the second.  And if the

9   Court makes that initial findings, then it needs to consider

10  2 because 1 and 2 under Section B of 3148 are connected with

11  an "and."  The Court would then go into the 3142(g) factors

12  of the title and consider the more traditional standard

13  regarding whether there's any condition or combination of

14  conditions of release that will assure the person would not

15  flee or pose a danger to the safety of other persons or the

16  community.  That includes a consideration of the entire

17  record, not just isolated events, not just the events of the

18  last few days or weeks, but the entire record, including the

19  things that happened recently.

20       And B, this is 3148(b)(2)(B), a person is unlikely

21  to abide by any condition or combinations of conditions.

22  Certainly there's a predicate here to proceed under

23  (b)(1)(A).  The Court makes a factual finding that there is

24  probable cause to believe that a person -- the person has

25  committed a federal, state, or local crime while on release.

1      The evidence of the Arlington Heights incident

2  involved a series of events.  And while the Felony Review

3  Unit of the State's Attorney's Office declined to prosecute

4  it, that's because they have a different standard.  They have

5  to look at it and view it of whether or not they'll be able

6  to prove a case beyond a reasonable doubt.  That's not the

7  Court's standard.  The Court's standard is probable cause.

8  The officers from the Arlington Heights Police Department had

9  probable cause to arrest defendants.  That's exactly what

10  they did and then they presented the case for felony

11  consideration to the State's Attorney's Office.

12      The information provided to them was -- abundantly

13  established probable cause under *Gayton*, et cetera.  There

14  was a named citizen complainant who wanted to press charges

15  who gave information; and I'm incorporating by reference the

16  exhibit that was admitted into evidence and I'm going to

17  invite the Seventh Circuit to take a look at the detailed

18  information that went in there.  That's certainly probable

19  cause to believe the defendant committed a federal, state, or

20  local crime while on release.  Is it proof beyond a

21  reasonable doubt?  I -- you would need to know more than

22  what's presented in the record in front of me.  Probable

23  cause is not proof beyond reasonable doubt but it is --

24  certainly probable cause is here.  The arrest was lawful.  No

25  one is even accusing that arrest of being unlawful because

1    there was.  And it's probable cause for a series of felonies,

2    including other felonies and misdemeanors because Section

3    (b)(1)(A) is probable cause to commit a crime and that's not

4    limited to felonies.  There were felonies -- a series of

5    felonies, including stalking.  There were other more minor

6    violations as well some of which are not even disputed at

7    all, including running red lights and reckless driving, a

8    variety of different things.

9          The allegations there also include allegations that

10   abused steroids during his time of release.  At least it's

11   possible.  The timing is not clear.  That's not a major

12   factor for the Court.  I'm not putting a lot of weight on

13   that but it's a factor that's in there.  Also, that he

14   previously threatened to beat up Reese's ex-boyfriend.

15   Again, that's a minor comment.  There's -- it appears to be

16   credible based on the record in front of me but it's not

17   detailed.  So in the absence of detail, I'm not placing much

18   weight at all on that.  I'm simply noting it as part of the

19   totality of the circumstances.

20         There's also clear and convincing evidence the

21   defendant has violated other conditions of release.  In fact,

22   there's no dispute in the record that he violated curfew and

23   EM violations, among others.  So the fact that there's that

24   predicate to allow the Court to go into the more detailed

25   findings under (b)(2)(A), the record is more than

1    satisfactory or sufficient.

2           The Court is also making credibility
3    determinations.  The Court had an opportunity to review the
4    demeanor of the witnesses, the three witnesses who testified.
5    The Court finds that the case agent testified credibly, finds
6    that the Pretrial Services' officer testified credibly.  Some
7    of the defendant's testimony was credible, other portions
8    were not, and the Court is finding that some of his testimony
9    was incredible.

10          I'm going to repeat for the sake of clarity.  The
11   Court did not take any adverse inference at all regarding the
12   defendant's assertion of Fifth Amendment, which he's totally
13   able to do that, and that's why I gave him an opportunity to
14   do that and sustained the objection.

15          So the Court needs to look at the 3142(g) factors
16   about both flight and danger to the community and that's the
17   entire record; not just isolated events.  And harm is not
18   just harm in terms of violence but in terms of harm which
19   includes more than violence and the Court has looked at all
20   of those possible things.

21          The Court has also looked at more recent
22   information that cast the more historical information in a
23   different light.  The withdrawal of the defendant's attorney
24   upset the defendant.  The third-party custodian is no longer
25   a check on his behavior because she's out of the district

1    through no fault of anyone but it's part of the record.

2    There's been adverse rulings by Judge Lee that upped the

3    ante.  There's been arguments on -- from this Court and the

4    defendant was very keen to figure out whether or not that was

5    going to go his way and he was present.  In fact, essentially

6    surveilled the Court for a period of six months so that he

7    would be able to try to gauge what was happening.

8         The more recent events also include not just

9    additional suicide threats but an escalation of behavior,

10   which included making arrangements in terms of his assets;

11   and the Court does not credit his testimony that that had

12   nothing to do with him preparing for the hearing.  The Court

13   is making the factual finding that that was incredible

14   testimony.  So based on the factual record in front of me, I

15   think the inferences that the medical professionals took and

16   the Pretrial Services' officer took, those are shared by the

17   Court that there was an escalation of plans and he was

18   preparing for something desperate.

19        He had done suicide previously and he had

20   threatened it again more recently; but as the case

21   progressed, the stakes also progressed.  So the fact that he

22   had periods of compliance does not alter the Court's result

23   because the Court has to look at everything and the more

24   recent plans and the series of threats, they transcend just

25   suicidal ideation.

1    The defendant was getting ready to do something

2    desperate, did not want to go up to prison like many

3    defendants, and he posed a risk to himself, to others.

4    Obviously, the risk to others is critical.  The notion of

5    whether or not a person is a risk to the community is more

6    generalized.  And whether a defendant -- certainly a statute

7    doesn't contemplate whether a defendant is a risk to himself

8    for the purposes of danger.  But the notion that his suicide

9    "well, Judge, we can just assess it and we can of course

10   predict that the suicide is going to be safe for everyone

11   involved," that's not what's presented in the record.  What's

12   presented in the record is the defendant who was taken

13   drastic action in the past who has had difficulty with

14   adverse decisions -- and you can see from some of his

15   character when he stalks ex-girlfriends and surveils this

16   Court in preparation of whether or not he's going to like the

17   decision I'm going to make -- there's an issue of whether or

18   not he's going to be safe to others.  That's not the key

19   determination for the Court but it's part of the total

20   record.  So I'm noting it because it's part of the Court's

21   totality of circumstance analysis.  I believe there is

22   evidence of threat to others and more generalized to the

23   community.

24   To the degree the defendant threatens himself, I do

25   find that that does constitute a potential of the defendant

1    not appearing in court as directed.  The government has cited

2    several cases and I've cited a couple extra.  I believe those

3    cases are rightly decided.  I think the logic of it is

4    compelling that if a defendant terminates his own life, he

5    will not be able to appear as ordered.  And the purpose of

6    appearing is not just so you can show up and raise your hand

7    and say you're here.  It's so that the proceeding can run its

8    course, that the rule of law can be applied and that a person

9    will subject themselves to the application of the rule of

10   law, whether that's an acquittal or a conviction or whatever.

11   And it means showing up on time and it means allowing the

12   proceeding to run.  And if a person kills themselves, then

13   they are not -- that does not -- there's -- it presents an

14   issue that they're not going to appear as ordered because

15   they're deceased.  So in that sense, it is a form of flight.

16          So when the statute -- there's different portions

17   of the statute.  Sometimes it says flight; sometimes it says

18   appear as directed.  Certainly it's appear as directed.  I

19   mean, a dead person doesn't appear but it's also a form of

20   flight based on a reasonable and logical meaning of the

21   statute.  Cases to the contrary were not convincing that the

22   Court looked at.

23          The Court has also looked at -- and I'm going to be

24   incorporating some of this when I talk about the

25   reconsideration of the prior denial, but now I'm looking at

1    3142 as part of the revocation of -- under 3148.  The Court

2    has to look at everything.  Part of that under the 3142 as

3    incorporated under the second section of 3148 includes a

4    variety of things.  The weight against -- of the evidence

5    against the defendant is part of the analysis.  The Court

6    also is taking into consideration the presumption of

7    innocence.  The Court has to do both things.

8         The defendant is presumed innocent of the charges,

9    both in the initial indictment and the superseding

10   indictment.  The affidavit in support of that has a bunch of

11   facts in it.  Those were presented and the -- they were

12   verified by an agent who testified credibly.  That's not

13   proof that the defendant is guilty but it's a relevant

14   consideration that the defendant, as part of the totality of

15   the circumstances, there's a factual basis to believe he

16   engaged in cyberstalking in violation of 18 U.S.C.

17   2261(a)(2), and others; and that's part of the record.

18        The defendant has current and active history of

19   mental illness and instability and that prevents a person

20   from complying from -- with court orders.  Now there have

21   been periods where the defendant has complied with Court

22   orders and there have been periods when he hasn't.  There was

23   a long period of time in '21 and earlier where a series of --

24   he basically ignored curfew and electronic monitoring.

25   That's a violation of the conditions of release.  It's also a

1    factor about whether or not a defendant is going to abide by

2    the Court's orders.  There's international travel.  There's

3    residency abroad.  Maybe the defendant decides not to kill

4    himself but maybe -- but he decides, and it's clear from his

5    testimony, that he has a great fear of custody and that's a

6    reasonable fear.  Most defendants do that.  The question is,

7    is that fear sufficient that it will overcome the defendant

8    and he will not abide by the Court's orders on release and

9    attend proceedings to their conclusion.  Sometimes defendants

10   do that; sometimes they don't.  The Court has to look at all

11   of the things and try to make a prediction about whether or

12   not he can and in that regard it's the government's burden of

13   establishing by the appropriate standard either flight or

14   risk so the Court is looking at everything and I'm trying to

15   mention everything as best I can given our time crunch.

16           There was international travel.  There was prior

17   residency abroad.  There were lack of ties to the district.

18   There was the loss of the third-party custodian.  There's

19   also, as I indicated, from 2020 to 2021 over 30 violations of

20   curfew and location.  There was the stalking incident, which

21   I've already mentioned in February of '21.  That was a very

22   serious violation.  And it also needs to be looked at in

23   context not only of the defendant's course of conduct

24   throughout the entire pretrial release but also in terms of

25   his prior conduct which is at least evidenced in part by the

1    underlying criminal case.  It's a very similar position and
2    he was arrested for the violation and then had a superseding
3    indictment.  Again, another change in circumstance.
4    Additional charges, more serious charges, additional victims,
5    and the fact that he would engage -- that there's probable
6    cause to believe at a minimum probable cause, if not more,
7    that he engaged in stalking in addition to other series of
8    criminal offenses albeit in February of '21 is extremely
9    troubling.

10               I commend the court and the government for giving
11   the defendant a chance at that point but the court needs to
12   look at it under the lens of everything that we know today;
13   not at that moment.  And certainly they gave him a chance to
14   modify the conditions at that time but that's before things
15   have escalated and the additional factors that I'm talking
16   about today.

17               It also include adverse rulings in the case.  Judge
18   Lee entered various rulings that were not advantageous to the
19   defendant.  They brought him closer to custody and the
20   farther the case progresses, the more dangerous and more
21   prevalent that the defendant's fear would be.  And as I
22   indicated, even old facts can gain new significance and the
23   Court has the power to look at the whole record.

24               The recent plans and not just the suicidal threats
25   and not just the mental illness, but additional -- the

1    initial suicide attempt and the recent one.  Defendant's

2    suicide attempt on August 3rd.  That's also another

3    indication that those threats were not idle threats, that he,

4    in fact, was not intending to appear as ordered and would

5    rather kill himself depending on how he thought the case

6    would go or otherwise take desperate action.  Certainly he

7    was making preparations, financially and otherwise, to

8    prepare for him to take desperate action.

9            I'm also incorporating by reference the factors I

10   noted in my order of Docket Entry 151.  I've already noted

11   that flight includes suicide or, at a minimum, inability to

12   appear or the issue of nonappearance as ordered.  The safety

13   prong, the statute says "others" and "community."  I'm not

14   reading community to mean the defendant but certainly it has

15   to mean something other than just "others" because otherwise

16   the statute would say others and others and that's a nonsense

17   reading.  And I think it talks about the more generalized

18   goal of public safety and well-being of everyone.  I suppose

19   technically that includes the defendant.  But I think what

20   the statute is getting at there based on my reading of it, a

21   plain language of it is that the defendant is going to

22   conduct himself in a manner that does not present issues with

23   public safety.  Killing yourself can, depending on the

24   method, do exactly that so that's part of the Court's

25   analysis.

1    The Court has given defendant notice.  He was given

2    an opportunity to be heard.  The hearing has now occurred and

3    that's I believe what the Court has done.  So based on both

4    its inherent powers and its statutory powers and consistent

5    with the Seventh Circuit's directives which I always follow

6    to the letter of the law, based upon the government's motion,

7    the Pretrial request and based on the Court's sua sponte

8    powers and incorporating by reference my findings of fact and

9    subject to additional findings of fact by written order in

10   light of our timing today and the Court's credibility

11   determinations based on live testimony and the reasonable

12   inferences from it, I'm going to rule both in the alternative

13   both first under 3548 which incorporates 3142 -- and I

14   believe that there is a factual predicate for the 3148 -- I

15   reject the defendant's legal argument that there's a time bar

16   use-it-or-lose-it rule imposed upon the government that there

17   is some unsettled or finality of an initial determination or

18   agreement of the parties or how ever it comes about on

19   initial violation.  And if additional facts cast those same

20   facts in a different light, then the Court has the inherent

21   authority and the statutory authority -- and again, I talked

22   about all that at length at the beginning of the hearing --

23   to revisit and to consider either revocation of release or in

24   the alternative -- and I am ruling in the alternative under

25   3142 to reconsider the prior denial of the government's

1    motion to detain -- both of those would be based on a

2    totality of the circumstances.

3           The Court's findings based both on safety and

4    assuring the defendant's appearance, the Court has considered

5    as part of that process certainly all of the factors in 3148.

6    In the interest of time, which I've already probably gone

7    over, I'm going to indicate that I find the -- make the

8    predicate findings as to probable cause to believe he has

9    committed a federal, state, and local crime while on release.

10   I'm making the factual finding there's clear and convincing

11   evidence he violated conditions of release.  And then based

12   on the factors in 3142, I do not believe there's any

13   condition or combinations of conditions of release that would

14   assure the person would not flee or pose a danger of safety

15   to any other person or the community and/or the defendant is

16   unlikely to abide by any conditions or combinations

17   conditions.  I hope I've discussed the facts sufficiently.

18   I'm incorporating again by reference my prior conversations

19   and the exhibits that have been admitted into evidence as

20   part of the factual -- Court's factual basis.

21          In terms of 3142, the Court has the power to

22   reconsider non-final orders and that is both inherent in its

23   authority and it's based on the statute; and I've quoted that

24   here today including, but not limited to, "the hearing may be

25   reopened before or after a determination by the judicial

1   officer at any time before trial if the judicial officer
2   finds that information exists that was not known to the
3   movant at the time of the hearing and that has a material
4   bearing on the issue." I believe there's a lot of factors
5   the Court needed to look at and the more recent events, I
6   think, are very material whether the defendant is preparing
7   for something desperate, either flight or danger to himself
8   by way of suicide, actual suicide attempts, threats of
9   suicide attempts, preparation for desperate action, the more
10  recent escalation of the case itself, switching of the
11  attorneys -- which I don't know why that upset the defendant,
12  it did -- and the adverse rulings, and then the perception of
13  an adverse ruling after essentially surveilling the Court for
14  six months to figure out whether or not he would do something
15  like that. There certainly was a basis to initially detain,
16  as I did, pending further hearing and now we've had the
17  further hearing so that's all part of the Court's finding.

18          I've considered the nature and circumstances of the
19  offense charged. I've considered the weight of the evidence
20  against the defendant. I've considered the history and
21  characteristics of the defendant; and I've done so not just
22  in isolation but a totality of the circumstances, including
23  up to the more recent events. I have not, as counsel
24  suggested, simply incarcerated someone based on mental
25  illness. That is an unfair and inaccurate characterization

1   of the record so I'm making that finding.

2   The person's mental condition, his prior conduct,

3   his pattern of conduct because one of the things the Court

4   can look at is his character and he has, as part of his

5   character, it appears, a pattern of behavior when he

6   encounters adverse decisions -- whether it's a girlfriend or

7   the Court -- and engages in unlawful activity.

8   I have considered his community ties.  I've

9   considered his failures to abide by previous court orders

10  including not committing an offense and not abiding by order

11  of release or the more stringent conditions which did not at

12  least initially take care of the defendant.  And then of

13  course after that initial time, there was a short period of

14  good behavior but that of course has changed now too.  The

15  defendant is in a different position and by way of the

16  proceeding, the suicidal ideation has increased.  The

17  actual -- there's been another actual attempt even as of the

18  3rd.  There's been preparation for -- in terms of his assets,

19  et cetera.

20  I've also considered the nature and seriousness of

21  danger to any person or the community that would be posed by

22  the person's release.  And it says here "the nature and

23  seriousness of danger to any person."  It doesn't say

24  "others."  It doesn't say "others" or the "community."  It

25  says "a danger to any person or the community that would be

1   posed by the defendant's release," and that's in 3142(g)(4).

2   Certainly the defendant constitutes any person.

3           In the release order, I'm going to have to

4   incorporate by reference today so the Court needs to find --

5   the judicial officer needs to find a written statement of

6   all -- that sets forth all of the conditions to which the

7   release would be subject in a manner sufficiently clear and

8   specific to guide that person if he does a release order.  If

9   he doesn't and if there's a detention order, then the

10  detention order on Subsection E of this section "the judicial

11  officer shall include written findings of fact and written

12  statement of the reasons for the detention."  Today's

13  transcript is that.

14          I'm also reserving that -- because it's a written

15  statement of findings of fact and statement of reasons, I'm

16  reserving the right for the purposes of any appellate review

17  to supplement that because I can only talk so much before

18  they close the building and the defendant has to go back to

19  custody and my invitation for additional proceedings has been

20  rebuffed.

21          The defendant is going to be directed to the

22  custody of the Marshals and obviously he needs a reasonable

23  opportunity for private consultation with counsel.

24          I'm going to indicate that the Court did not

25  prejudge this.  The Court has not violated defendant's Fifth

1    Amendment right, has not undermined the defendant's

2    presumption of innocence; and despite the defendant's

3    insistence on precipitating a ruling based on the record

4    today only instead of allowing all of the parties including

5    the defense attorney to develop the record properly, the

6    Court is still wide open to a motion for reconsideration of

7    either its order revoking bond or its reconsideration of the

8    prior denial of the detention.  And if the parties want to

9    engage in that interactive process and have the defendant

10   evaluated and want to set a hearing with this Court based on

11   new information -- and there's actually a proposal by the

12   government or otherwise where the defendant can have a

13   different placement -- the Court not only encourages that, I

14   hope they explore that.  That would include not only the

15   potential evaluation at the behest of the defense but also

16   the government should, as part of its due diligence, consult

17   the State's Attorney's Office and see whether or not there's

18   another placement outside of the MCC.

19           But based on the record that's presented to me

20   today, the controlling law, the Court's inherent authority,

21   the government has carried its burden both as to the

22   revocation of bond for the reasons I've stated and for the

23   reconsideration of the prior denial of the previous motion to

24   detain the defendant.

25           All other dates and deadlines stand.  Time

1    previously excluded.  Court's in recess.

2          (Proceedings concluded at 5:58 p.m.)

3

4

5                    C E R T I F I C A T E

6          I hereby certify that the foregoing is a complete, true,

7    and accurate transcript of the proceedings had in the

8    above-entitled matter before the Honorable John Robert Blakey

9    at Chicago, Illinois, on August 9, 2023.

10

11

12   /s/*Laura LaCien*                  August 22, 2023
     Official Court Reporter                 DATE
13

14

15

16

17

18

19

20

21

22

23

24

25